# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORGE SALCEDO, *et al.*,<br><br>Defendant. | Crim. No. 19-cr-10081-IT-MPK<br><br>**LEAVE TO FILE GRANTED**<br>**January 16, 2020** |

## MEMORANDUM OF DEFENDANT JORGE SALCEDO IN SUPPORT OF HIS MOTION FOR ISSUANCE OF PRE-TRIAL SUBPOENAS PURSUANT TO RULE 17(c)

Thomas C. Frongillo (BBO No. 180690)
Christina N. Lindberg (BBO No. 690443)
PIERCE BAINBRIDGE BECK PRICE & HECHT LLC
One Liberty Square, 13th Floor
Boston, MA 02109
Tel: (617) 313-07401
tfrongillo@piercebainbridge.com
clindberg@piercebainbridge.com

Susan G. Winkler (BBO No. 530682)
WINKLER LAW LLC
120 Holmes Street, Suite 313
Quincy, MA 02171
Tel: (617) 642-6671
winkler.susan@gmail.com

*Counsel for Defendant Jorge Salcedo*

DATE:  January 23, 2020

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS .....................................................................................................5

I.    UCLA'S STRATEGIC USE OF ITS STUDENT-ATHLETE ADMISSIONS PROCESS TO RAISE FUNDS FOR ITS ATHLETIC PROGRAMS ...........................................5

    A.    The Integral Role of Athletics at UCLA ...............................................5

    B.    The High Cost of UCLA's Athletic Programs and the Role of Fundraising ................5

    C.    UCLA's Admission of Applicants as Student-Athletes in Exchange for Large Donations from Their Wealthy Parents to Athletic Programs ...................6

    D.    Securing Academic Eligibility of UCLA Teams ...............................................7

II.    THE COMPLIANCE OFFICE'S REVIEW OF UCLA'S STUDENT-ATHLETE ADMISSIONS PRACTICES ...........................................8

    A.    Overview of the Investigation ...............................................8

    B.    Admission of Student 1 in Exchange for Her Parents' $100,000 Donation to the Track & Field Team ...............................................9

    C.    Admission of Student 2 in Exchange for Her Parents' Commitment to Donate $100,000 to the Water Polo Team ...................14

    D.    Admission of Men's Tennis Team "Walk-Ons" in Exchange for Their Parents' Substantial Donations to the Men's Tennis Program ...................19

    E.    Concealment of the Compliance Report for Five Years ...................20

    F.    UCLA's Continued Relationship with Mr. Singer After the Compliance Office Report ...................21

    G.    Additional Non-Athletes Apparently Admitted through the Student-Athlete Admissions Process ...................21

ARGUMENT ...................23

III.    THE SUBPOENAS PROPERLY REQUEST PRODUCTION OF SPECIFIC, ADMISSIBLE EVIDENCE THAT IS RELEVANT TO THE CHARGES AND NECESSARY FOR MR. SALCEDO TO PREPARE HIS DEFENSE ...................23

    A.    Applicable Legal Standard ...................23

    B.    The Requested Information Is Relevant, Specific, and Admissible to Support Mr. Salcedo's Defense Theory and Negate Elements of the Offenses ...................23

        1.    Evidence Supporting the Defense Theory ...................23

        2.    Evidence Negating Elements of the Crimes Charged ...................29

    C.    Mr. Salcedo Is Unable to Obtain the Documents Before Trial ...................31

CONCLUSION ...................33

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Skilling v. United States,*
    561 U.S. 358 (2010)............................................................................................................29

*United States v. Braunstein,*
    281 F.3d 982 (9th Cir. 2002)...........................................................................................31

*United States v. Carlo,*
    507 F.3d 799 (2d Cir. 2007)............................................................................................24

*United States v. Cassiere,*
    4 F.3d 1006 (1st Cir. 1993) .............................................................................................29

*United States v. George,*
    676 F.3d 249 (1st Cir. 2012) ...........................................................................................29

*United States v. Kravetz,*
    706 F.3d 47 (1st Cir. 2013) .............................................................................................23

*United States v. McLellan,*
    No. 16-CR-10094-LTS, 2018 WL 9439896 (D. Mass. Jan. 19, 2018) ..............................23

*United States v. Nixon,*
    418 U.S. 683 (1974).........................................................................................................23

*United States v. Pendergraft,*
    297 F.3d 1198 (11th Cir. 2002) .......................................................................................30

**Statutes**

18 U.S.C. § 1341 ...................................................................................................................29

18 U.S.C. § 1343..............................................................................................................24, 29

18 U.S.C. § 1346...................................................................................................................29

**Rules**

Fed. R. Crim. P. 17(c) ......................................................................................................4, 23

Fed. R. Evid. 401 ...........................................................................................................23, 28

Fed. R. Evid. 803(6) .......................................................................................................23, 28

## INTRODUCTION

The government accuses Jorge Salcedo, the former Head Coach of UCLA's Men's Soccer team, of participating in a *"Student-Athlete Recruitment Scam."* It alleges that Mr. Salcedo was paid to manipulate UCLA's student-athlete admissions process to ensure the admission of two applicants as members of the Men's and Women's Soccer teams. While both applicants were high school athletes, neither one was known as a soccer player. The government calls this a fraud scheme, labeling UCLA as the *victim*.

The charges reflect the government's fundamental misunderstanding of how UCLA has strategically used its student-athlete admissions process as a vehicle to raise funds to pay for its many expensive and underfunded athletic programs. UCLA's own internal documents reveal that, for many years, its Athletic Department has facilitated the admission of unqualified applicants—students who do not meet UCLA's rigorous academic or athletics standards—through the student-athlete admissions process in exchange for huge "donations" by the students' wealthy parents. These documents, which UCLA did not disclose to the government before this prosecution, tell a compelling behind-the-scenes story, one that undermines the Superseding Indictment's narrative by definitively proving that UCLA is not a *victim* of a fraud scheme.

Until this prosecution, UCLA has been able to keep its roster-spot-for-money admissions practice under wraps, hidden from the public. But the practice has been no secret at UCLA. Five years ago, UCLA's Compliance Office was forced to review the Athletic Department's admissions and fundraising tactics in response to a parent's complaint concerning the revocation of her daughter's admission. The Compliance Office investigation, spearheaded by the University's Compliance Director, resulted in a *"confidential"* report loaded with explosive facts that drive a stake through the heart of the government's charges.

1

The *"confidential"* report, coupled with a related letter from Michael Maynard, UCLA's former Director of Track & Field and Cross-Country, to UCLA Athletic Director Daniel Guerrero, expose rock-solid details of how the Athletic Department's chief fundraiser, Josh Rebholz, engineered the admission of the daughter of "major donors" through the student-athlete admissions process—even though she lacked requisite athletic skill. Director Maynard's comprehensive letter describes how Rebholz, an Associate Athletic Director of Development and member of Athletic Director Guerrero's management team, pressed him to ensure the student's admission. Rebholz knew nothing about the student's track and field background or ability. His main interest was obtaining a large donation from her parents in exchange for her admission. Director Maynard explained Rebholz's request to his direct supervisor, a Senior Associate Athletic Director, who did not object or discourage him from proceeding with the admissions process. Student 1 was admitted to UCLA in exchange for her affluent parents' $100,000 donation to UCLA Athletics, per a deal the parents struck with Rebholz.

The *"confidential"* report describes similar events surrounding the admission of another non-athlete as a member of the women's water polo team. Again, using its student-athlete admissions process, UCLA initially admitted the applicant as a "walk-on" or manager of the water polo team, a sport she had never played, with the expectation that her family would donate $100,000 to the water polo program. An admissions official's unanticipated reversal of the admission decision, however, triggered a revealing confrontation between the student's irate mother and UCLA. The complaining parent had retained William "Rick" Singer as a college admissions consultant, whom the government has portrayed as the mastermind of the college admissions cheating scandal. During interviews with compliance officials, the student's mother explained critical information about UCLA's admissions practices, as told to her by Mr. Singer. Mr. Singer said that UCLA would admit applicants as student-athletes in exchange for a $100,000 donation, which was a "common practice" of the Athletic Department. He also admitted that his company used some of the donation money to pay UCLA's

coaches.  This information was a veritable roadmap to what the government now calls the *"Student-Athlete Recruitment Scam."*

Finally, the *"confidential"* report reflects the Compliance Office's belief that the practices described by the angry parent had pervaded UCLA's men's tennis program for at least a decade.  The report confirmed that Mr. Singer had a 10-year relationship with UCLA's men's tennis coach and had steered applicants to the program during that time.  And the Compliance Office concluded that, based on its analysis of tennis rosters and donor lists for the 10-year period, many parents of "walk-ons" with "limited" tennis skill had made large donations to the men's tennis program.

Having uncovered a mountain of damning evidence, the Compliance Office concluded that UCLA's use of athletic team roster slots to raise funds violated Policy 2202 of UCLA's governing body, the University of California Board of Regents ("UC Regents").  Policy 2202, titled *"Policy Barring Development Considerations from Influencing Admission Decisions,"* prohibits admission decisions based on financial benefits to the University.  The Compliance Office, however, was careful to protect top-echelon members of the Athletic Department, while heaping all of the blame on the coaches' shoulders.  Notably, the chief fundraiser's name is not even mentioned in the report.

UCLA's response to the *"confidential"* report's scathing findings is telling.  Available evidence suggests that UCLA did not revoke the admission of the student on the track team or return her parents' $100,000 donation.  It did not report the matter to UC Regents or to law enforcement authorities.  It did not discipline members of the Athletic Department's executive management team, or even interview Rebholz, who had brokered the deal with the parents of the student admitted on the track team.  Rather, UCLA rewarded him with a hefty raise.  The University ironically restored the admission decision of the student whose parent had complained.  And, remarkably, UCLA continued conducting business with Mr. Singer, permitting him to use UCLA's facilities to give college admission counseling presentations on campus.

3

Other evidence suggests that top Athletic Department officials used their influence to secure admission of their own children to UCLA as recruited student-athletes, even though their children lacked the requisite athletic ability. Given UCLA's extraordinarily low tuition for in-state students, this presumably enabled Athletic Department members to pocket tens of thousands of dollars, representing the difference between UCLA's affordable tuition and the pricey tuition of comparable private colleges.

Evidence demonstrating UCLA's purposeful practice of admitting unqualified applicants as student-athletes in exchange for sizeable donations to athletic programs is central to Mr. Salcedo's defense theory. That evidence convincingly proves that UCLA was the *architect* and *orchestrator* of the alleged *"Student-Athlete Recruitment Scam,"* and is not the *victim* of the fraud crimes charged. The evidence further negates the centerpiece of the government's case and a vital element of the fraud offenses—the existence of a scheme to defraud UCLA.

To prepare his defense for trial, Mr. Salcedo has attempted to obtain the original evidence underlying UCLA's admissions and fundraising practices described in the Compliance Office report. The government says it does not have the evidence, and directed Mr. Salcedo to request it from UCLA. Mr. Salcedo served public records requests on both UCLA and UC Regents to no avail. Determined to prevent public disclosure of this blockbuster evidence, UCLA has stonewalled the defense, producing minimal documents and interposing a litany of objections. It has even tried to hide behind the government's "ongoing criminal investigation" as an excuse for non-production. Mr. Salcedo's liberty is at stake. UCLA's apparent public relations concerns provide no basis for withholding evidence. The evidence requested is specific, relevant, admissible, and exculpatory. Fed. R. Crim. P. 17(c) authorizes a defendant to obtain production of precisely this type of evidence to adequately prepare for trial. Mr. Salcedo respectfully asks the Court to allow his motion to issue pre-trial subpoenas to UCLA and UC Regents.

## STATEMENT OF FACTS

I. **UCLA'S STRATEGIC USE OF ITS STUDENT-ATHLETE ADMISSIONS PROCESS TO RAISE FUNDS FOR ITS ATHLETIC PROGRAMS**

A. **The Integral Role of Athletics at UCLA**

Athletics at UCLA is second to none. UCLA has one of the Nation's most decorated and star-studded legacies in collegiate athletics history. Amassing 119 national championships, UCLA athletics has produced scores of Olympic medal winners, hall of famers, and professional athletes in numerous sports.[1] Under current Athletic Director Guerrero, who took the post in 2002, UCLA has won 32 NCAA team championships in 15 sports. UCLA's athletics play a vital role for students, applicants, alumni and the University itself. They spawn school pride, heighten school profile, promote alumni loyalty, increase applications of qualified students, and produce tremendous revenue from TV contracts, media licenses, merchandise and ticket sales, and donations. For students, alumni, and fans—members of Bruins Nation—UCLA athletics are a religion.

B. **The High Cost of UCLA's Athletic Programs and the Role of Fundraising**

Many factors contribute to UCLA's ability to attract blue chip athletes, including its high national rankings, accomplished coaching staff, state-of-the art training facilities, and capacious stadiums and arenas. The athletic programs are inordinately expensive and include a host of non-revenue generating sports that operate in the red. For example, in 2020, Athletic Department expenses are projected to reach more than $125 million (Ex. 1). According to the University, UCLA Athletics

---

[1] Some famous former UCLA athletes include Jackie Robinson (the first African American athlete to play in Major League Baseball), Lew Alcindor (Hall of Fame Center for the L.A. Lakers, later known as Kareem Abdul-Jabbar), Florence Griffith-Joyner (known as the fastest woman of all time, setting world records in the 100 and 200 meter sprints in the 1998 Olympics), Troy Aikman (number one pick in the NFL draft and NFL Hall of Fame Quarterback for the Dallas Cowboys), Jackie Joyner-Kersee (track and field athlete and winner of six Olympic medals), Bill Walton (NBA Most Valuable Player and member of NBA Hall of Fame), and Arthur Ashe (professional tennis player and winner of three Grand Slam titles), to name a few. UCLA's former legendary Head Coach of its famed Men's Basketball team, John Wooden, is widely considered to be the greatest NCAA basketball coach of all time.

has direct responsibility for 98% of all expenses because it receives no state funding (Ex. 1). Consequently, the Athletic Department heavily depends on fundraising and donations (Ex. 1).

In the wake of the 2008 financial crisis, UCLA aimed to bolster its athletics fundraising by hiring Josh Rebholz as a senior member of the Athletic Director's executive management team (Ex. 2). Now the Senior Associate Athletic Director for External Relations at UCLA, Josh Rebholz ("Sr. Assoc. AD Rebholz") has been the leading contributor to the meteoric rise in UCLA Athletics' fundraising over the past eight years (Ex. 2). Since his arrival in 2011, the number of donors who annually contribute $25,000 or more to UCLA increased from 16 to over 260 (Ex. 2). In 2014, UCLA Athletics broke an all-time fundraising record, raising $80 million (Ex. 2). And in fiscal year 2019, it collected over $41 million, its third-highest annual total (Ex. 1). Under Sr. Assoc. AD Rebholz, UCLA Athletics' scholarship endowment has soared from $25 to $50 million, and funding for capital projects rose to more than $18 million in 2019, helping UCLA open a new soccer stadium and construct a new tennis scoreboard (Exs. 1, 2).

### C.     UCLA's Admission of Applicants as Student-Athletes in Exchange for Large Donations from Their Wealthy Parents to Athletic Programs

UCLA's emphasis on maintaining its standing as the Nation's premier athletic program and its constant need to raise massive capital to support the program may have been factors impacting how the University has used its preferential student-athlete admissions process. For many years, UCLA has purposefully and strategically used its student-athlete admissions process to fill roster spots with non-athlete applicants from wealthy families.[2] These applicants lack the requisite athletic talent; some have never even competed in the sports of their designated teams. Nor do their academic achievements meet the lofty admission standards that UCLA uses to evaluate non-athletes. Yet,

---

[2] Unlike traditional applicants, recruited student-athletes are evaluated through a preferential student-athlete admissions process that heavily weighs their athletic ability and achievement. While UCLA's athletic requirements are rigorous, athletes are held to far lower academic standards than non-athletes.

UCLA has had a clear objective and goal in using roster spots to admit otherwise unqualified students: their affluent parents are expected to make sizable donations to athletic programs, many of which are underfunded, non-revenue generating sports.  In exchange, prosperous parents receive a guarantee that their children will be admitted to one of the Nation's premier universities, where competition for limited slots is fierce.[3]

The practice of using roster spots to raise funds for athletic programs is common among many leading colleges and universities.  It was publicly unveiled as early as 2006, well over a decade before this prosecution, in a national bestseller titled, *"The Price of Admission:  How America's Ruling Class Buys Its Way into Elite Colleges and Who Gets Left Outside the Gates."*  In *The Price of Admission*, author Daniel Golden described the universities' financial motive for the practice:

> While coaches pursue top players based on their abilities, some borderline candidates are helped by factors other than physical prowess.  Children of wealthy alumni and donors sometimes are given slots on teams even if they're out of their league athletically, in hope that their parents will renovate a locker room or a sprinkler system. . . . For some privileged players, who are marginal academically as well as athletically, a coach's interest may tip the scale with the admissions office (p. 166).

As an example, Golden cites the case of a prominent Division I university that, in 2001, offered admission and a partial athletic scholarship to a middling high school baseball player whose parents later contributed $1 million to overhaul the university's baseball stadium (pp. 170-71).

### D.    Securing Academic Eligibility of UCLA Teams

While recruiting marquee athletes has been a key to the success of UCLA's athletic programs, ensuring that athletic teams meet NCAA academic eligibility requirements is essential, too.  Under NCAA rules, college teams must earn a minimum Academic Progress Rate ("APR") to maintain

---

[3] Frequently ranked as a top-20 college/university and the Nation's number one public university, admission to UCLA as a traditional applicant is extremely competitive. *2020 Top Public Schools*, U.S. News & World Report, https://www.usnews.com/best-colleges/rankings/national-universities/top-public (last visited Dec. 4, 2019). With an acceptance rate of 14-16%, most applicants must earn top standardized test scores and attain near perfect GPAs to have a legitimate chance at admission.  Each year, UCLA turns away thousands of highly qualified students.

eligibility for post-season competition and avoid sanctions (Exs. 3, 4).  UCLA has struggled with low

APRs and risks being banned from post-season competition.  UCLA's May 2019 APR report, which

includes data for academic years 2014 through 2018, reveals low multi-year APRs for several sports,

including men's basketball, football, and men's soccer (Exs. 5, 6).[4]

Once again, UCLA has been able to resort to its student-athlete admissions practice to address

this vital issue.  The Athletic Department has admitted non-athletes whose academic performances

helped raise their teams' GPAs.  Often known as GPA boosters, these students typically fill spots

from the bottom of the roster and are from affluent families who donate to UCLA's athletic programs.

While these students generally do not meet UCLA's academic admissions standards, their scholastic

skills tend to be much higher than those of recruited athletes.

## II.   THE COMPLIANCE OFFICE'S REVIEW OF UCLA'S STUDENT-ATHLETE ADMISSIONS PRACTICES

### A.   Overview of the Investigation

A bright spotlight was shined on the Athletic Department's student-athlete admissions

practices in 2014 as a result of a parent's appeal of the reversal of her daughter's prior admission to

UCLA's Admissions Committee (Ex. 9 at 1, 8, 10).  UCLA's Vice Chancellor for Legal Affairs had to

intercede and requested the Director of UCLA's Compliance Office to examine the concerns raised

by the parent (Ex. 9 at 3).  The Compliance Office is responsible for coordinating investigations of

alleged violations of federal or state laws, and for conducting investigations of suspected violations of

University policies involving significant matters (Ex. 9 at 3).  The parent's appeal ultimately triggered

---

[4] This issue is not unique to UCLA.  The difficulty in meeting NCAA academic eligibility requirements has
resulted in several high-profile scandals involving prominent collegiate athletic programs.  For example, in 1999,
there were allegations that members of the academic counseling department at a Big Ten university, with the
approval of the head coach, completed hundreds of papers for basketball players over six-years (Ex. 7).  And
in 2014, the NCAA investigated whether an ACC university had engaged in steering athletes to special classes
where attendance was not required, and high grades were guaranteed (Ex. 8).

a comprehensive review by the Compliance Office, which initially focused on the Athletic Department's approval to admit a female freshman applicant as a Track & Field student-athlete in 2012-2013 ("Student 1") and a female freshman applicant as a Water Polo student-athlete in 2013-2014 ("Student 2") (Ex. 9 at 5-8). During the investigation, the Compliance Office obtained information regarding Mr. Singer's 10-year relationship with the Head Coach of the Men's Tennis team, and determined it was necessary to review the program for that 10-year period to assess whether parents' donations had influenced admission decisions (Ex. 9 at 5). On July 1, 2014, the Compliance Office issued a "*confidential*" report titled "*Student-Athlete Admissions: Compliance Investigation Report*." The three subject matters addressed by the investigation are described below.

**B.      Admission of Student 1 in Exchange for Her Parents' $100,000 Donation to the Track & Field Team**

Student 1 attended high school in the Los Angeles area, where she competed in tennis and track (Ex. 9 at 14). While in high school, Student 1 attended tennis camps hosted by Grant Chen, an Assistant Coach of UCLA's Men's Tennis team (Ex. 9 at 6). Coach Chen, a friend of Student 1's family, knew she had applied to UCLA for the 2013-2014 academic year (Ex. 9 at 5, 14).

Using his position as a UCLA coach, Coach Chen explored ways to enhance Student 1's chance for admission to UCLA as a recruited student-athlete. Aware there were no open roster spots on UCLA's Women's Tennis team, Coach Chen considered the possible openings on the Track & Field team (Ex. 9 at 5, 14). Student 1, however, lacked the necessary athletic ability to compete in collegiate track.

The Director of UCLA's Track & Field and Cross-Country program at that time was Michael Maynard (Ex. 9 at 5). Before Coach Chen spoke with Director Maynard about Student 1, Sr. Assoc. AD Rebholz already had done so (Ex. 10 at 1). According to Director Maynard, Sr. Assoc. AD Rebholz asked whether he had an open roster spot for a female athlete, and, if so, would he assist with her admission (Ex. 10 at 1). When Director Maynard inquired about Student 1's track ability, Sr.

9

Assoc. AD Rebholz confessed his lack of knowledge (Ex. 10 at 1). He did not even know what events, if any, the student performed (Ex. 10 at 1). Instead, Sr. Assoc. AD Rebholz emphasized she was the daughter of "major donors" from Brentwood (Ex. 10 at 1). Director Maynard said he had some roster openings, but had never heard of Student 1, who attended a local high school (Ex. 10 at 1). Director Maynard then asked point blank "if it was important to the department to help get her in" (Ex. 10 at 1). Sr. Assoc. AD Rebholz reiterated that Student 1's parents were major donors, stating her admission "was very important to development"—the Athletic Department's fundraising arm (Ex. 10 at 1).

Coach Chen later met with Director Maynard to discuss Student 1's admission (Ex. 10 at 2). Explaining there was no room for Student 1 on the tennis team, Coach Chen said that she ran the 800 meters and "wanted to try to do track in college" (Ex. 10 at 2). Director Maynard proposed that Student 1, if admitted, could run on the Cross-Country team in the fall, but would have to be a manager for the indoor and outdoor track seasons (Ex. 10 at 2). Coach Chen agreed that was acceptable, adding that Student 1's parents may make a donation if she was admitted (Ex. 10 at 2). Director Maynard assumed the donation would be to the Athletic Department given his prior conversation with Sr. Assoc. AD Rebholz (Ex. 10 at 2).

Before "Priority Coding" Student 1 as a recruited student-athlete,[5] Director Maynard spoke with Glenn Toth, his Sport Supervisor and a Senior Associate Athletic Director, about Sr. Assoc. AD Rebholz's request (Ex. 10 at 2). As Direct Maynard's direct supervisor, Sr. Assoc. AD Toth first asked if Director Maynard had an open roster spot (Ex. 10 at 2). Director Maynard said that he had space and mentioned that Student 1 was an 800-meter runner (Ex. 10 at 2). Sr. Assoc. AD Toth next

---

[5] When a UCLA head coach presents a Prospective Student Athlete ("PSA") to the Athletic Department admissions committee, the coach must assign a "Priority Code" to each PSA based on athletic ability. An "A" is a starting athlete or strong contributor warranting either immediate or future athletic aid. A "B" is a recruited walk-on who is projected to compete for UCLA. A "C" is a walk-on who may not compete for UCLA but will be a productive practice player.

inquired whether Student 1 was "any good" (Ex. 10 at 2).   Director Maynard said, "she probably wasn't great" because she was local student and he had not heard of her (Ex. 10 at 2).

On March 21, 2013, Director Maynard completed a "UCLA Priority Coding Process" form for Student 1 in the Athletic Coding System (Ex. 9 at 5, Exhibit B).   Director Maynard saw no need to verify the information about Student 1's athletic ability (Ex. 10 at 3).   From Director Maynard's perspective, Student 1's athletic performance level was not "really crucial" to his coding statement because (1) Sr. Assoc. AD Rebholz had requested the Priority Coding, and (2) Director Maynard had discussed the issue with his direct supervisor, Sr. Assoc. AD Toth (Ex. 10 at 3).

That same day, another high-level member of the Athletic Department's fundraising staff, Assoc. AD Taylor Swearingen, assisted Coach Chen to cement a $100,000 donation by Student 1's parents to the track and field program in exchange for her admission as a member of the track team. Assoc. AD Swearingen sent an e-mail to Coach Chen entitled "Track Gift Agreements," attaching "sample gift agreements" for $80,000 and $100,000 to the track program (Ex. 9 at 5, Exhibit C).   He requested Director Maynard's involvement in the process, and offered to meet with Student 1's parents to help finalize a pledge agreement:

> I've attached a couple of sample gift agreements for either $80K or $100K to track over the next four years.   A gift directly to Track would be 100% tax deductible and we should be sure Coach Maynard is looped in before we "ask" for anything.   As attached, these gift agreements are pretty basic but we can expand upon them at the needs of either Coach  Maynard or the donors.
>
> * * *
>
> I would greatly appreciate the opportunity to join you and the [redacted] for a meeting to discuss their interests and motivations for giving, ensure that UCLA meets all of their wishes, and ultimately finalize the terms of a pledge agreement (Ex. 9 at 5, Exhibit C).

As later noted by the Compliance Office, this e-mail showed that UCLA admitted Student 1 because her parents had pledged to make a huge donation to the track program (Ex. 9 at 5).

At the next Admissions Meeting, UCLA decided to admit Student 1 (Ex. 10 at 3).  In a follow-up meeting with Director Maynard, Coach Chen told him Student 1 did not feel comfortable running on the Cross-Country team (Ex. 10 at 3).  Director Maynard knew Student 1 lacked the athletic ability to participate in indoor or outdoor track (Ex. 10 at 3).

UCLA notified Student 1 of her admission on April 1, 2013 (Ex. 9 at 5-6).  Days later, Coach Chen advised Assoc. AD Swearingen that Student 1's parents would donate $100,000 to the track team over a 4-year period, and possibly $5,000 to the Wooden Fund:

> We got a deal at $25K x four years for track I'm getting the paperwork I may be able to get another $5K for wooden fund for the tickets (Ex. 9 at 6, Exhibit D).

Sr. Assoc. AD Rebholz then delivered the good news to Director Maynard, telling him about Student 1's parents' $100,000 donation to the Track & Field team (Ex. 10 at 3).  According to Director Maynard, Sr. Assoc. AD Rebholz said he had spoken directly with Student 1's parents about the four-year pledge (Ex. 10 at 2-3).  When Sr. Assoc. AD Rebholz asked whether money would be "impactful," Director Maynard replied it would be "a huge help" (Ex. 10 at 3).

After interviewing Coach Chen, Director Maynard, and Sr. Assoc. AD Toth, and reviewing documents surrounding Student 1's admission, the Compliance Office concluded UCLA had used its student-athlete admissions process to admit Student 1 in exchange for a monetary contribution by her parents as a *quid pro quo*:

> The timing of [Student 1's] admission and the verbal pledge obtained by Chen from the parents, together with the revelation that she was intended to be only a manager, in violation of department recruitment and admission policy, removes any reasonable doubt that the contribution from the parents was obtained *quid pro quo* for the daughter's admission" (Ex. 9 at 6).

In the Compliance Office's view, UCLA had violated UC Regents Policy 2202, which states: "Admissions motivated by concern for financial, political, or other such benefit to the University do not have a place in the admissions process" (Ex. 9 at 1, 4).  It also concluded the admission of Student 1 as a manager violated UCLA's Athletic Department's policy and compounded the seriousness of

the coaches' misconduct (Ex. 9 at 1). The coaches were motivated by the expectation that UCLA would receive a financial benefit (Ex. 9 at 1).[6] Notably, the Compliance Office chose not to interview Sr. Assoc. AD Rebholz even though he was the one who had pressed for the admission of Student 1 and who had interacted directly with her parents to solicit the financial contribution.

After the report was issued, Director Maynard wrote a letter to Athletic Director Guerrero voicing his concern about being disciplined as a scapegoat (Ex. 10). In striking detail, Director Maynard described how Sr. Assoc. AD Rebholz drove the process to admit Student 1 as a recruited track athlete, despite her underwhelming high school athletic performance, as a means to secure a significant, six-figure donation by Student 1's parents to the track program (Ex. 10). Director Maynard, for his part, explained that he had relied on Sr. Assoc. AD Rebholz for guidance and direction, including the student-athlete coding request (Ex. 10 at 2). Director Maynard was unequivocal that Sr. Assoc. AD Rebholz was the "initiating influence in this coding request" (Ex. 10 at 2). Further, Director Maynard stated that he had reasonably expected that "Development" (*i.e.*, Sr. Assoc. AD Rebholz) would have provided him with accurate direction, since Development was responsible for that activity (Ex. 10 at 2). From Director Maynard's perspective, Sr. Assoc. AD Rebholz's request implied that it was acceptable to Priority Code Student 1 (Ex. 10 at 2).

Director Maynard further expressed frustration with UCLA's senior officials and the Compliance Office's handling of the investigation. In his view, Sr. Assoc. AD Rebholz deserved punishment, as he "played a definitive and negative role" (Ex. 10 at 4). Yet UCLA gave him a pass. In a poignant concluding remark, Director Maynard wrote: "The very branch within the DIA [Department of Intercollegiate Athletics] that should have completely understood the Regents [*sic*]

---

[6] The Compliance Office claims it did not find any evidence that coaches requested or received any personal financial benefit from Student 1's family or any private educational counselor (Ex. 9 at 2). However it provided no detail about what investigative steps it had taken, if any, to support that statement. For example, the report does not state whether the Compliance Office examined bank records or tax returns of any coaches, or simply elicited a "denial" from the coaches.

charge against finances affecting admissions decisions [had] initiated and was complicit in violating those same expectations" (Ex. 10 at 4).

UCLA largely ignored Director Maynard's letter. Following news of the indictments in early 2019, UCLA issued a press release admitting it did not interview or discipline Sr. Assoc. AD Rebholz (Ex. 11). Claiming it was aware of Director Maynard's information, UCLA nonetheless declined to reopen its investigation, providing no explanation for its decision (Ex. 11). Athletic Director Guerrero, however, announced his intent to retire this year (Ex. 12).

    **C.**    **Admission of Student 2 in Exchange for Her Parents' Commitment to Donate $100,000 to the Water Polo Team**

In the summer of 2013, before Student 2's senior year in high school, her mother engaged Mr. Singer, a private educational counselor, to advise Student 2 on her college options and assist with her applications (Ex. 9 at 2, 6, 9). Student 2's mother hired Mr. Singer because she believed her daughter would have difficulty getting admitted to college (Ex. 9 at 9).

Mr. Singer learned that Student 2 had played high school tennis and was interested in attending UCLA (Ex. 9 at 2, 6). He then offered to contact Billy Martin, UCLA's Head Coach of the Men's Tennis team, whom he had known for years, to introduce them and discuss whether there were any openings on the Women's Tennis team (Ex. 9 at 2, 6, 9).[7] Mr. Singer told Student 2's mother, "They expect you will support the program" and "strongly encouraged" her to contribute $100,000 once her daughter was admitted (Ex. 9 at 9). When Student 2's mother asked Mr. Singer how the money would be used, he responded: "Some of this donation would go to UCLA directly and some to the coaches through his [Mr. Singer's] company" (Ex. 9 at 9).

Mr. Singer called Coach Martin in the fall of 2013 and described Student 2 as a possible candidate for the Women's Tennis team (Ex. 9 at 13). Aware of the family's financial resources, Mr.

---

[7] Coach Martin told the Compliance Office that he had known Mr. Singer for about 10 years (Ex. 9 at 13).

Singer told Coach Martin that UCLA could expect the family to support the tennis program if Student 2 were admitted (Ex. 9 at 2, 13).

Student 2 and her mother met with Coaches Martin and Chen in October 2013 (Ex. 9 at 6, 10, 12). Coach Martin stated he knew Mr. Singer well, commenting that Mr. Singer had found scholar athletes for him (Ex. 9 at 10). Coach Martin told Student 2's mother there were no positions on the Women's Tennis team, but Coach Chen wanted to introduce her daughter to the Water Polo coach (Ex. 9 at 13). Mr. Singer also advised Student 2 and her mother that the Women's Water Polo team needed student-athletes, and Student 2 could be considered for a position (Ex. 9 at 2, 7, 10).

In late November or early December 2013, Coach Chen spoke with UCLA's Women's Water Polo Coach Brandon Brooks, and described Student 2 as a great student-athlete whose parents had the wherewithal to support the program (Ex. 9 at 12). Coach Chen arranged a meeting between Student 2 and Coach Brooks in December (Ex. 9 at 2, 7). During the meeting, Student 2 told Coach Brooks she had no water polo experience, though she was willing to be team manager (Ex. 9 at 12). Coach Brooks said he would consider her as a player or manager (Ex. 9 at 2, 7, 10, 12).

After the meeting, Student 2 sent an e-mail to Mr. Singer, informing him that Coach Brooks had told her "he wasn't quite sure what to do with me regarding having me listed on the team as a player, or as a manager" (Ex. 9 at 7, Exhibit I). Student 2 explained she was well suited to be a manager given her "good organizational skills" and prior "team building" experience (Ex. 9 at 7, Exhibit I). She included a draft e-mail to Coach Brooks for Mr. Singer's review (Ex. 9 at 7, Exhibit I). Mr. Singer promptly replied, advising her as follows:

> Tell him you will be listed either way—if a player for admissions sake, I obviously will not play but come to practice but take on a role as manager or you can say manager from the start but it is probably easier to do player. I have a friend of [redacted] that can create a profile if needed for polo" (Ex. 9 at 7, Exhibit I).

Following Mr. Singer's advice, Student 2 sent a thank you e-mail to Coach Brooks, noting it might be best for her to be a manager since she had no water polo experience (Ex. 9 at 7, 10, Exhibit J).

15

On December 13, 2013, Coach Brooks forwarded the e-mail to Coach Chen, who responded: "Thanks man . . . Appreciate it . . . I'll handle the other thing. . . . How does Nov 2014, Nov 2015, Nov 2016, Nov 2017 sound for each one?" (Ex. 9 at 7, Exhibit J). Coach Chen then sent an e-mail to a UCLA fundraising official, requesting the preparation of necessary documents for a donation of $80,000 to the Women's Water Polo program: "Can you write me up a commitment letter . . . $20K per year, for 4 years . . . Paid Nov 2014, Nov 2015, Nov 2016, Nov 2017 . . . . To the Women's Water Polo program . . . . I don't know if it's going to happen but would like to have paper ready in case" (Ex. 9 at 7, Exhibit K). During the admissions process, Coach Chen showed the proposed donation pledge letter to Student 2's mother (Ex. 9 at 13). He viewed fundraising as part of a UCLA coach's job and considered his actions to be "proactive" (Ex. 9 at 14).[8]

Coach Brooks completed a "UCLA Priority Coding Process" form for Student 2 in the Athletic Coding System for the Athletics Admission Committee's consideration (Ex. 9 at 7, Exhibit L). He wrote: "Will help to build local base. Intelligent person who I believe will help the program excel. Walk on who will add depth" (Ex. 9 at 7, Exhibit L). He then submitted Student 2's application to the Student-Athlete Admission Committee process (Ex. 9 at 2).

On January 27, 2014, Coach Brooks sent an e-mail to Coach Chen, stating Student 2 had been through the admissions process and had been accepted (Ex. 9 at 7, 12). Mr. Singer then told Student 2 that she had been approved by the committee and would receive a formal acceptance by UCLA in April (Ex. 9 at 2, 7, 10).

Student 2's application hit a snag on March 21. A member of the Athletic Department's compliance staff reviewed the coding information describing Student 2's background and concluded

---

[8] While UCLA was finalizing Student 2's admission through the Women's Water Polo program, Mr. Singer assured Student 2 and her mother that she would be admitted. In mid-December 2013, Mr. Singer contacted Student 2's mother twice, informing her that Student 2's admission was "certain" and she "will be approved without a second thought" (Ex. 9 at 10, Exhibit M).

she lacked requisite water polo playing experience to justify admission as a "walk-on" (Ex. 9 at 7). When confronted, Coach Brooks explained he had planned to use Student 2 as a manager, not a walk-on (Ex. 9 at 7, 12).  UCLA halted the admissions process because the Athletic Department's policy did not permit special admissions for student managers lacking athletic experience and ability to compete in the team's sport (Ex. 9 at 7-8).  Student 2's admission was revoked (Ex. 9 at 8).

UCLA notified Student 2 of her rejection in early April 2014.  Her mother immediately contacted Mr. Singer to learn what had happened (Ex. 9 at 2, 10).  Mr. Singer responded that the coaches would appeal the decision, but this never occurred (Ex. 9 at 2, 10).  In May 2014, after the expiration of the appeal period, Student 2's mother contacted UCLA Admissions officials requesting an explanation and pressing for a further appeal of the decision (Ex. 9 at 2, 8, 10).  A UCLA Admissions official called Student 2's mother and told her the coaches mistakenly had presented Student 2 for student-athlete admission as a Women's Water Polo team manager (Ex. 9 at 2-3, 8).  The official further explained that Student 2 would not have been admitted as a walk-on because special admission student-athletes must have athletic qualifications to compete in the sponsoring sport (Ex. 9 at 8).

Student 2's mother responded she was "still willing to pay" (Ex. 9 at 8).  When asked what she meant, Student 2's mother explained that, based on what Mr. Singer had told her, the family was expected to donate $100,000 to the program for the admission of her daughter through athletics, and such arrangements were a common practice in the Athletic Department (Ex. 9 at 3, 8).  As a result of these statements, UCLA's Vice Chancellor for Legal Affair interceded, and referred the matter to the Compliance Office for its investigation (Ex. 9 at 3).

The inquiry began with an in-person interview of Student 2's mother in mid-May 2014 (Ex. 9 at 9-10).  Student 2's mother again told UCLA that Mr. Singer had advised her that admission to UCLA through the student-athlete process could be influenced by her offer to make a substantial

donation to the program and "this was a common practice" (Ex. 9 at 1). Student 2's mother also stated she had specifically asked Mr. Singer how the donation would be used, and he responded: "Some of this donation would go to UCLA directly and some to the coaches through his [Mr. Singer's] company" (Ex. 9 at 9). Significantly, the Compliance Office recorded these statements in its report.

The Compliance Office then contacted Mr. Singer, and interviewed him by phone on May 22, regarding his dealings with Student 2 and her mother (Ex. 9 at 11). Mr. Singer admitted he had offered to contact Coach Martin when he learned that Student 2 was a high school tennis player and wanted to attend UCLA (Ex. 9 at 11). Regarding expected donations to UCLA's athletic programs, Mr. Singer said he had raised the issue with Student 2's mother, telling her that the family should plan to donate if Student 2 were admitted as a "show of appreciation" (Ex. 9 at 11). Claiming that Student 2's mother had pressed him on the amount of the donation, Mr. Singer explained that he had initially suggested $100,000, but later raised the amount to $150,000 (Ex. 9 at 11).

Mr. Singer denied telling Student 2's mother that a large donation would buy her daughter's admission and that he expected to receive any payment from the mother or the coaches (Ex. 9 at 11). While Mr. Singer acknowledged telling Coach Martin that the family "would be most gracious" if Student 2 were admitted, he denied having an arrangement where he or the coaches would receive some portion of the donation (Ex. 9 at 12). Mr. Singer's denial directly contradicted Student 2's mother's account—that Mr. Singer had told her that some of the donation would be used to pay coaches.[9]

---

[9] There is no indication that compliance officials directly questioned Mr. Singer about his comment to Student 2's mother that some of the family's donation would go to the coaches through Mr. Singer's company (Ex. 9 at 11-12). In addition, the Compliance Office claimed it was unable to uncover evidence that coaches had requested or received any personal financial benefit from Student 2's family or any private educational counselor (Ex. 9 at 2). Again, the report provided no details whether the Compliance Office conducted a genuine investigation of this issue or simply asked coaches whether they had requested money.

Compliance officials also interviewed Coach Martin, who denied ever discussing with Mr. Singer a monetary commitment by Student 2's mother (Ex. 9 at 13).  He further denied ever being compensated by Mr. Singer in connection with the admission of students in the Men's Tennis program who had been sponsored by Mr. Singer (Ex. 9 at 13).

As to Student 2, the Compliance Office concluded that the coaches' proposed actions (1) violated Regents Policy 2202 because they had initiated the student's admission with the expectation of a financial contribution to the program, and (2) violated the Athletic Department's policy by processing the admission of a student-athlete who was to be a manager only (Ex. 9 at 1-2).[10]

### D.   Admission of Men's Tennis Team "Walk-Ons" in Exchange for Their Parents' Substantial Donations to the Men's Tennis Program

After learning of Mr. Singer's ten-year relationship with Men's Tennis Head Coach Martin and Mr. Singer's involvement with Student 2, the Compliance Office put the Tennis team under the microscope.  It looked for patterns of suspicious admissions conduct showing whether parents of students with "limited" athletic talent—likely sponsored by Mr. Singer—had been big donors to the Men's Tennis program, suggesting they had bought their sons' admission to UCLA (Ex. 9 at 8).

The Compliance Office reviewed the admissions practices of the tennis program covering the ten-year period during which Mr. Singer knew Coach Martin—2004 to 2014 (Ex. 9 at 1).  It reviewed all men's tennis student-athlete admissions from 2004 to 2014, classified as having either "excellent," "good," or "limited" tennis athletic ability (Ex. 9 at 8).  Of the 54 student-athletes identified, 10 were classified as "limited" (Ex. 9 at 8).   Using Athletic Department fundraising information, the Compliance Staff found that substantial donations to the program were made by a high percentage of families of walk-on athletes with "limited" athletic skill (Ex. 9 at 5, 8).  Mr. Singer had been retained by at least two of those families (Ex. 9 at 8).  The Compliance Office concluded there was persuasive

---

[10]  Despite the Compliance Office's conclusions, publicly available sources indicate that Student 2 graduated from UCLA, indicating that UCLA reinstated its prior decision to admit Student 2.

evidence of a pattern of admissions influenced by the expectation the family would likely contribute to the program, expressing specific concern about Mr. Singer's involvement (Ex. 9 at 8).

### E.     Concealment of the Compliance Report for Five Years

UCLA designated the Compliance Office report as a "confidential" document and carefully guarded its contents.  For almost five years, the report remained a protected, non-public document until the government brought the charges in this case.  The report appears to have first surfaced in mid-April 2019, when the *Los Angeles Times* obtained a copy and issued an article titled, "*UCLA knew of a cash-for-admissions deal, years before the scandal*" (Ex. 13).  In a pointed, factual piece of journalism, the *Los Angeles Times* exposed the details of the Compliance Office's investigation and conclusions, showing UCLA knew of its Athletic Department's historical practice of admitting students through the student-athlete admission process to raise sizable donations for athletic programs.  The article raised important questions why the Compliance Office had never interviewed Sr. Assoc. AD Rebholz, even though Director Maynard's letter to Athletic Director Guerrero had laid bare Sr. Assoc. AD Rebholz's central role in pressing for the admission of Student 1.  And the article effectively unmasked disingenuous public statements issued by UCLA immediately following the indictments, in which Athletic Director Guerrero expressed shock to learn of the alleged scheme, and vigorously defended UCLA's student-athlete admission process as one of the toughest in the country (Ex. 14).[11]

---

[11] The *Los Angeles Times'* hard-hitting article left UCLA with no choice but to respond the following day with a rebuttal, proffering explanations for why it had not interviewed or disciplined Sr. Assoc. AD Rebholz (Ex. 11). Notably, UCLA's attempted damage control provided no explanation for why it has kept the Compliance Office's report under lock and key for five years, hidden from the public.

F.      **UCLA's Continued Relationship with Mr. Singer After the Compliance Office Report**

After the revelations in the Compliance Office's report, UCLA continued to host programs by Mr. Singer's organizations, which had a consistent presence on campus.  For example, UCLA records from 2013 and 2014 reveal that Mr. Singer had an account with UCLA Catering and Conference Services (Ex. 15).  In July 2014, UCLA sent The Key Worldwide ("The Key") an estimate for pre-payment in the amount of $12,152 for lodging, meal packages, and meeting spaces (Ex. 16).  On July 15, 2014, just two weeks after the Compliance Office had issued its report, Mr. Singer signed the estimate and paid UCLA $12,152 (Ex. 16 at 2).  UCLA's documents show that Mr. Singer had blocked 59 rooms for "educational sessions on various topics" (Ex. 16).  Other documents reveal UCLA's similar ties to Mr. Singer in 2018 (Ex. 17).  On August 9, 2018, UCLA Catering sent The Key a billing summary reflecting $67,353.41 in total charges for audio-visual equipment, room rentals, and meals (Ex. 17 at 3).  The detailed room information shows The Key rented 26 rooms for 46 guests from July 22 to August 8, 2018.  The Key also reserved meeting space with projectors for multiple days of its program (Ex. 17).  Rather than banish Mr. Singer from the campus, UCLA opted to continue its business relationship with him.

G.      **Additional Non-Athletes Apparently Admitted through the Student-Athlete Admissions Process**

Other evidence suggests UCLA historically has admitted students through its student-athlete admissions process even though they were unqualified for admission as student-athletes.  This practice has occurred in several sports, including UCLA's prestigious Women's Gymnastics Team.  Winners of seven NCAA championships and 21 regional titles, UCLA has excelled at recruiting some of the Nation's top women gymnasts.  Its freshman class of recruits in 2016 included two Olympic gold medal winners along with six other decorated athletes.

One member of the freshman class, however, apparently was an anomaly.  A recent *Los Angeles Times* article titled "*Did this student deserve admission to UCLA's renowned gymnastics team?*" reported that the student had "no record of a competitive career" (Ex. 18).  Instead, she has an uncle who has been a close friend of former Head Coach Valorie Kondos Field for 30 years (Ex. 18).  Coach Kondos Field, the *Los Angeles Times* wrote, claimed that her friendship with the student's uncle had nothing to do with her spot on the team (Ex. 18).  Rather, Coach Kondos Field "credited [the student's] character, work ethic and potential in the vault" (Ex. 18).  The article further notes that the student had not competed for UCLA for the past two seasons due to medical issues but served as the team's manager (Ex. 18).  The student was listed on the UCLA gymnastics team roster for 2017 only.

That was not the only time Coach Kondos Field apparently supported admission of a UCLA applicant as a student-athlete who lacked athletic ability to compete in a given sport.  The *Los Angeles Times* also reported that "[i]n 2014, UCLA's student newspaper quoted Kondos Field as saying she suggested the school's golf coach add the son of former Bruins gymnastics coach . . . ." (Ex. 18).  According to the article, Coach Kondos Field "told men's golf coach Derek Freeman to recruit [the student]" as a walk-on student athlete even though, as she admitted, the student would probably not give "the numbers that [Coach Freeman] would want to recruit" (Ex. 19).  The student was listed as a member of UCLA's golf team, though there is no record that he ever played, and the golf coach of his high school had never heard of him (Ex. 18).  The student served as a manager for UCLA's Women's Gymnastics team from 2010-2014 (Ex. 18).

In the same article, the *Los Angeles Times* reported that in 2004, UCLA admitted the daughter of Athletic Director Guerrero as a member of its Women's Crew team (Ex. 18).  Based on her UCLA biography, the daughter did not list a club rowing team (Ex. 20).  She did not remain on the crew team for her four years at UCLA and is only listed on the team's roster for the 2005 season (Ex. 21).  The article further identified the admission of the son of former UCLA Sports Supervisor Ken Weiner, as

a member of the Men's Soccer team (Ex. 18). The *Los Angeles Times* noted that his qualifications did

not compare with those of the stellar athletes on the roster (Ex. 18).[12]

## ARGUMENT

III.   **THE SUBPOENAS PROPERLY REQUEST PRODUCTION OF SPECIFIC, ADMISSIBLE EVIDENCE THAT IS RELEVANT TO THE CHARGES AND NECESSARY FOR MR. SALCEDO TO PREPARE HIS DEFENSE**

### A.   **Applicable Legal Standard**

Fed. R. Crim. P. 17(c) authorizes criminal defendants to file requests for subpoenas *duces tecum*

to witnesses that are returnable before trial. *See United States v. Kravetz*, 706 F.3d 47, 53 n.2 (1st Cir.

2013). To obtain a Rule 17(c) subpoena, a defendant must show: (1) the documents are evidentiary

and relevant; (2) the documents are not otherwise obtainable reasonably in advance of trial by exercise

of due diligence; (3) he cannot properly prepare for trial without inspecting the documents before

trial; and (4) the application is made in good faith and is not intended as a general fishing expedition.

*United States v. Nixon*, 418 U.S. 683, 699-700 (1974); *United States v. McLellan*, No. 16-CR-10094-LTS,

2018 WL 9439896, at *3 (D. Mass. Jan. 19, 2018). Ultimately, the defendant must demonstrate

relevancy, admissibility, and specificity. *Nixon*, 418 U.S. at 700.

### B.   **The Requested Information Is Relevant, Specific, and Admissible to Support Mr. Salcedo's Defense Theory and Negate Elements of the Offenses**

The evidence sought by the subpoenas is relevant and admissible under Fed. R. Evid. 401 and

803(6) because it supports Mr. Salcedo's defense theory and negates several elements of the crimes

charged. Four of the five charges against Mr. Salcedo are nearly identical, fraud-based crimes

grounded on the factual allegations in *"The Student-Athlete Recruitment Scam"* section of the Superseding

---

[12] Tuition for in state students at UCLA from 2004 through 2006 did not exceed $6,522 (Ex. 22). Tuition at comparable private colleges/universities during the same period ranged from approximately $29,000 to $33,000 (Ex. 23). Given this disparity, the admission of a student through UCLA's athletic programs has significant monetary value to parents, including those who are members of UCLA's Athletic Department.

Indictment (Par. 49).[13]  The government asserts that two sets of parents paid large sums to Mr. Singer, who then used the money to bribe Mr. Salcedo to designate their children as recruited athletes, a favored admissions category, and facilitate their admissions (Pars. 49, 99-115).  The core crimes underlying the fraud charges are mail fraud, wire fraud, and honest services fraud.

These fraud-based crimes require proof of a *victim*—a person or entity whom a defendant intended to defraud to obtain money or property.  *See United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) (to sustain a conviction for wire fraud under 18 U.S.C. § 1343, government must prove that defendant acted with specific intent to obtain money or property by a fraudulent scheme contemplating harm to victim's property interests).  As to Mr. Salcedo's alleged crimes, the Superseding Indictment identifies UCLA as the *victim* of the alleged scheme to defraud.  This is consistent with the government's position in other "Varsity Blues" prosecutions, in which it has asserted that the universities are fraud victims.[14]

In the "Varsity Blues" cases, the government also has been steadfast in its view of what constitutes a "bribe."  According to the government, a parent's payment constitutes a "bribe" irrespective whether (1) the payment was made as a donation directly to a university, or (2) the payment was to a coach.  *United States v. Vandemoer* is illustrative.  There, the Sailing Coach of Stanford University was charged with violating RICO for his alleged role in facilitating the admission of two non-athletes

---

[13]  Mr. Salcedo is charged with racketeering conspiracy (Count 1), conspiracy to commit mail and wire fraud and honest services mail and wire fraud (Count 2); conspiracy to commit federal programs bribery (Count 5); wire fraud and honest services wire fraud and aiding and abetting (Count 17); and mail fraud and honest services mail fraud and aiding and abetting (Count 20).  Counts 2, 17, and 20 directly charge Mr. Salcedo with mail fraud, wire fraud or honest services fraud.  Count 1, racketeering conspiracy, alleges a "pattern of racketeering activity" consisting of acts indictable as mail fraud, wire fraud, and honest services fraud (Par. 144).  Even the federal programs bribery charge (Count 5), is based on the same factual allegations underlying the other four charges.

[14]  For example, in *United States v. Bizzack*, 19-CR-10222 (Dkt. 34 at 12:3-8), and *United States v. Vandemoer*, 19-CR-10079 (Dkt. 21 at 9), the government argued the University of Southern California and Stanford University were fraud victims, respectively.

through Stanford's student-athlete admissions process.  The parents of the students allegedly donated at total of $270,000 to Stanford's sailing program.  Coach Vandemoer received no money.  Although only the University received money, the government argued the payment to Stanford was a "bribe" (Dkt. 26 at 8:12-23).  Collectively, the government's position in the "Varsity Blues" prosecutions is the universities are *victims*, and a coach is criminally liable for committing a federal fraud-based crime, even if the coach received no monetary payment for his or her role in the student's admission.

### 1.        Evidence Supporting the Defense Theory

Mr. Salcedo's defense theory collides head-on with the prosecution's theory of the case spelled out in the Superseding Indictment's narrative.  Mr. Salcedo will prove that UCLA is not a *victim* of any of the fraud-based charges.  Rather, UCLA is both the *architect* and *orchestrator* of the *"The Student-Athlete Recruitment Scam."*  The defense is based on the irrefutable facts and conclusions determined by UCLA's own Compliance Office, related documents, public information, and reasonable inferences derived from this information.

At trial, the defense expects to prove that the *"Student-Athlete Recruitment Scam"* originated sometime around 2004, when Mr. Singer—the alleged mastermind of the college admissions scandal—began recommending that UCLA admit his student clients as members of the Men's Tennis team.  Over the next ten years, the Men's Tennis team received substantial donations from parents of team members who had been admitted as walk-ons with "limited" tennis talent.  At least two of them were Mr. Singer's clients.

In 2011, following the financial crisis, UCLA hired Josh Rebholz as a member of the Athletic Department's executive management team.  His primary job was to boost athletic fundraising to generate the financial support needed to maintain UCLA's all-important athletic programs.  Almost immediately, Sr. Assoc. AD Rebholz hit the ground running, successfully engineering the admission of a non-athlete, Student 1, through UCLA's student-athlete admissions process in exchange for a

$100,000 donation by her parents.  Sr. Assoc. AD Rebholz brokered the deal with the parents and pressed Director Maynard to "priority code" Student 1 so she would qualify for admission as a student-athlete.  This resulted in the admission of a faux athlete in exchange for a $100,000 infusion of cash to a non-revenue generating sport.

The following year, 2013, Mr. Singer called on the Men's Tennis coach to request his assistance in the admission of another Singer client, Student 2.  Once again, UCLA admitted another non-athlete as a member of the Women's Polo team based on the expectation that her family would make a $100,000 donation to the program. The admission decision was temporarily reversed, which generated a confrontation between Student 2's mother and UCLA admissions officials.  In discussions with the UCLA Admissions officials, the mother reported comments that Mr. Singer had made about UCLA's student-athlete admissions process.  She said that Mr. Singer had told her it was a "common practice" that UCLA's Athletic Department would admit a student in exchange for a substantial donation to an athletic program.  She further recounted Mr. Singer's statement that his company would use some of the donation to pay UCLA's coaches.

The implications of this scandalous information caused the intercession of the Vice Chancellor for Legal Affairs, who reports directly to UCLA's Chancellor.  The matter ultimately was referred to the Compliance Office for investigation.  After completing its probe, the Compliance Office generated a report riddled with explosive evidence about the Athletic Department's roster spot-for-money admissions and fundraising practices—raising a legion of red flags.  The report, however, carefully omitted highly charged facts implicating management-level members of the Athletic Department.  The report undoubtedly was disseminated to the Vice Chancellor for Legal Affairs and other UCLA governing officials.  Its findings were no secret at UCLA.

Available evidence to date indicates the following occurred following the Compliance Office's probe:

- Every page of the compliance report was stamped **"CONFIDENTIAL"**;

- The compliance report was concealed from the public for five years;

- UCLA blamed Director Maynard and Coach Brooks;

- None of the top-echelon members of the Athletic Department, including Sr. Assoc. AD Rebholz, Sr. Assoc. AD Toth, and Athletic Director Guerrero were disciplined;

- Sr. Assoc. AD Rebholz was never interviewed;

- Sr. Assoc. AD Rebholz was awarded a salary raise; [15]

- Student 1's admission was not revoked;

- The $100,000 donation by Student 1's parents was not returned;

- Student 2 was admitted;

- The Compliance Office findings were not reported to UC Regents; and

- UCLA continued to conduct business with Mr. Singer, letting him use campus facilities to give presentations.

Thus, well *before* the events regarding Mr. Salcedo are alleged to have occurred, there is compelling and persuasive proof that UCLA—not Mr. Salcedo—had originated and executed *"The Student-Athlete Recruitment Scam."* As an institution, UCLA knew of Mr. Singer's admission that he had been paying UCLA coaches to facilitate the admission of non-athletes in exchange for sizeable donations form the students' parents. UCLA withheld this information from the government before the indictment was returned. Immediately following the news of the indictment, UCLA feigned shock and outrage about the allegations concerning Mr. Salcedo and defended its student-athlete admissions process as one of the toughest in the country.

---

[15] *Transparent California*: California's largest public pay and pension database, *available at* https://transparentcalifornia.com/salaries/?q=joshua+rebholz&a=&y=&s= (last visited Jan. 20, 2020).

Mr. Salcedo's subpoena requests are crafted with specificity and target production of admissible evidence he will use to support his defense. Most of the requests ask UCLA to produce original sources of specific evidence described in the Compliance Office Report, supplying accompanying page citations. For example, the requests seek student applications, e-mails of coaches and members of the Athletic Department's executive team, Priority Coding forms, parents' pledge agreements, UCLA documents and e-mails pertaining to the admission of Students 1 and 2, and the admission of unqualified athletes as members of the Men's Tennis team from 2004-2014. *See* UCLA Requests 3.0 to 5.4. There are similar requests pertaining to the admission of other non-athletes through the student-athlete admissions process in exchange for large donations or to benefit UCLA coaches and employees. *See* UCLA Requests 11, 12, 13. This evidence is relevant to prove the defense theory under Rule 401. The documentary evidence is admissible both as business records under Rule 803(6) and as non-hearsay, since it will be offered to prove that UCLA was not a victim as opposed to the truth of the matter asserted.

Additional requests seek production of investigative files of UCLA and UC Regents pertaining to UCLA's admission of non-athletes through its student-athlete admissions process to fundraise for its athletic programs. *See* UCLA Requests 1, 10; UC Regents Requests 1, 3. Other requests ask for production of documents regarding the dissemination of the Compliance Office Report and any corrective actions taken by UCLA and UC Regents after the investigation, including any actions by UCLA regarding its ongoing business relationship with Mr. Singer. *See* UCLA Requests 2, 6, 8.0-8.4, 9.0-9.7; UC Regents Requests 2, 4. Again, this evidence is relevant under Rule 401 to prove the knowledge of UCLA's governing officials, including the Chancellor and other top-echelon management officials who received the report, as well as their failure to act after reviewing the evidence.

Finally, the subpoenas to UCLA and UC Regents request production of (1) government subpoenas and requests for information; (2) documents and information produced; and (3) information about witness interviews conducted by the government and attended by agents of UCLA and UC Regents. *See* UCLA Request 14; UC Regent Request 5. The government subpoenas are relevant to show whether UCLA took corrective action only *after* it had learned of the government's criminal investigation. The documents produced are germane to show UCLA's withholding of evidence that would implicate the University in the alleged *"Student-Athlete Recruitment Scam."*

## 2. Evidence Negating Elements of the Crimes Charged

The key legal element the government is required to prove beyond a reasonable doubt as to the core fraud-based crimes is that Mr. Salcedo committed a "scheme to defraud" UCLA "by means of a material deception."[16] As demonstrated above, the evidence requested by the subpoenas is relevant to prove that UCLA—not Mr. Salcedo—originated and orchestrated *"The Student-Athlete Recruitment Scam."* For example, the conduct of UCLA's top-echelon Athletic Department officials involved in the admission of Student 1, is essentially identical to conduct of the coach charged in *United States v. Vandemoer.*

In *Vandemoer*, the parents of the students who were admitted as faux athletes donated funds directly to the university. The coach did not receive any money, yet the government maintained the

---

[16] To prove that Mr. Salcedo committed mail fraud, wire fraud, or honest services fraud, the government must establish beyond a reasonable doubt the following elements: (1) he perpetrated a scheme to defraud by means of a material deception; (2) with the intent to defraud; (3) while using the mails, private commercial carriers, and/or wires in furtherance of the scheme; and (4) that resulted or would have resulted in the loss of money or property or the deprivation of honest services. *See* 18 U.S.C. §§ 1341, 1343, and 1346. JUSTICE DEPT. MANUAL, Sections 940, 941; *United States v. Cassiere*, 4 F.3d 1006, 1011 (1st Cir. 1993) (elements of wire fraud); *Twenty-Eighth Annual Survey of White Collar Crime*, 50 AM. CRIM. L. REV. No. 4 at 1245-66 (2013). The honest services statute, 18 U.S.C. § 1346, requires the government to prove beyond a reasonable doubt that Mr. Salcedo engaged in a fraudulent scheme to deprive UCLA of honest services through bribes or kickbacks supplied by a third party who had not been deceived. *Skilling v. United States*, 561 U.S. 358, 408-09 (2010); *United States v. George*, 676 F.3d 249, 260 (1st Cir. 2012).

payment to the Stanford was a bribe, resulting in criminal liability.  In the case of Student 1, the evidence shows that Sr. Assoc. AD Rebholz dictated the admissions process and brokered the $100,000 donation by Student 1's parents.  No coach received any funds.  Applying the government's reasoning in *Vandemoer*, its Athletic Department engaged in a "scheme to defraud" UCLA, and the $100,000 payment to UCLA was a "bribe."

Yet UCLA, to this day, does not consider itself a victim of its own "scheme to defraud." UCLA was the architect of the practice of trading roster spots-for-money.  It was not deceived, and thus could not have intended to deceive itself.  *See United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002) (holding there was no intent to defraud and no "scheme to defraud" where defendant knew his misrepresentations would not deceive the alleged victim).  After receiving Director Maynard's letter, UCLA effectively tossed it in the waste basket.  UCLA did not interview Sr. Assoc. AD Rebholz. It did not discipline him.  Instead, it rewarded him with a raise that year.  And UCLA kept the $100,000.[17]

Mr. Salcedo's alleged conduct—trading a roster spot-for-money and keeping the parent's payment—does not convert UCLA into a *victim*.  UCLA was not defrauded of any money, since it is prohibited from accepting financial consideration that influences an admission decision under UC Regents Policy 2202.  UCLA did not lose any money or property.  There is no evidence that the student admitted in 2016 failed to pay her tuition.  Moreover, the alleged conduct mirrors the conduct that UCLA has engaged in over the years.  In addition, for at least five years, high-echelon UCLA official knew from the Compliance Office report that Student 2's mother had reported Mr. Singer admission that he had paid UCLA coaches to facilitate admission of non-athletes through the student-

---

[17]  When UCLA admits a non-athlete through its student-athlete admissions process, collects a $100,000 donation from the student's parents, and spends the money on an athletic program, there is no victim and no scheme to defraud.  The non-athlete, his or her parents, and UCLA are voluntary participants, not victims.  In this scenario, no one is defrauded out of money or property.  UCLA cannot defraud itself. UC Regents Policy 2202, however, prohibits UCLA from accepting any payment that influences an admissions decision.

athlete admissions process. *See United States v. Braunstein*, 281 F.3d 982, 996-97 (9th Cir. 2002) (company could not be deceived when its employees commit practices that the company had actively endorsed). At most, UCLA might believe that Mr. Salcedo committed a breach of his employment agreement, and that it may have had a basis to terminate his employment.

At trial, Mr. Salcedo will challenge the government's proof that (1) he intended to defraud UCLA of money or property, (2) he engaged in a scheme to defraud UCLA, and (3) that UCLA lost money, property, or honest services. He intends to offer evidence targeted by the subpoenas to challenge each of these elements and has a good faith basis to seek the requested documents. His requests are specific—based on evidence obtained to date—and do not constitute a "fishing expedition."

## C.      Mr. Salcedo Is Unable to Obtain the Documents Before Trial

The information sought by the subpoenas is available only from UCLA and UC Regents. Mr. Salcedo has issued public records requests under the California Public Records Acts to UCLA and UC Regents to obtain information supporting his defense. UCLA and UC Regents made minimal productions and resisted producing complete responses, asserting a host of objections that effectively deny Mr. Salcedo from obtaining critical evidence necessary for his defense.

Counsel for Mr. Salcedo sent two public records requests to UCLA on April 16, 2019 and May 3, 2019. The First Request included 20 specific categories of documents, including the Compliance Office report; records of admission of certain students with ties to UCLA employees; correspondence between certain Athletic Department officials relating to donations in exchange for admission; and disciplinary and investigative materials for certain employees relating to donations in exchange for admission (Ex. 24). On May 24, 2019, UCLA responded to the First Request, producing only a heavily redacted version of the Compliance Office report. UCLA declined to produce requested documents based on various statutory exemptions, including disclosure "would constitute an unwarranted

31

invasion of personal privacy" or if "the public interest served by not disclosing a record clearly outweigh[ed] the public interest served by disclosure" (Ex. 25). UCLA asserted that documents sought by 8 requests were exempt from production under the Family Educational Rights and Privacy Act (Ex. 25). For the 8 remaining requests, UCLA stated it was still considering the requests (Ex. 25). To date, UCLA has not provided an additional response.

Mr. Salcedo's Second Request specifically identified 14 categories of documents, including documents requested by the *Los Angeles Times*; documents relating to this case and related cases; documents relating to certain UCLA internal investigations; budget information for non-revenue sports; compensation information for certain athletic department staff members; certain donation information; documents relating to the admission of the children of the coaching staff; and documents relating to Mr. Salcedo (Ex. 26). UCLA responded with another limited document production (Ex. 27). UCLA declined to produce documents in response to 4 requests, claiming an exemption applied for the government's ongoing investigation (Ex. 27). UCLA claimed documents responsive to 4 requests were subject to various exemptions and claimed it could not locate responsive documents for 1 request (Ex. 27). In response to 2 requests, UCLA stated that it would conduct a reasonable search; as of this date, UCLA has not provided an additional response.

Counsel for Mr. Salcedo sent a public records request to UC Regents on May 20, 2019. It sought documents relating to Regents Policy 2202, the Compliance Office report, an internal investigation of a senior associate athletic director, and financial benefits received by University of California campuses in connection with admissions (Ex. 28). On July 30, 2019, UC Regents made a limited production, which included only records it identified as responsive (Ex. 29).

On April 29, 2019, counsel requested the Government to produce particular documents, including the Compliance Office's report and documents relating to ongoing internal investigations by UCLA (Ex. 30). The government directed counsel to obtain the documents directly from UCLA:

"I don't have the compliance review from UCLA – you'll have to seek that from UCLA" (Ex. 30).

Under these circumstances, highly relevant evidence sought is otherwise unavailable.

## CONCLUSION

This crucial evidence sought by the subpoenas undermines the legal basis of the charges against Mr. Salcedo.  It exposes the government's factually flawed assertion that UCLA is a fraud *victim*, as opposed to the *architect* and *orchestrator* of the student-athlete admissions practice condemned as an illegal "scam."  More importantly, the evidence supports the defense theory and negates essential elements of the crimes, including the existence of a scheme to defraud UCLA.  Accordingly, Mr. Salcedo respectfully requests that this Court allow his motion.

DATE:  January 23, 2020                           **JORGE SALCEDO,**

By his attorneys,

*/s/ Thomas C. Frongillo*
Thomas C. Frongillo (BBO No. 180690)
Christina N. Lindberg (BBO No. 690443)
PIERCE BAINBRIDGE BECK PRICE & HECHT LLC
One Liberty Square, 13th Floor
Boston, MA 02109
Tel: (617) 313-07401
tfrongillo@piercebainbridge.com
clindberg@piercebainbridge.com

*/s/ Susan G. Winkler*
Susan G. Winkler (BBO No. 530682)
WINKLER LAW LLC
120 Holmes Street, Suite 313
Quincy, MA 02171
Tel: (617) 642-6671
winkler.susan@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Thomas C. Frongillo*
Thomas C. Frongillo