**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORGE SALCEDO,<br><br>Defendant. | Crim. No. 19-cr-10081-IT-MPK |

**REPLY MEMORANDUM OF DEFENDANT JORGE SALCEDO
IN SUPPORT OF HIS MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

**INTRODUCTION**

Defendant Jorge Salcedo has argued that all honest services fraud charges against him should be dismissed because the Superseding Indictment fails to allege that he owed a fiduciary duty to UCLA, an element of honest services fraud. In the government's opposition, it argues that the allegations are sufficient because they assert that Mr. Salcedo, UCLA's head soccer coach, was entrusted to fill athletic-recruit admissions slots with qualified candidates. To the contrary, the allegations fail to establish the existence of a fiduciary duty, which requires control and decision-making authority. For example, the Superseding Indictment alleges that Mr. Salcedo merely referred UCLA Applicant 1 to the head coach of the UCLA women's soccer team. He did not coach that team. The women's soccer coach was responsible for assessing UCLA Applicant 1's abilities and recommending whether or not the University should offer her admission. Adoption of the government's position—based on such thin allegations—would eviscerate established concepts of fiduciary duties and fiduciary relationships.

Mr. Salcedo also argues that the Court should dismiss the mail fraud charges, wire fraud charges, and RICO predicate acts based on mail and wire fraud because the Superseding Indictment fails to allege that Mr. Salcedo engaged in a scheme to defraud UCLA, the alleged victim, of "money"

or "property." Mr. Salcedo could not have deprived UCLA of any "money" because a policy of the University of California Board of Regents prohibited UCLA from accepting payment in connection with any admissions decision, which is exactly what Mr. Salcedo allegedly received. The Superseding Indictment alleges no other pecuniary harm. In addition, the Superseding Indictment fails to allege that Mr. Salcedo deprived UCLA of any "property." The University's decision to offer admission to a student—which may be either accepted or rejected—does not conform with traditional notions of "property" under the mail and wire fraud statutes. This Court should decline to adopt the government's novel and expansive interpretation of "property," as it would not provide fair notice to defendants and has no precedential support.

## I.  THE SUPERSEDING INDICTMENT FALLS FAR SHORT OF ALLEGING THAT MR. SALCEDO OWED A FIDUCIARY DUTY TO UCLA

In its opposition, the government concedes the "uncontroversial assertion that a breach of a fiduciary duty is a prerequisite to honest services fraud" (ECF No. 371 at 30). As to Mr. Salcedo, the government advances two arguments. First, it asserts that federal law, not state law, is the sole source of the fiduciary duty (ECF No. 371 at 31). Second, it argues that even if California law governed the issue, the allegations regarding Mr. Salcedo in the Superseding Indictment nonetheless are sufficient to allege the existence of a fiduciary relationship between him and UCLA (ECF No. 371 at 32).

As to the first issue, the government argues that "*Skilling* suggests that federal, not state, standards govern § 1346 prosecutions" (ECF No. 371 at 31). The government's reading of *Skilling* is too expansive on the issue of the source of the fiduciary duty required in an honest services fraud prosecution. *Skilling* simply does not squarely address this question.

It then relies on the First Circuit's two opinions in *United States v. Sawyer*, 85 F.3d 713, 726 (1st Cir. 2001), and *United States v. Sawyer*, 239 F.3d 31, 41-42 (1st Cir. 2001), for the proposition that proof of a violation of state law is not required for a conviction of honest services fraud (ECF No. 371 at

31). The government's reliance on the *Sawyer* opinions also is inapposite because those cases, like *Skilling*, do not address the question raised regarding the source of the fiduciary duty.

*Sawyer* involved the prosecution of a lobbyist for John Hancock Mutual Life Insurance Company, who was responsible for lobbying the Massachusetts Legislature. Sawyer's successful lobbying efforts resulted in legislative action favorable to John Hancock. His lobbying activities included paying for entertainment for Massachusetts legislators, such as meals, transportation, and rounds of golf. The indictment charged Sawyer with engaging in a scheme to deprive the citizens of Massachusetts of the right to honest services of their state legislators.

At trial, the government sought to prove that Sawyer had violated two Massachusetts statutes prohibiting the offering or giving of gifts and gratuities to public officials. On appeal, Sawyer challenged the district court's jury instructions on the state statutes and their role in the alleged scheme to defraud. The First Circuit vacated the fraud convictions on the ground that the jury was permitted to find that Sawyer had engaged in a scheme to defraud on proof that he violated either the gift or gratuity statute. 85 F.3d at 730. In general, the court observed that proof of a state law violation is not required for conviction of honest services fraud. *Id.* at 726. The reference to state law in the *Sawyer* cases related only to the government's theory that the defendant's violation of state ethics laws showed that he had committed honest services fraud. Neither *Sawyer* opinion discussed the issue raised here: the source of the fiduciary duty requirement. Consequently, the *Sawyer* cases provide no guidance on this issue. Moreover, the government cites no First Circuit cases holding that federal law is the source of the fiduciary duty.

Contrary to the government's position, courts have found various sources of fiduciary duties sufficient to sustain an honest services conviction, including state law, federal law, common law, and inherent duties arising out of a defendant's position. *See United States v. Lusk*, No. 15-CR-00124, 2017 WL 508589, at *10 (S.D. W.Va. Feb. 7, 2017) (Courts have "reached wildly different determinations

as to the permissible sources of fiduciary duties that can sustain an honest-services offense."); *United States v. Smith*, 985 F. Supp. 2d 547, 597 (S.D.N.Y. 2014) ("[C]ourts have looked to a smorgasbord of sources to find the fiduciary duty that, after *Skilling*, presumably underpins all honest-services-fraud prosecutions."). In the First Circuit, the issue remains unsettled. *See United States v. Urciuoli*, 513 F.3d 290, 298 (1st Cir. 2008) ("The relationship between state law and the federal honest services statute is unsettled."); *United States v. Meredith*, No. 19-CR-10075-MLW (D. Mass. Mar. 28, 2019), ECF No. 41 at 33:16-20 ("But I expect, if I were trying this case, this could be a contested issue because there is some jurisprudence that says you look to state law to see if there's a fiduciary relationship, duty[.]").

Under state and federal law, a fiduciary duty exists when the fiduciary can exercise control. California law rarely imposes a fiduciary duty outside of archetypal fiduciary relationships, like attorney-client relationships. In the employment context, an employer must delegate "control and decision-making power over important and valuable university assets and staff" to an employee to create a fiduciary duty. *Regents of the Univ. of California v. Aisen*, No. 15-CV-1766-BEN, 2016 WL 4097072, at *5 (S.D. Cal. Apr. 18, 2016). Even under federal law, control is essential. For example, in *United States v. Halloran*, the Second Circuit analyzed fiduciary duty in the context of honest services and explained that at "the heart of the fiduciary relationship lies reliance, and de facto control and dominance." 821 F.3d 321, 338 (2d Cir. 2016) (internal citation and quotation marks omitted). Under either standard, the Superseding Indictment fails to allege that UCLA entrusted Mr. Salcedo with control and decision-making power necessary to establish a fiduciary duty.

The government argues otherwise, pointing to Paragraphs 6 and 99 through 115 of the Superseding Indictment. It maintains that Mr. Salcedo was entrusted with control and decision-making power over valuable UCLA assets in the form of coveted athletic-recruit admissions slots. These allegations, however, fail to sufficiently assert a fiduciary duty. Paragraph 6 alleges only that Mr. Salcedo "was employed as the head coach of men's soccer," and "[i]n that capacity, [Mr. Salcedo]

4

owed a duty of honest and faithful services to UCLA." SI at ¶ 6. This conclusory allegation does not demonstrate that Mr. Salcedo had control and decision-making power over recruited athlete admissions slots.

Paragraphs 99 through 115, which discuss the admission of UCLA Applicants 1 and 2, similarly fail to allege a fiduciary duty. As to UCLA Applicant 1, the government claims that Mr. Khosroshahin forwarded her falsified soccer profile to Mr. Salcedo. *Id.* at ¶ 100. There is no allegation that Mr. Salcedo knew the profile was false.[1] Mr. Salcedo allegedly forwarded UCLA Applicant 1's transcript and test scores, which he received from Mr. Singer, to a UCLA women's soccer coach. *Id.* at ¶ 102. The Superseding Indictment alleges only that Mr. Salcedo was the head coach of the men's soccer team; it does not allege that Mr. Salcedo had any control over the women's coach or the women's team. The omission is not surprising. Mr. Salcedo could not possibly have had a fiduciary duty—which required control and decision-making authority—over a team that he did not coach. Mr. Salcedo simply referred an applicant to another coach. The UCLA women's coach had the responsibility to assess UCLA Applicant 1's athletic ability through research, a tryout, and an interview, and to recommend whether to recruit her.

The government implicitly concedes that Mr. Salcedo did not have control and decision-making power over recruited athlete admissions. Paragraph 103 alleges that the UCLA Student-Athlete Admissions Committee *approved* UCLA Applicant 1 for "provisional student-athlete admission." *Id.* at ¶ 103. The admission of UCLA Applicant 1, the control and decision-making power over that recruited athlete's admission, was entrusted only to the UCLA Student-Athlete

---

[1] Mr. Singer began cooperating with the government in 2018. On March 12, 2019, he pled guilty and agreed to continue cooperating with the government's investigation. *United States v. Singer*, No. 19-CR-10078, Tr. of R. 11 H'rg, (D. Mass. Mar. 12, 2019), ECF No. 24. On June 27, 2019, Mr. Khosroshahin pled guilty and also agreed to cooperate with the government. *United States v. Khosroshahin*, No. 19-CR-10081, Tr. of R. 11 H'rg (D. Mass. June 27, 2019), ECF No. 201. Although the government has had months to debrief Messrs. Singer and Khosroshahin and interview personnel at UCLA before the grand jury returned the Superseding Indictment, the charges remain bereft of allegations to establish that Mr. Salcedo owed a fiduciary duty to UCLA.

Admissions Committee. As a head coach—and not a member of the Student-Athlete Admissions Committee—Mr. Salcedo did not have control and decision-making power over the student-athlete admissions slot for UCLA Applicant 1.

Additional allegations support Mr. Salcedo's lack of control and decision-making power over student-athlete admissions slots. In Paragraphs 103 through 108, the Superseding Indictment alleges that, *after* UCLA Applicant 1 was provisionally admitted, Mr. Singer and her parents discussed returning her parents' funds in the event she did not receive final admission to UCLA. *Id.* at ¶¶ 103-108. Mr. Singer allegedly agreed that he would return the funds if UCLA Applicant 1 did not receive final admission. *Id.* at ¶ 108. Mr. Singer and the parents of UCLA Applicant 1 knew that her admission as a recruited athlete could not be guaranteed. Mr. Salcedo, in allegedly making a referral to the women's soccer coach, did not have control and decision-making power over whether UCLA Applicant 1 should be admitted.

The Superseding Indictment similarly fails to allege that Mr. Salcedo exercised any control and decision-making power as to UCLA Applicant 2. In Paragraph 113, the government alleges that Mr. Salcedo "designated" UCLA Applicant 2 as a recruit to the men's soccer team, thereby facilitating his admission to UCLA. *Id.* at ¶ 113. The government does not allege that Mr. Salcedo determined or controlled the admission of UCLA Applicant 2. As with UCLA Applicant 1, the UCLA Student-Athlete Admissions Committee controlled the offer of admission to UCLA Applicant 2, not Mr. Salcedo. Accordingly, Counts 2, 17, and 20 must be dismissed, and all RICO predicate acts alleged in Count 1 for honest services fraud must be stricken. To hold otherwise would effectively transform every employee-employer relationship into a fiduciary one, thereby rendering meaningless the concept of fiduciary duties and fiduciary relationships.

## II. THE SUPERSEDING INDICTMENT FAILS TO ALLEGE THAT UCLA IS THE VICTIM OF A SCHEME TO DEFRAUD IT OF "MONEY" OR "PROPERTY"

In its opposition, the government, in a footnote, argues that Mr. Salcedo has attacked a legal theory of fraud that is not alleged in the Superseding Indictment (ECF 371 at 44 n.14). The government's footnote suggest that it misunderstands Mr. Salcedo's argument, which is set forth in Section IV.A. of his memorandum in support of his motion to dismiss. In that argument, Mr. Salcedo asserts that, aside from the bribery counts, the mail fraud charges, the wire fraud charges, and the RICO predicate acts based on mail and wire fraud all require the government to prove that he engaged in a scheme to defraud UCLA by depriving it of "money" or "property." Mr. Salcedo maintains that, to the extent those counts and RICO predicate acts are based on the theory that Mr. Salcedo deprived UCLA of "money," they must be dismissed because UCLA is barred from accepting any financial consideration in connection with admissions decisions. The government apparently has conflated its bribe-based charges (honest services fraud and federal program bribery) with its mail fraud charges, wire fraud charges, and RICO predicate acts based on mail and wire fraud.

All of these fraud-based crimes require proof of a victim—a person or entity whom a defendant intended to defraud to obtain "money" or "property." *See United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) (to sustain a conviction for wire fraud under 18 U.S.C. § 1343, government must prove that defendant acted with specific intent to obtain money or property by a fraudulent scheme contemplating harm to victim's property interests). The Superseding Indictment identifies UCLA as Mr. Salcedo's only alleged fraud victim. SI at ¶¶ 147, 157, 159. In fact, the government has uniformly asserted that the universities are the "victims" across its "Varsity Blues" prosecutions.

Mr. Salcedo could not have deprived UCLA of "money" by allegedly accepting payments in connection with the designation of applicants as student-athletes because the University of California Board of Regents ("UC Regents"), the governing body of California public universities, prohibits UCLA from accepting money in connection with admissions decisions. UC Regents Policy 2202, titled

7

*Policy Barring Development Considerations from Influencing Admissions Decisions*, was approved in July 1998 and was applicable during the time frame described in the Superseding Indictment. Given UC Regents Policy 2202, Mr. Salcedo could not have engaged in a scheme to defraud UCLA of "money" in connection with admission of UCLA Applicants 1 and 2.

In addition, UCLA could not have suffered any economic or other articulable harm. The mail and wire fraud statues are inapplicable where the alleged victim received the full benefit of its bargain. *See United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."). For example, in *United States v. Sadler*, the defendant lied to pharmaceutical distributors when ordering prescription drugs, but she purchased them at full price. 750 F.3d 585, 590 (6th Cir. 2014). The Sixth Circuit vacated the wire fraud conviction, holding that the government failed to prove that the defendant intended to unfairly deprive the distributors of property. *Id.* UCLA stands in a similar position to the distributors.

The Superseding Indictment does not allege that UCLA Applicants 1 and 2 failed to fully and timely pay their tuition. In its opposition, the government claims UCLA's harm is "clear" when it is in fact non-existent, a point on which this Court and the Probation Department have agreed. In *United States v. Abbott*, the Probation Department took the position—to which this Court agreed—that the universities suffered no pecuniary loss. No. 19-CR-10117, Mem. and Order, (D. Mass. Sept. 13, 2019), ECF No. 443; Probation Office's Submission (D. Mass. Sept. 11, 2019), ECF No. 440.

Alternatively, to the extent the government argues that it can satisfy its burden to plead a deprivation of "money" or "property" by alleging an unquantifiable, non-pecuniary harm to UCLA such as reputational harm or loss of goodwill, the charges still must be dismissed. This type of reputational harm must still amount to an articulable harm. *United States v. Rosen*, 130 F.3d 5, 9 (1st

8

Cir. 1997). There was no economic loss to UCLA and the government does not allege that it suffered reputational or other articulable harm.[2]

Absent a deprivation of "money," the government must allege that Mr. Salcedo engaged in a scheme to deprive UCLA of "property." As demonstrated by the other co-defendants motions to dismiss, the Superseding Indictment does not allege that any university was the victim of a scheme to defraud it of "property."

In addition to the well-reasoned arguments of the co-defendants, Mr. Salcedo notes that colleges and universities are merely service providers. They teach subject matters to students. In that regard, they are no different than a host of other service providers, such as yoga teachers, martial arts instructors, music teachers, electricians, plumbers, auto mechanics, accountants, and lawyers, to name a few. The government has attempted to elevate a college's or university's decision to *offer admission* to a student by calling it an admission slot and labeling it as "property" under the federal mail and wire fraud statutes. The *offer admission* of is nothing more than a contract offer with various contingencies, such as timely payment of tuition and receipt of final transcripts and test scores, among other conditions. If a university's *admission offers* constitute "property," then virtually every service provider's offers to service a customer, teach a student, or counsel a client is "property" too. The government's attempt to equate a university's contractual admissions offer to "property" would not provide fair

---

[2] The government would be hard-pressed to claim that UCLA suffered reputational harm due to the admission of UCLA Applicants 1 and 2, as the University has had a long history of publicized student admissions scandals, occurring in 1996, 2007, and 2014. In 1996, the *Los Angeles Times* published a five-part series on UCLA's favored admissions practices for major donors. LOS ANGELES TIMES, *2 dentistry scandals rock UCLA*, (Nov. 14, 2007) *available at* https://www.latimes.com/archives/la-xpm-2007-nov-14-me-ucla14-story.html. In 2007, UCLA's School of Dentistry was accused by the UCLA newspaper, the *Daily Bruin*, of preferential treatment to large financial donors. *Id.* And in 2014, UCLA's own internal investigation revealed that athletic department officials violated UC Regents Policy 2202 by accepting donations in connection with admissions. *See* Mem. in Supp. of Mot. for R. 17(c) Subpoenas, *United States v. Salcedo*, No. 19-CR-10081 (D. Mass. Jan. 23, 2020) ECF No. 373. The Court can take judicial notice of publication of articles regarding UCLA's prior admissions scandals. *Flynn v. Hubbard*, 782 F.3d 1084, 1087 n.1 (1st Cir. 1986).

9

notice to defendants and has no precedential support. This Court should resist adopting the government's novel and expansive interpretation of "property" under the mail and wire fraud statutes. *Yates v. United States*, 574 U.S. 528, 135 S.Ct. 1074, 1088-89 (2015).

## CONCLUSION

The Superseding Indictment fails to adequately allege that Mr. Salcedo intentionally deprived UCLA of "money" or "property", that UCLA was a fraud victim, or that Mr. Salcedo owed a fiduciary duty to it. Accordingly, Mr. Salcedo respectfully requests that the Court dismiss Counts 1, 2, 17, and 20 for failure to state an offense.

**JORGE SALCEDO,**

DATE: February 14, 2020

By his attorneys,

*/s/ Thomas C. Frongillo*
Thomas C. Frongillo (BBO No. 180690)
Christina N. Lindberg (BBO No. 690443)
PIERCE BAINBRIDGE BECK PRICE & HECHT LLC
One Liberty Square, 13th Floor
Boston, MA 02109
Tel: (617) 313-07401
tfrongillo@piercebainbridge.com
clindberg@piercebainbridge.com

Susan G. Winkler (BBO No. 530682)
WINKLER LAW LLC
120 Holmes Street, Suite 313
Quincy, MA 02171
Tel: (617) 642-6671
winkler.susan@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Thomas C. Frongillo*
Thomas C. Frongillo