UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORGE SALCEDO, *et al.*,<br><br>Defendants. | Criminal No. 19-10081-IT-MPK |

### NON-PARTIES UNIVERSITY OF CALIFORNIA, LOS ANGELES AND THE REGENTS OF THE UNIVERSITY OF CALIFORNIA OPPOSITION TO JORGE SALCEDO'S MOTION FOR 17(C) SUBPOENAS

# TABLE OF CONTENTS

**Page**

I.    Introduction ..................................................................................................... 1

II.    Factual Background ......................................................................................... 4

    A.    The University of California ................................................................ 5

    B.    Student-Athlete Admissions at UCLA ............................................... 7

    C.    Salcedo's Circumvention of UCLA's Safeguards .............................. 9

        1.    UCLA Applicant 1 .................................................................. 9

        2.    UCLA Applicant 2 ................................................................ 11

    D.    2014 Investigation ........................................................................... 12

    E.    UCLA's Purported "Relationship" With Rick Singer ....................... 14

    F.    Other Purportedly Improper Admissions .......................................... 15

    G.    The Charges Against Salcedo and Salcedo's Requested Subpoenas ... 15

III.    Legal Standard .............................................................................................. 16

IV.    Argument ...................................................................................................... 17

    A.    The Subpoenas Do Not Seek Relevant Evidence ............................. 17

        1.    The Documents Sought are Not Relevant Because UCLA Was Defrauded Regardless of the Actions of Other UCLA Employees .......... 18

        2.    The Documents Sought are Not Relevant to any Cognizable Defense Theory Based on UCLA's Purported Condonation of Admissions Fraud .................................................................... 20

        3.    The Evidence Sought Concerns Unrelated Conduct ................. 23

        4.    The Specific Categories of Documents Sought by the Subpoenas Confirm That Salcedo is not Seeking Relevant Evidence ......... 25

            (a)    UCLA Subpoena Parts I-IV and UC Regents Subpoena Requests 1-4 – Admissions Investigations ................... 26

            (b)    UCLA Subpoena Part V – Admission of Non-Athletes as Student-Athletes ............................................................. 27

            (c)    UCLA Subpoena Part III – Relationship With Singer ... 27

            (d)    UCLA Subpoena Part VI – Admission of Friends and Relatives ....................................................................... 28

            (e)    UCLA Subpoena Request 8.2 and UC Regents Subpoena Request 4 – Regents Policy 2202 ................................... 28

# TABLE OF CONTENTS
## (Continued)

**Page**

    (f)  UCLA Subpoena Request 14 and UC Regents Subpoena Request 5 – Documents Concerning U.S. Attorney's Office Investigation ................................................................................28

  B.  The Subpoenas Seek Inadmissible Evidence .........................................29

  C.  The Requests Lack The Requisite Specificity .......................................30

    1.  UCLA Subpoena Parts I and IV and UC Regents Subpoena Requests 1, 2 and 3 – Requests Regarding UCLA and UC Regents' Investigations .................................................................31

    2.  UCLA Subpoena Part II – Requests Regarding the 2014 Investigation ................................................................................31

    3.  UCLA Subpoena Part III – UCLA's Relationship with Singer ................32

    4.  UCLA Subpoena Parts V and VI – Admission of Non-Athletes and Children and Relatives .............................................................32

V.  Conclusion .....................................................................................................33

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Brady v. Maryland*,
  373 U.S. 83 (1963) ......................................................................................... 29

*Gilbert v. United States*
  359 F.2d 285 (9th Cir. 1966) ......................................................................... 27

*Hook v. Regents of Univ. of Cal.*,
  394 F. App'x 522 (10th Cir. 2010) ............................................................... 30

*United States v. Allard*,
  926 F.2d 1242 (1st Cir. 1991) ....................................................................... 21

*United States v. Arditti*,
  955 F.2d 331 (5th Cir. 1992) .................................................................... 16, 28

*United States v. Barford*,
  2004 WL 5645086 (E.D. Mo. Apr. 23, 2004) .............................................. 19

*United States v. Braunstein*,
  281 F.3d 982 (9th Cir. 2002) ......................................................................... 24

*United States v. Camuti*,
  78 F.3d 738 (1st Cir. 1996) ............................................................................ 21

*United States v. Carlo*,
  507 F.3d 799 (2d. Cir. 2007) ......................................................................... 23

*United States v. Carriles*,
  263 F.R.D. 400 (W.D. Tex. 2009) ................................................................. 31

*United States v. Cartagena-Albaladejo*,
  299 F. Supp. 3d 378 (D.P.R. 2018) ........................................................ passim

*United States v. Coyle*,
  63 F.3d 1239 (3d Cir. 1995) ........................................................................... 21

*United States v. De La Cruz*,
  469 F.3d 1064 (7th Cir. 2006) ....................................................................... 23

*United States v. Foley*,
  851 F. Supp. 507 (D. Conn. 1994) ................................................................ 20

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*United States v. Gikas*,
112 F.R.D. 198 (D. Mass. 1986) ............................................................................................17

*United States v. Jackson*,
155 F.R.D. 664 (D. Kan. 1994) ..............................................................................................17

*United States v. Josleyn*,
206 F.3d 144 (1st Cir. 2000) ...................................................................................................22

*United States v. Josleyn*,
99 F.3d 1182 (1st Cir. 1996) ........................................................................................... passim

*United States v. Martin*,
228 F.3d 1 (1st Cir. 2000) .......................................................................................................20

*United States v. Maxwell*,
254 F.3d 21 (1st Cir. 2001) .....................................................................................................29

*United States v. Moore*,
923 F.2d 910 (1st Cir. 1991) .............................................................................................21, 26

*United States v. Morris*,
287 F.3d 985 (10th Cir. 2002) ...................................................................................30, 31, 32

*United States v. Nivica*,
887 F.2d 1110 (1st Cir. 1989) .................................................................................................17

*United States v. Nixon*,
418 U.S. 683 (1974) ......................................................................................................... passim

*United States v. Noriega*,
764 F. Supp. 1480 (S.D. Fla. 1991) .......................................................................................30

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) ..................................................................................23, 24, 25

*United States v. Phoenix*,
2015 WL 6094882 (N.D. Cal., Oct. 16, 2015) .......................................................................33

*United States v. Rackley*,
986 F.2d 1357 (10th Cir. 1993) ..............................................................................................19

*United States v. Reed*,
726 F.2d 570 (9th Cir. 1984) .....................................................................................24, 26, 31

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*United States v. Reyes*,
   239 F.R.D. 591 (N.D. Cal. 2006) ..........................................................................30

*United States v. Ross*,
   131 F.3d 970 (11th Cir. 1997) ...............................................................................27

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996) ...................................................................................20

*United States v. Shinderman*,
   232 F.R.D. 147 (D. Me. 2005) ..............................................................................17

*United States v. Silva-Rosa*,
   275 F.3d 18 (1st Cir. 2001) ...................................................................................29

*United States v. Starr*,
   916 F.2d 94 (2d Cir. 1987) ....................................................................................21

*United States v. Tokash*,
   282 F.3d 962 (7th Cir. 2002) .................................................................................16

*United States v. Turner*,
   934 F.3d 794 (8th Cir. 2019) .................................................................................31

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ...............................................................................2, 19

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017) ....................................................................................21

**STATE CASES**

*Miklosy v. Regents of Univ. of Calif.*,
   188 P.3d 629 (Cal. 2008) .........................................................................................5

*San Francisco Labor Council v. Regents of Univ. of Calif.*,
   608 P.2d 277 (Cal. 1980) .........................................................................................5

**FEDERAL STATUTES**

20 U.S.C. § 1232g ...........................................................................................................33

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

**RULES - OTHER**

Fed. R. Crim. P. 17(c) ................................................................................................  passim

FRE 802 ...............................................................................................................................30

FRE 803(6)...........................................................................................................................30

FRE 1101(c).........................................................................................................................30

**CONSTITUTIONAL PROVISIONS**

Cal. Const. Article IX, § 9, subdiv. (a) ..............................................................................5

California Constitution...........................................................................................2, 5, 18, 19

I.      Introduction

Defendant Jorge Salcedo stands charged with five counts of criminal fraud.  The indictment alleges that while acting as the head men's soccer coach at the University of California, Los Angeles ("UCLA"), Salcedo accepted $200,000 in bribes to help two applicants gain admission to UCLA by misrepresenting their qualifications as student-athletes.  Salcedo's alleged fraud includes promoting one applicant as a NCAA Division I soccer athlete using a fictitious soccer profile, and offering a twenty-five percent soccer scholarship to another non-soccer player. If convicted, he faces potentially years of incarceration in Federal Prison.

Salcedo's motion asks this Court to issue subpoenas to UCLA and the Regents of the University of California ("UC Regents") seeking information to support a legally and factually infirm theory of defense.  To be clear, Salcedo does not allege that the evidence he seeks would show that he did not accept bribes.  Nor does Salcedo claim that it would show that he did not falsify the applicants' athletic credentials, or that he did not try to deceive UCLA.  Instead, Salcedo seeks evidence to deflect attention away from his own actions and instead turn the focus on the institution he defrauded, UCLA, in a misguided attempt to find fault with the University's admissions practices.

Salcedo bases his motion on the fact that in 2014, UCLA found in a self-initiated investigation that the athletics admission process had been misused to admit two applicants who were children of prospective donors in violation of UC policy.  As a result, UCLA disciplined employees found to have violated University policy, and  instituted new antifraud controls that included increased due diligence of prospective student-athletes' athletic abilities.  Contrary to Salcedo's claim, nothing about that investigation shows that UCLA "condoned" admissions fraud, let alone the fraudulent scheme in which Salcedo is alleged to have participated years

later.  Quite the opposite, the entire investigation was premised on determining whether employees violated University policy that specifically prohibits the receipt of financial benefits in exchange for admissions decisions.  And the investigation resulted in UCLA implementing the exact controls that Salcedo actively circumvented when, in 2016 and 2018, he promoted two prospective student-athletes for admission as Division I soccer players by making numerous false statements about their purported soccer abilities to deceive UCLA's compliance personnel.

More fundamentally, the evidence Salcedo seeks would not form a cognizable legal defense, nor would it exonerate him.  *First,* entities like UCLA exist independent of the individuals they employ and the officials who are authorized to make decisions on their behalf. It is no answer to a charge of fraud to say that an entity cannot have been deceived because high level officials were purportedly "in on" it.  *See, e.g., United States v. Wallach,* 935 F.2d 445, 464 (2d Cir. 1991) (cited with approval in *United States v. Josleyn,* 99 F.3d 1182, 1194 (1st Cir. 1996) ("*Josleyn I*")).  UCLA is an operating unit of the University of California, which is chartered under the California Constitution and operates in public trust. The entity and the public it serves are the victims here. Whether some other UCLA employee may have violated policy several years before Salcedo's conduct simply does not insulate him from the charge that he allegedly accepted personal bribes to misrepresent students' qualifications.

*Second,* fraud does not require a victim: what matters is not whether anyone purportedly condoned the fraud, but whether the defendant believed that his conduct was acceptable and therefore lacked an intent to deceive.  *Josleyn I,* 99 F.3d at 1194.  Salcedo's defense would thus have to rest, if at all, on the far-fetched argument that he sincerely believed UCLA would have had no quarrel with him accepting $200,000 in personal bribes to help applicants get into UCLA by lying about their athletic abilities.  But no discovery is needed for him to make this claim:

2

everything Salcedo knew, understood, and believed at the time of his alleged crime is already within his personal knowledge.

*Third,* the evidence sought by the subpoenas does not concern the kind of fraudulent conduct in which Salcedo is alleged to have engaged.  The subpoenas seek evidence to support Salcedo's theory that UCLA allegedly condoned the misuse of the athletics admissions process to generate donations to athletics programs.  But Salcedo has not been charged with that.  He is not alleged to have falsified athletic credentials for applicants so that their parents would donate to UCLA.  He is alleged to have lined his own pockets with hundreds of thousands of dollars in bribes for helping two applicants seek admission as soccer athletes when they were anything but—even going so far as to offer one of the applicants an athletic scholarship for a quarter of the individual's tuition.  Those University resources were not Salcedo's to give away for his own personal financial enrichment.  UC ethical standards explicitly prohibit such self-dealing, and basic common sense dictates that such behavior is improper.  Even if Salcedo's proposed discovery were to uncover some evidence to support his theory about UCLA purportedly condoning the misuse of the athletics admissions process to garner donations (and Salcedo provides no reason to think that it would) that would not show that UCLA condoned its coaches accepting personal bribes to pass off non-athletes as bona fide recruits.

Rule 17(c)[1] does not sanction the use of criminal subpoenas for the purpose of mounting a defense that has no support in the law and is irrelevant to the charges in the indictment.  Nor are Rule 17(c) subpoenas "discovery devices or investigatory tools" to fish for some morsel of information that might relate to whatever defense theory a defendant might concoct.  *United*

---

[1] All references to "Rules" are to the Federal Rules of Criminal Procedure. All references to "FRE" are to the Federal Rules of Evidence.

*States v. Cartagena-Albaladejo*, 299 F. Supp. 3d 378, 382 (D.P.R. 2018).  They should issue

only if they clear "three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity."  *United*

*States v. Nixon*, 418 U.S. 683, 700 (1974).  Salcedo's proposed subpoena clears none of these.

The evidence sought by the subpoenas is not relevant.  UCLA still would be a victim, and

Salcedo would be no less culpable, even if Salcedo could show all that he alleges in his motion.

The subpoenas also do not clear the admissibility hurdle.  In addition to being irrelevant and

therefore inadmissible, most of the documents Salcedo seeks are inadmissible hearsay.  Finally,

the subpoena requests are not specific.  Salcedo seeks to conduct an unbounded investigation of

UCLA's student-athlete admissions practices with no limits on the time or scope of his requests.

That fishing expedition is improper.  In addition to being extremely burdensome to a public

university, it would yield nothing that could plausibly support a viable defense.

For these reasons and those set forth below, UCLA and the UC Regents respectfully

request that the Court deny Salcedo's motion.

II.     Factual Background

Salcedo's claim that UCLA has allegedly condoned deception in the admissions process

for years is both inaccurate and irrelevant.  Salcedo betrayed the trust of UCLA, and thus the

public's trust, by providing false information to help two students seek admission to UCLA as

athletes.  His actions benefitted him alone, allegedly to the tune of $200,000.  Salcedo, however,

contends that UCLA cannot be a victim of his alleged fraud because, years before he committed

his alleged crimes, other UCLA employees were found to have misused the athletic admissions

process.  Not only were those events separated in time and different in kind from Salcedo's

alleged fraud, UCLA caught and punished those involved.  That hardly exonerates Salcedo.  To

the contrary, the previous events around which Salcedo hopes to construct his defense

demonstrate UCLA's intolerance for deception in admissions and the lengths to which Salcedo had to go to conceal his own actions.

A.      The University of California

UCLA is part of the University of California ("UC"), a single legal entity comprised of a system of ten campuses, five medical centers, and three affiliated national laboratories.  The California Constitution establishes UC as a "public trust . . . with full powers of organization and government."  Cal. Const. art. IX, § 9, subdiv. (a).  It is governed by Regents, who have "broad powers to organize and govern the university."  *Miklosy v. Regents of Univ. of Calif.*, 188 P.3d 629, 699 (Cal. 2008) (quoting *San Francisco Labor Council v. Regents of Univ. of Calif.*, 608 P.2d 277, 278 (Cal. 1980)). The Regents "have been characterized as a branch of the state itself or a statewide administrative agency."  *Id.* at 700  (citations and quotations omitted).  As a public institution, UC's mission is to serve society through education and research, and as a repository of knowledge. (Li Decl. Ex. A (University of California, *UC's Mission*).)

There are more than 280,000 enrolled students in the entire UC system.  UCLA became the second UC campus in 1919.  UCLA is one of the top public universities in the country, and a global leader in education and research.  Its admissions process is highly selective.  Last year, UCLA admitted approximately 13,000 freshman from a total pool of over 110,000 applicants to its undergraduate program.  (Li Decl. Ex. B (UCLA, *Profile of Admitted Freshmen Fall 2019*).)

UC is committed to admitting students based on merit and achievement and to maintaining the integrity of its admissions process.  To this end, a longstanding UC policy, Regents Policy 2202, prohibits admission that is in any way "motivated by concern for financial, political, or other such benefit to the University."  (Li Decl. Ex. C (University of California Board of Regents, *Regents Policy 2202: Policy Barring Development Considerations from Influencing Admissions Decisions*).)

Additionally, UC ethical standards make clear that financial self-dealing in the admissions process is prohibited.  Standard 6 of the UC Standards of Ethical Conduct provides that "[e]mployee members of the University community are expected to devote primary professional allegiance to the University and to the mission of teaching, research and public service," and  that "[i]n all matters, community members are expected to take appropriate steps, including consultation if issues are unclear, to avoid both conflicts of interest and the appearance of such conflicts."  (Li Decl. Ex. D (University of California, *Regents Policy 1111:Policy on Statement of Ethical Values and Standards of Ethical Conduct*).)  Standard 6 explains the kinds of conflicts that must be avoided, including "personal financial interests, or acceptance of benefits from third parties," which "can create actual or perceived conflicts between the University's mission and an individual's private interests."  (*Id.*)  Salcedo's employment contract explicitly referred to UC's policies against self-dealing, and conditioned his employment on complying with them.  (Li Decl. Ex. E.)

UC has multiple systems in place to guard against fraud in the admissions process.  Each campus verifies the grades and standardized test scores of all applicants who accept offers of admission.  (*See* Li Decl. Ex. F (*Systemwide Audit of Undergraduate Admissions*), at 5.)  A third-party vendor also verifies both academic and non-academic achievements of a random sample of applicants.  (*Id.* at 5-6.)  UC denies or revokes admission for students that have falsified their application information, regardless of whether that information played a role in the admissions decision. (*Id.* at 6.) [2]

---

[2] These safeguards have been strengthened further as a result of the Government's investigation and indictments.  (*See* Li Decl. Ex. F (*Systemwide Audit of Undergraduate Admissions*).)

B.      Student-Athlete Admissions at UCLA

In addition to these safeguards, which apply to every campus in the UC system, UCLA has campus-specific measures to protect the integrity of athletics admissions at UCLA.

UCLA recruits world-class student-athletes to compete in its highly competitive, NCAA Division I athletic programs.  In recognition of their achievements and potential to contribute to the university, UCLA has a set of procedures for considering the application of student-athletes separately from the standard admissions process.  This set of procedures ensures that, although recruited athletes are evaluated in a separate process, the assessment is no less rigorous.

The process begins when coaches identify the athletes they are recruiting to the Athletics Compliance Department.  (Munger-Rivera Decl. ¶ 6.)  That department reviews the academic and athletic qualifications of each prospect and approves him or her for consideration by a special committee, the Student-Athlete Admissions Committee ("SAAC"), which is made up of faculty and staff who are not affiliated with the Athletics Department.  (*Id.* ¶¶ 6-7.)  The SAAC evaluates the prospect's record and, if the prospect meets academic and other criteria, grants the student provisional admission.  (*Id.* ¶¶ 7-8.)  Admission is not final until the prospect is notified of final admission by the Admissions Office.  (*Id.* ¶ 8.)

UCLA has tightened these safeguards over time.  For example, following a 2014 investigation into student-athlete admissions, UCLA started applying heightened scrutiny to applicants who are recruited through this process but who are not awarded athletic scholarships (so-called "recruited walk-ons"). Compliance staff began independently confirming the athletic qualifications of every recruited walk-on and reviewing whether the family of a recruited walk-on has made donations to UCLA.  (*Id.* ¶ 13.)  When athletic qualifications have not been confirmed, or a giving history check in combination with a review of the applicant's entire

application has raised sufficient concern, applicants have not been granted admission through the
student-athlete admission process. (*Id.* ¶ 15.)

Until this year, UCLA did not apply these additional checks to scholarship athletes
because of the significantly lower risk of fraud they present.  Athletic scholarships are a limited
resource, without which coaches would be hard-pressed to recruit the top athletes they need to
win games and titles.  NCAA rules limit the scholarships available to each team.  (*Id.* ¶ 9.)  In
some sports, like football, a coach has a fixed number of full-ride scholarships to award.  (*Id.*)  In
other sports, like soccer, athletic scholarships may be divided among an unlimited number of
players, but the total amount that can be awarded is capped at a pre-determined level.  (*Id.*)
Thus, if one player is given a 25% scholarship, that reduces the remaining pool of scholarships
available for the soccer team by that amount.  (*Id.*)  UCLA believed its coaches, who are
incentivized to win competitions, would not jeopardize their success by giving coveted
scholarships to non-athletes.  Although a recent UC audit determined that the nature of
scholarship recruiting should largely operate as its own check on fraud, (Li Decl. Ex. F, at 10),
UCLA this year expanded its controls and now checks athletic credentials and donation histories
for all recruited athletes, not just recruited walk-ons, (Munger-Rivera Decl. ¶ 14).

As an additional control, students admitted through the student-athlete process to UCLA
have been required to commit to participating as an athlete on the team for which they were
recruited for at least one year.  (*Id.* ¶ 12.)  Students enrolling in Fall 2020 will be required to
commit to participate for at least two years.  (*Id.* ¶ 14.) And coaches may not present an
applicant to the SAAC if they intend the applicant to act as a student manager for the team
instead of being a player.  (*Id.* ¶ 12.)

C.      Salcedo's Circumvention of UCLA's Safeguards

The indictments filed by the Government amass a mountain of evidence that Salcedo violated numerous University policies and went to great lengths to elude the measures UCLA had in place to protect the integrity of its athletics admissions process.

The Superseding Indictment charges Salcedo with facilitating the fraudulent admission of two applicants to UCLA in exchange for bribes totaling $200,000.  (*See* Dkt. 272 ("Superseding Indictment") at 17-19 .)  All of the other indicted participants in the scheme to admit these two applicants have pleaded guilty and admitted to the allegations against them. (*See* Dkt. 197 (Khosroshahin); Li Decl. Ex. G (Sui);  *id.* Exs. H & I (Isacksons); *id.* Ex. J (Singer).)  These individuals include William "Rick" Singer, the college admissions consultant alleged to have masterminded a nationwide scheme to fraudulently admit students to universities across the country; the parents of both applicants who hired Singer to help their children get admitted to college; and the former USC head women's soccer coach Ali Khosroshahin, who, in addition to working with Singer to fraudulently admit students to USC, is alleged to have acted as a conduit between Singer and Salcedo.  Salcedo stands alone in maintaining that he is not guilty of the fraudulent scheme to admit the two applicants as purported athletes to UCLA.

Although Salcedo bears the burden of explaining why the information he seeks through his proposed subpoenas is relevant to charges against him, *see Nixon*, 418 U.S. at 700,  Salcedo mentions none of the facts relating to his involvement in the recruitment of these two applicants. The facts are these:

1.      UCLA Applicant 1

In 2016 Salcedo recommended "UCLA Applicant 1" as a prospect for the UCLA women's soccer team.  Salcedo provided the student's transcript and test scores, and the women's coaching staff submitted her application for approval as a recruited walk-on.

(Superseding Indictment at 17; Munger-Rivera Decl. ¶ 17.)  Consistent with UCLA's policies, Compliance staff searched for evidence of the student's soccer abilities online and found none. (Munger-Rivera Decl. ¶ 17.)  Asked to provide more information about the student and how she was recruited, the women's coaching staff supplied a soccer profile outlining the student's soccer experience and explained that Salcedo had recommended the student based on what he had heard about her skills from well reputed girls' coaches.  (*Id.*)  As set forth in the Superseding Indictment—but unbeknownst to UCLA at the time—the information about the student's soccer abilities was false.  The profile contained fabricated information, and had been provided to Salcedo by Rick Singer's admitted co-conspirator, Ali Khosroshahin.  (Superseding Indictment at 17.)  After UCLA Applicant 1 was admitted as a student-athlete on the basis of this false information, Salcedo directly informed Singer of her admission.  (*Id.* at 18.)

The Superseding Indictment alleges that UCLA Applicant 1's parents paid Singer over $250,000 when she was provisionally admitted, $100,000 of which Singer paid to Salcedo.  (*Id.*) Emails between Singer and UCLA Applicant 1's parents reflect that they expressed concern about what would happen if their daughter did not receive final admission to UCLA.  Singer assured the parents that he would return their money if the admission fell through.  (*Id.*; *see also* Li Decl. Ex. K (Singer Information), at 15-16; *id.* Ex. L (Isackson Information), at 9-10.)

It almost did.  Upon her arrival at UCLA for the Fall 2016 term, UCLA Applicant 1 disclosed information that precluded her from being cleared to participate on the soccer team. (Munger-Rivera Decl. ¶ 19.)  She was informed that, because she had been admitted as a student-athlete, she had to participate on the team for one year, and she was not allowed to enroll because she was not participating.  (*Id.*)  She was allowed to enroll in Winter 2017 only after resolving the issue that prevented her from being cleared to participate on the team.  (*Id.* ¶ 20.)

Salcedo tracked UCLA Applicant 1's admission, and presumably knew how close the plan to admit her had come to failing because of UCLA's safeguards.  (*See, e.g.*, Superseding Indictment at 18.)

### 2.      UCLA Applicant 2

The next time Salcedo allegedly sought to admit an unqualified student as an athlete, he found a way around those controls.  The Superseding Indictment charges Salcedo with recruiting another student, "UCLA Applicant 2," to the men's soccer team in 2018 despite the student's lack of any soccer experience.  (Superseding Indictment at 19.)   Rather than designate UCLA Applicant 2 as a recruited walk-on, which would have triggered the additional levels of scrutiny that almost prevented UCLA Applicant 1 from being admitted and allowed to enroll, Salcedo offered UCLA Applicant 2 an athletic scholarship to cover twenty-five percent of UCLA Applicant 2's tuition, room and board, books and supplies, and transportation expenses each year.  (Munger-Rivera Decl. ¶ 21.)  Allegedly armed with a falsified sports resume for Applicant 2 that Salcedo received from Singer (Dkt. 201 (Khosroshahin plea colloquy) at 21), Salcedo told the UCLA Athletics Department that UCLA Applicant 2 was a soccer player he had seen in China with "good quickness and speed."  (Li Decl. Ex. M (Sui Superseding Indictment), at 5.) Because UCLA Applicant 2 was designated as a scholarship player, UCLA's Compliance staff did not independently verify this assertion, but after learning of the allegations against Salcedo and Singer, UCLA acted to block Applicant 2 from enrolling and he was never admitted to UCLA.  (Munger-Rivera Decl. ¶ 22.)

As with his efforts to recruit UCLA Applicant 1, Salcedo is alleged to have been rewarded handsomely for his efforts on behalf of UCLA Applicant 2.  Singer asked Khosroshahin what Salcedo wanted in exchange for his role, and Khosroshahin said "He wants a hundred."  (Dkt. 201 (Khosroshahin plea colloquy), at 22 .)  Singer replied, "Done deal," and

allegedly paid Salcedo another $100,000 in exchange for this fraud.  (*Id.*; Superseding Indictment at 18.)

The Government does not allege, and there is no evidence to support, that either UCLA Applicant 1 or UCLA Applicant 2 was recruited because of past or pledged donations to UCLA. The only donation connected to either prospect is a $100 donation by UCLA Applicant 1's mother to the Department of Sociology.  (Munger-Rivera Decl. ¶ 23.)

D.     2014 Investigation

Salcedo skates past these facts and instead spends the majority of his brief excoriating UCLA over a UCLA-initiated 2014 investigation into student-athlete admissions.  But the investigation Salcedo now attempts to weaponize against UCLA is evidence not of willful blindness to or approval of fraud, but of UCLA's dedication to enforcing its admissions policies.

UCLA launched the 2014 investigation after its Athletics Compliance staff, in the process of verifying the information in a student's application, discovered that an applicant who had been provisionally admitted as a water polo recruit was not in fact a water polo player.  (Dkt. 373 ("Br.") Ex. 9, at 10.)  The Compliance staff inquired and learned that the team's coach intended for her to serve as a team manager, in contravention of UCLA policy.  (*Id.*)  After rescinding the applicant's provisional admission, UCLA learned from the applicant's mother that she had hired Rick Singer as an admissions consultant, and that he had suggested that she make a significant donation to the water polo program.  (*Id.* at 9-11.)

That prompted UCLA to engage its Administrative Policies & Compliance Office to conduct an investigation into the admissions actions surrounding this applicant, led by the director of that office.  The investigation found evidence of one other student who had been admitted though the student-athlete process with the intention that she would be a team manager for track and field, and whose parents had subsequently donated to that team.  (*Id.* at 8-9.)  The

12

Compliance Director determined the latter admission violated Regents Policy 2202, which

prohibits financial benefits to the university from factoring in admissions decisions, and that both

admissions violated UCLA policy regarding the admission of student-athletes as team managers.

(*Id.* at 4-5.)[3]  An assistant men's tennis coach was found to have facilitated both admissions.

The Compliance Director also reviewed ten years' worth of student-athlete admissions to

the UCLA men's tennis program.  Contrary to Salcedo's assertion that this review found

"persuasive evidence" of a pattern of improper admissions (Br. at 19-20) the Compliance

Director concluded that, while some of the admissions raised concerns, "specific wrongdoing

could not be substantiated in these cases."  (Br. Ex. 9, at 23.)

UCLA's thorough, self-initiated investigation, which was detailed in a 20-page, single-

spaced written report, belies Salcedo's claim that UCLA actively encouraged admissions fraud.

Salcedo nonetheless attempts to turn the 2014 investigation against UCLA by claiming that

UCLA "concealed" the report and did not do enough to remedy the issues it identified.  That

again ignores the facts.  UCLA did not "conceal" the report, it simply labeled it as

"confidential"—an unremarkable fact given that the report contained sensitive personal

information about specific students and employees.[4]  Nor did UCLA "omit" relevant facts from

the report.  (Br. at 26.)  The information that Salcedo claims was "omitted"—namely, the track

---

[3] Salcedo notes that the mother who had hired Singer told the Compliance Director that she had understood Singer to say that her donation would partly go to UCLA and partly to the coaches. (Br. at 14.)  However, the investigation found "no evidence that any of the coaches involved in the[] two admissions actions received any personal financial benefit."  (Br. Ex. 9, at 22.)

[4] Salcedo falsely claims that "UCLA withheld this information [that the 2014 investigation found Rick Singer was involved in facilitating improper admissions] from the government before the indictment was returned." (Br. at 27.)  UCLA disclosed the report's existence to the Assistant U.S. Attorneys involved in this case on multiple occasions, the earliest being January 2019— three months before Salcedo was indicted.  (Li Decl. ¶¶ 2-3.)  UCLA's counsel sent the report to Assistant U.S. Attorney Eric Rosen in August 2019.  (*Id.* ¶ 4.)

and field coach's allegation that a development director had encouraged him to consider one of the students for the track team—was in fact withheld by the coach from the Compliance Director during his investigation.  It did not surface until more than a week *after* the investigation report was finalized, when the track and field coach sent a letter to the Athletics Director in which he admitted he did not "fully disclose" to the Compliance Director the information in the letter.  (Br. Ex. 10, at 4; *id.* Ex. 9, at 2.)

And while Salcedo attempts to find fault with UCLA's response, he ignores the many remedial measures UCLA took, as well as the controls that UCLA had in place and enhanced over time, several of which Salcedo took pains to evade when he later promoted two applicants as soccer recruits despite their lack of merit in that sport.  Those measures included the athletics qualification and giving history checks for recruited walk-ons described above, a requirement that recruited walk-ons sign statements committing to participate on the team for one year, and a policy that donations could not be accepted from the family of a prospective student-athlete until the student enrolled at UCLA.  (Munger-Rivera Decl. ¶¶ 12-13; Br. Ex. 11, at 2.)

E.     UCLA's Purported "Relationship" With Rick Singer

In addition to ignoring the UCLA compliance controls that he circumvented, Salcedo distorts the facts when he claims that UCLA continued a "business relationship" with Rick Singer.  (Br. at  21.)  The so-called "business relationship" had nothing to do with athletics, admissions, donations to UCLA, or even with Rick Singer himself.  Rather, it refers to the fact that on three occasions in 2013, 2014, and 2018, respectively, an organization associated with Singer called The Key Worldwide ("the Key") rented space from UCLA's Catering and Conference Services ("UCLA Catering") on the same terms and through the same process available to the general public.  As the exhibits Salcedo attached to his motion reflect, UCLA Catering addressed its communications to individuals at The Key other than Singer, whose name

is absent from all of the related paperwork save for one handwritten signature on one contract. (*See* Br. Exs. 15, 17 (invoices addressing Mikaela Sanford as the "responsible party" for The Key); *id.* Ex. 16 (correspondence from UCLA Catering addressed to Mikaela Sanford and Steve Masera at The Key).)  These facts do not show, or even raise a shadow of an inference, that UCLA was complicit in Singer's nationwide scheme to admit unqualified students under false pretenses to UCLA and other universities.

> F.     Other Purportedly Improper Admissions

Nor is there any link between the fraudulent scheme in which Salcedo is alleged to have participated and the isolated examples that Salcedo cites of "additional non-athletes" who, he claims, were improperly admitted through the student-athlete process because of connections between their families or friends and UCLA athletics staff.  None of these alleged incidents involved personal bribes to coaches in exchange for misrepresenting athletic qualifications.

> G.     The Charges Against Salcedo and Salcedo's Requested Subpoenas

On March 5, 2019 Salcedo was indicted and charged with mail, wire, and honest services fraud, as well as federal programs bribery, for accepting $200,000 to deceive UCLA into admitting Applicants 1 and 2 as student-athletes. Purportedly in support of his defense, Salcedo asks this Court to issue subpoenas to UCLA and the UC Regents seeking information that has nothing to do with the charges against him.  (*See* Dkt. 372 Ex. 1 ("UCLA Subpoena"); *id.* Ex. 2 ("UC Regents Subpoena").) Salcedo does not seek information relating to the applications of UCLA Applicants 1 or 2, or about his own files or records.  Rather, his numerous demands seek information on five irrelevant topics.  First, he requests all documents and communications concerning any internal investigations into the consideration of benefits to the University in the student-athlete admissions process, including documents underlying the 2014 investigation and any documents related to an investigation undertaken after his indictment.  (UCLA Subpoena

Parts I, II, and IV; UC Regents Subpoena Requests 1, 2, and 3.)  Second, Salcedo seeks any

documents related to UCLA's alleged "relationship" with Singer.  (UCLA Subpoena Part III.)

Third, he asks UCLA to search through its records of all students ever admitted through the

student-athlete admissions process, identify which of them have certain characteristics he

enumerates, and produce all records of their admission.  (UCLA Subpoena Parts V and VI.)

Fourth, he requests all documents and communications concerning compliance with UC Regents

Policy 2202.  (UC Regents Subpoena Request 4.)  And finally, Salcedo demands all documents

and communications regarding UCLA's cooperation with the Government in the investigation

that led to his indictment.  (UCLA Subpoena Part VII; UC Regents Subpoena Request 5.)  For

the reasons discussed below, the subpoenas should not issue.

III.    Legal Standard

Federal Rule of Criminal Procedure 17(c) allows defendants to subpoena third parties for

the production of documents needed for their defense.  But these subpoenas are "not discovery

devices or investigatory tools."  *United States v. Cartagena-Albaladejo*, 299 F. Supp. 3d at 382.

They allow "only for the gathering of specifically identified documents which a defendant *knows*

to contain relevant evidence to an admissible issue at trial." *United States v. Tokash*, 282 F.3d

962, 971 (7th Cir. 2002) (emphasis added).

Parties moving for the issuance of a Rule 17(c) subpoena must show that it clears "three

hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity."  *Nixon*, 418 U.S. at 700.  These

are high bars intended to compel the moving party to name the precise documents he seeks and

why they are relevant to his case.  *See United States v. Arditti*, 955 F.2d 331, 345 (5th Cir. 1992)

("[The] specificity and relevance elements require more than the title of a document and

conjecture as to its contents.").  The moving party must also show that the documents "are not

otherwise procurable reasonably in advance of trial by exercise of due diligence; . . . that the

party cannot properly prepare for trial without such production and inspection in advance of trial

and that the failure to obtain such inspection may tend unreasonably to delay the trial; and . . .

that the application is made in good faith and is not intended as a general 'fishing expedition.'"

*Nixon*, 418 U.S. at 699-700.

The Court has "great latitude" to weigh the factors for and against issuing the subpoena,

such as "timeliness, materiality, relevancy, competency, practicality, and utility."  *United States*

*v. Nivica*, 887 F.2d 1110, 1118 (1st Cir. 1989).

IV.     Argument

Salcedo cannot clear any of the three hurdles of relevancy, admissibility, and specificity.

The proposed subpoenas improperly seek to launch a fishing expedition that would yield no

admissible information relevant to any legally cognizable theory of defense.

A.     The Subpoenas Do Not Seek Relevant Evidence

Documents requested in a Rule 17(c) subpoena must have more than "some *potential* of

relevance and evidentiary use."  *United States v. Shinderman*, 232 F.R.D. 147, 152 (D. Me.

2005) (quoting *United States v. Jackson*, 155 F.R.D. 664, 667-68 (D. Kan. 1994)).  Salcedo must

show "a sufficient likelihood that the requested material is relevant to the offenses charged in the

indictment."  *Id.*  Although the allegations of the indictment need not be taken as true, they are

"what the defendant[] ha[s] to prepare to defend against," so he must "present some facts

demonstrating that the materials sought are relevant and of evidentiary value to a defense against

the allegations."  *United States v. Gikas*, 112 F.R.D. 198, 201 (D. Mass. 1986).

Salcedo argues that the documents he seeks will show that UCLA condoned the

fraudulent practices in which he is alleged to have participated and therefore is not a victim.

This, he claims, would negate the existence of a fraudulent scheme and undermine the

Government's portrayal of UCLA as a victim.  For three reasons, Salcedo's argument fails.

First, because an institution exists independent of the individuals it employs, it is not a defense to argue that others within the institution participated in or approved of the alleged fraudulent scheme.  UCLA is an operating unit of the UC, an entity chartered in public trust under the California Constitution.  Even in a counterfactual world in which some UCLA employees had condoned the alleged fraud, that would not mean UCLA—which exists separate from those individuals for the benefit of the public—was not defrauded or was not a victim.

Second, as courts have long recognized, fraud does not require a victim but rather an intent to defraud.  Thus, whether the targeted entity condoned the fraud is not by itself relevant. What matters is whether the defendant *knew or believed* the entity condoned his activities and therefore lacked the requisite intent to defraud.  *See, e.g.*, *Josleyn I*, 99 F.3d at 1194.  The documents Salcedo seeks do not bear on this question at all, since he already (and uniquely) possesses all of the facts about what he knew and believed at the time of his alleged crimes.

Third, even if there were such a thing as a "condonation defense," UCLA has never come close to condoning the type of conduct of which Salcedo is accused.  The most Salcedo claims he will be able to show is that certain UCLA employees allowed unqualified students to be admitted as athletes in an effort to garner donations, or because of a pre-existing personal relationship with someone in the athletics department.  But Salcedo is not accused of soliciting donations for UCLA or helping his friends or family members; he is accused of deceiving UCLA in order to line his own pockets with hundreds of thousands of dollars in bribes.  Any alleged condonation of the former does not mean UCLA condoned the latter.

       1.     The Documents Sought are Not Relevant Because UCLA Was Defrauded Regardless of the Actions of Other UCLA Employees

Salcedo's proposed subpoenas do not seek any evidence that would show that UCLA was not defrauded when Salcedo falsified student-athlete information to enrich himself with bribes.

Even if others within the targeted institution may have also engaged in wrongdoing, evidence of such wrongdoing is not a defense to fraud or federal programs bribery.

Courts have refused to "endorse a theory of criminal law that would effectively grant corporate officials and third-parties working in concert with them a license to loot the corporate treasury as long as they were all in on the scheme." *United States v. Wallach,* 935 F.2d at 464 (cited with approval in *Josleyn I*, 99 F.2d at 1194). A theory that a criminal fraud "cannot be perpetrated" against an entity when officers who have authority to act on behalf of that entity participate in the scheme "completely fails to recognize and to protect the property interests of the shareholders and the corporation." *Id.*; *see also United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993) (explaining it is a "financial institution itself—not its directors or agents— that is the victim of the fraud," so knowledge of directors or agents is not a defense to fraud on the institution); *United States v. Barford,* 2004 WL 5645086, at *10 (E.D. Mo. Apr. 23, 2004) (defense theory that fraud could not be shown where executives knew of the alleged fraudulent activities "overlooks the basic legal premise that a corporation's identity and existence in the law is incorporeal and independent of its officers, employees, directors, and shareholders" and that "it is not a defense … that corporate executives condoned the actions of the defendants").

That observation applies with equal or greater force to public entities like UCLA. UCLA is an operating unit of the University of California ("UC"), which is a public trust chartered under the California Constitution and funded largely by taxpayer dollars. UC and UCLA exist separate and apart from their employees, officers and managing agents, and operate for the benefit of the public. As the First Circuit has emphasized, it is ultimately the public that is harmed when an employee of a public entity such as UCLA engages in fraud or bribery:

> [T]he fraud involved in the bribery of a public official lies in the fact that the
> public official is not exercising his independent judgment in passing on official

matters. . . . [T]he official has been paid for his decisions, perhaps without even
considering the merits of the matter. Thus, *the public* is not receiving what it
expects and is entitled to, the public official's honest and faithful service.

*United States v. Sawyer*, 85 F.3d 713, 724 (1st Cir. 1996) (quotations omitted) (emphasis added).

Participation in a fraudulent scheme by the "top-echelon" (Br. at 29) does not mean that the

entity or the public it serves is any less a victim.

> 2.    The Documents Sought are Not Relevant to any Cognizable Defense
>        Theory Based on UCLA's Purported Condonation of Admissions Fraud

In any event, contrary to what Salcedo argues, the mail fraud, wire fraud, and the federal

bribery statutes under which he is charged do not require proof of a victim.  Even if others at

UCLA participated in the alleged fraudulent scheme and actively approved of it (and no such

individuals have been charged), that would not exonerate Salcedo unless he knew and believed

UCLA condoned his conduct.  But that question depends on what was in Salcedo's mind at the

time of his alleged crimes, not on what may or may not be in documents that Salcedo now seeks

to subpoena from UCLA and the UC Regents.

The federal program bribery charge—which Salcedo mentions only in a footnote (Br.

24)—does not require proof of either a fraudulent scheme or a victim.  Instead, it requires proof

that: (1) Salcedo was an agent of a state government or agency; (2) he corruptly accepted

something of value with the intent to be influenced or rewarded in connection with business of

the state involving $5,000 or more in value; (3) he acted willfully and knowingly; and (4) the

state received in excess of $10,000 in federal funds in any single year.  *United States v. Foley*,

851 F. Supp. 507, 508 n.1 (D. Conn. 1994).

The mail and wire fraud statutes under which Salcedo has been charged do not require

proof of a victim either.  Rather, they require proof of "(1) a scheme to defraud by means of false

pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to

defraud; and (3) the use of interstate wire or mail communications in furtherance of the scheme."

*United States v. Martin*, 228 F.3d 1, 15 (1st Cir. 2000).

"It is not necessary to establish that the intended victim was *actually* defrauded." *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir. 1991). The relevant inquiry is rather whether the defendant intended to mislead the target. *Id.*; *see also United States v. Weaver*, 860 F.3d 90, 97 (2d Cir. 2017) ("'[T]he government is not required to prove that an intended victim was actually defrauded' to establish guilt of mail or wire fraud.") (quoting *United States v. Starr*, 916 F.2d 94, 98 (2d Cir. 1987)). Whether the target of the fraud was "pure of heart" or "effectively deceived by the charged misrepresentations" is irrelevant. *United States v. Camuti*, 78 F.3d 738, 742 (1st Cir. 1996). So, for example, it is not a defense that the target could have prevented the fraud through "better 'internal controls or procedures.'" *United States v. Moore*, 923 F.2d 910, 917 (1st Cir. 1991); *see also United States v. Coyle*, 63 F.3d 1239, 1243-44 (3d Cir. 1995) ("negligence of the victim . . . is not a defense to criminal conduct").

The corollary to this settled principle is that a "condonation defense" to fraud does not exist. In *Josleyn I*, the First Circuit examined and rejected a defense theory similar to that which Salcedo attempts to assert here. In that case, the defendant, a sales manager for American Honda Motor Company ("Honda"), was convicted of conspiring to defraud Honda by accepting kickbacks from an outside vendor and from franchisees to whom he awarded Honda dealerships. Pointing to widespread, decades-long practices in which sales managers violated internal Honda conflict of interest policies by accepting kickbacks and bribes, and the fact that executives at the highest levels within Honda condoned that activity, the defendant argued that he could not have deceived Honda or deprived it of his honest services. On appeal, the First Circuit rejected the defendant's argument that the district court erred by refusing to instruct the jury that the

government had to prove Honda had not condoned the defendant's activities.  Because the

defendant had not shown that "any condonation by Honda was relevant to an element of the

charged offenses other than intent," the court found it was appropriate for the district court to

have instructed the jury that "[the company's] knowledge or condonation of the commission of

an offense does not *by itself* constitute a defense or an excuse," and that the jury could consider

evidence of the company's "actions or omissions, or evidence of deficiencies in the manner in

which it implemented and enforced its policies and procedures . . . *to the extent that* such

evidence bears on the issue of whether or not [defendant] formed the required intent to commit

the crimes with which he is charged."  99 F. 3d at 1194 (emphases altered).

    The evidence Salcedo seeks does not bear on the issue of whether he intended to defraud

UCLA.  As the First Circuit held in a second opinion relating to the *Josleyn* matter, if a

defendant did not know of the "alleged acts of condonation," he "could not, based on them, have

formed a belief that [his] activities were tacitly approved."  *United States v. Josleyn,* 206 F.3d

144 at 160 (1st Cir. 2000) ("*Josleyn II*") (upholding denial of Josleyn's motion for new trial

based on new evidence that Honda condoned fraudulent activities).  The proposed subpoenas

thus would not uncover anything of relevance to Salcedo's intent.  Either Salcedo knew of facts

indicating UCLA purportedly condoned his activities at the time he recruited UCLA Applicant 1

and UCLA Applicant 2 to UCLA in 2016 or 2018, or he did not.  No amount of discovery from

UCLA will change what was (or wasn't) in Salcedo's mind at the time.

    If anything, such discovery would taint the truth-finding process.  Salcedo cannot backfill

gaps in his knowledge by collecting evidence after the fact about UCLA's conduct.  The

subpoenas, however, seek to do just that.  They do not request information from Salcedo's email

or other custodial files at UCLA.  Instead, they cast a wide net for *any* information from *any*

source relating to the improper admission of student athletes, and investigations of such misconduct, before *and after* Salcedo's alleged activities.  None of that is relevant to what Salcedo knew and intended at the time of his alleged crimes.  *See, e.g., United States v. De La Cruz*, 469 F.3d 1064, 1068 (7th Cir. 2006) (entity's ex-post ratification of an action does not prove that defendant lacked the intent to defraud when he carried out the action).

The cases on which Salcedo relies do not help him.  To the contrary, they confirm that it is the defendant's intent, not the victim's condonation of the alleged fraudulent activities per se, that matters.  *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002), held that an "intent to deceive" does not exist if the defendant "knew that [his false representations] could not deceive" the person to whom they were directed.  *Id.*  Similarly, *United States v. Carlo,* 507 F.3d 799, 801 (2d. Cir. 2007), held not that proof of a victim was required, but that "the government must prove that the defendant *acted with specific intent* to obtain money or property by means of a fraudulent scheme *that contemplated harm to the property interests of the victim.*" (emphasis added).  The documents Salcedo seeks are not relevant to his intent.

### 3.    The Evidence Sought Concerns Unrelated Conduct

The information Salcedo seeks is irrelevant for a third, independent reason: it would not show that UCLA condoned the conduct in which Salcedo is alleged to have engaged.

Salcedo argues that the sought-after documents are relevant to show whether UCLA encouraged the admission of unqualified applicants as student-athletes to get "donations to athletic programs."  (Br. at 4.)  But Salcedo is not charged with falsifying athletic credentials in order to generate donations to UCLA.  He is charged with deceiving UCLA about applicants' athletic credentials in exchange for bribes totaling $200,000, which he allegedly accepted for his own personal gain.  Even if it existed, evidence that UCLA employees approved the use of the athletic admissions process to generate donations would not show that UCLA found it acceptable

for coaches to accept personal bribes for promoting non-athletes through the athletics admissions

process, or to squander limited University resources by doling out athletic scholarships to

applicants with no ability in the sport.  Salcedo does not claim that his proposed fishing

expedition would uncover such evidence, nor is there any reason to believe that UCLA would

have accepted such a blatant violation of the public trust and of clear UC ethical standards.

Where, as here, there is no showing that *other* incidents are sufficiently similar in kind to

the charged offense to be relevant to a defense, a Rule 17(c) subpoena seeking information about

such incidents should not issue.  *See, e.g., United States v. Reed*, 726 F.2d 570, 577 (9th Cir.

1984) (subpoena by arson defendants seeking investigative reports of other arson incidents to

prove that the fires charged in indictment were set by others was properly quashed, because "the

incidents described in the arson reports were different in nature from those in this case").

*United States v. Pendergraft* and *United States v. Braunstein*, on which Salcedo relies,

are distinguishable because both involved an entity that knew of the *exact* fraudulent conduct

that formed the basis of the defendant's fraud charges.  In *Pendergraft*, the court held the

defendants had not defrauded a county by sending the county, as part of litigation and settlement

discussions, false affidavits claiming they had been threatened by a county official.  The court

reasoned that because the county knew the allegations were false, and because the defendants

knew the official would deny making the threats, they could "not have had an intent to deceive."

297 F.3d at 1209.  *Pendergraft* involved the alleged victim's knowledge that the very statements

alleged to be fraudulent were false.

*Braunstein* likewise involved an entity that knew of and endorsed exactly the same kind

of conduct for which the defendant was indicted.  *See* 281 F.3d 982, 997 (9th Cir. 2002).  There,

the defendant, a distributor, was indicted for falsely representing to Apple Latin America

("ALAC") that he would sell their Apple products only in Mexico.  The court found that ALAC

could not have been deceived by any such representation because ALAC knowingly sold

computer products to distributors who resold them outside of Latin America—the very same

activity in which the defendant was alleged to have engaged. The information Salcedo requests,

in contrast, concerns a different kind of activity than the one in which Salcedo is alleged to have

engaged.  No approval by UCLA of Salcedo's alleged self-dealing can be found in its alleged

approval of using the student-athlete admissions process as a development tool.

Finally, Salcedo makes much of Government's charges against the former Stanford

University coach John Vandemoer, which allege that Vandemoer helped Singer's clients get

admitted to Stanford in exchange for donations to the Stanford sailing program, not personal

bribes.  (Br. at 24-25.)  This is a red herring.  Whether or not Salcedo's arguments would be

relevant to Vandemoer's defense,[5] they are not relevant to Salcedo's.  Though the Government

may equate a donation to a coach's athletic program with a bribe, that is not the Government's

theory against Salcedo.  Salcedo is accused of accepting a (substantial) *personal* financial benefit

in exchange for his actions.  For the reasons explained above, whether any UCLA employees

were engaged in conduct "essentially identical" to Vandemoer's (Br. at 29), is not relevant to

whether UCLA knew of or condoned Salcedo's distinctly different activities.

<div style="padding-left:2em">

4.      The Specific Categories of Documents Sought by the Subpoenas Confirm
That Salcedo is not Seeking Relevant Evidence

</div>

An examination of the specific topics covered by the subpoenas confirms that they do not

seek evidence relevant to the charges against Salcedo or any cognizable theory of defense.

---

[5] Vandemoer pled guilty, so the Government's theory of fraud based on a coach's solicitation of donations to his athletic program, and any related defense based on the institution's alleged condonation of such conduct, was never tested. In any event, the charges against Salcedo do not depend on the charges against Vandemoer one way or another.

(a)    UCLA Subpoena Parts I-IV and UC Regents Subpoena Requests
1-4 – Admissions Investigations

UCLA Subpoena Parts I-IV and UC Regents Subpoena Requests 1-4 relate to "any"

UCLA or UC Regents investigations into whether students were admitted as athletes in exchange

for actual or contemplated gifts to UCLA. They also seek information about actions taken in

response to such investigations.  These requests include "but [are] not limited to" the 2014

investigation discussed *supra* at Part II.D.

Salcedo already has a redacted copy of the 2014 investigation report.  (*See* Br. Ex. 9.)

To the extent that Salcedo hopes to find deficiencies in the investigation or the response to it by

sifting through the source documents for the report and communications in its wake, that is not a

viable defense strategy.  That UCLA might have prevented a later fraud through "better 'internal

controls or procedures'" is not a defense.  *See, e.g., Moore*, 923 F.2d at 917.  Nor is any

condonation of the alleged fraud by itself relevant  *See also supra* at Part IV.A.2.

Moreover, the 2014 investigation concerned different conduct.  Salcedo is accused of

accepting bribes for his own personal benefit, and of misusing a scarce University resource—

scholarship money. Those kinds of facts played no part in the prior events, which involved

coaches promoting non-scholarship applicants in an effort to fundraise for UCLA.  And

Salcedo's conduct occurred in 2016 and 2018—years after the matters reviewed in the 2014

investigation and after UCLA had put in place additional, stricter requirements for student-

athlete admissions.  Salcedo's attempt to re-open the 2014 investigation would not yield any

information probative of his intent, or of UCLA's intent (though that is irrelevant *see supra* Part

IV.A.2.), at the time of his alleged crimes.

Salcedo also has not provided a "substantial foundation" to show that discovery of other

similar investigations would yield relevant defense material.  *Reed,* 726 F.2d at 577.  Not only do

his requests for such discovery concern a different kind of fraud, they are so broad that they would cover even investigations (and conduct uncovered in those investigations) that post-date the charged events.  Any claim that UCLA endorsed Salcedo's fraudulent scheme based on conduct after his indictment would fail as a matter of law.  It is "totally irrelevant" whether UCLA ratified the crime after the fact.  *Gilbert v. United States,* 359 F.2d 285, 287 (9th Cir. 1966); *see also United States v. Ross*, 131 F.3d 970, 982 (11th Cir. 1997) ("Ratification or condonation is not a defense for past criminal behavior.").

> (b)    UCLA Subpoena Part V – Admission of Non-Athletes as Student-Athletes

Part V of the subpoena to UCLA directs UCLA to comb through student records to identify students who were admitted as athletes but lacked sufficient academic or athletic credentials, and whose parents pledged or donated $25,000 or more to UCLA.  Even if that onerous exercise were to yield fruit, that would not help Salcedo.  Again, condonation is not a defense, and Salcedo's conduct involved bribes to enrich himself, not donations to UCLA.

> (c)    UCLA Subpoena Part III – Relationship With Singer

UCLA Subpoena Part III seeks documents relating to UCLA's purported "relationship" with Singer.  Salcedo fails to explain why the fact that The Key rented space from UCLA is relevant to his theory that UCLA was not a victim of *Salcedo's* fraud.  The fact that a particular unit within UCLA knew Singer had counseled a parent to offer a donation to UCLA in connection with her daughter's admission, and that a different unit thereafter leased space to an organization with which Singer was affiliated, does not show that UCLA condoned Salcedo's fraud.  Nor does it change Salcedo's actions or intent.  As for other documents related to Singer, Salcedo does not show that UCLA has such documents, or that they would support his defense.

The relevance requirement demands more than conjecture that the subpoena might produce something relevant.  *Arditti*, 955 F.2d at 345.

     (d)  UCLA Subpoena Part VI – Admission of Friends and Relatives

  UCLA Subpoena Part VI seeks information about the admission of "children, relatives, or children of friends of UCLA officials and employees," through the student-athlete admissions process.  This also is irrelevant.  It is a leap too far to say that, if some coaches helped friends or family get admitted as student-athletes, UCLA therefore must have approved of Salcedo pocketing hundreds of thousands in bribes and giving away a soccer scholarship to a non-soccer player.  Notably, Salcedo's argument about the relevance of his requests addresses only the purported relevance of athletics admissions to generate donations; it does not mention how using the student-athlete process to admit friends or family would be relevant.  (*See* Br. at 25-31.)  Salcedo therefore does not meet his burden to show that the Part VI requests are relevant.

     (e)  UCLA Subpoena Request 8.2 and UC Regents Subpoena Request 4 – Regents Policy 2202

  UCLA Subpoena Request 8.2 and UC Regents Subpoena Request 4 specifically request information on "training, compliance, and disciplinary and/or corrective action" and "promulgation, interpretation, guidance, and enforcement" related to Regents Policy 2202.  (UC Regents Subpoena at 7; UCLA Subpoena at 7, 13.)  Regents Policy 2202 prohibits admissions motivated by "concern for financial, political or other such benefit to *the University*."  (Li Decl. Ex. C (emphasis added).)  It does not address facilitating an admission out of motivation for *personal* financial benefit, which is what Salcedo is accused of doing.[6]

     (f)  UCLA Subpoena Request 14 and UC Regents Subpoena Request 5 – Documents Concerning U.S. Attorney's Office Investigation

---

[6] Other policies address and prohibit that behavior, *see* Section II.A.-C.

Salcedo's last requests seek all documents in the possession of UCLA or the UC Regents concerning the U.S. Attorney's Office ("USAO") "Operation Varsity Blues" investigation, including any documents produced to the USAO.  This discovery is both irrelevant and unnecessary.  Salcedo argues these documents would show whether "UCLA took corrective action only *after* it had learned of the government's criminal investigation."  (Br. at 29.)  But that would have no bearing on Salcedo's intent at the time of his actions, which occurred prior to the government's investigation.  This discovery is also unnecessary.  The USAO has an obligation to produce any exculpatory documents in its possession to Salcedo under *Brady v. Maryland*, 373 U.S. 83 (1963).  Thus, any information UCLA provided to the USAO that could be relevant to a defense presumably has been or will be provided to Salcedo.

B.      The Subpoenas Seek Inadmissible Evidence

For similar reasons, the subpoenas also fail the *Nixon* admissibility test.  Evidence is admissible only if it is relevant, and although "a criminal defendant is granted much latitude in presenting a defense . . . he does not have the right to present irrelevant testimony."  *United States v. Silva-Rosa*, 275 F.3d 18, 23 (1st Cir. 2001).  When a "proffer in support of an anticipated affirmative defense is insufficient as a matter of law to create a triable issue," it may be excluded.  *Id.* (quoting *United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001)).  As described above, the defense Salcedo is attempting to construct with the requested documents fails as a matter of law, and does not relate to the charges in the Superseding Indictment in any event.

Additionally, all of the investigatory documents sought by the subpoena (which constitute the bulk of Salcedo's requests) are inadmissible hearsay.  Salcedo's relevancy arguments are premised on the presumption that the events discussed in the investigation documents he seeks, such as the 2014 investigation report or communications about it, occurred as described. That is

the definition of hearsay.  The 2014 investigation report, for example, contains multiple layers of hearsay, including the statements in the report, statements the report recounts from witness interviews, and prior statements those witnesses recounted in their interviews.  Under FRE 802, none of that can be used to prove truth of the events described.

Salcedo invokes the business records exception to the hearsay rule, but that exception does not apply to the investigative documents he demands. Conducting internal investigations and preparing related documents is not part of UCLA's "regularly conducted," day-to-day operations or "a regular practice" of the University.  FRE 803(6); *see Hook v. Regents of Univ. of Cal.,* 394 F. App'x 522 (10th Cir. 2010) (transcripts and interview notes from internal investigation properly excluded because they contained multiple levels of hearsay and did not fall within a hearsay exception); *United States v. Reyes,* 239 F.R.D. 591, 600 (N.D. Cal. 2006) ("Documents produced in a full-fledged, one-time internal investigation into alleged corporate malfeasance do not fall under [the business records exception because] . . . they lack the hallmarks of reliability that justify the admission of run-of-the-mill business records.").

Finally, to the extent the subpoenas also seek information protected by the attorney-client privilege, such evidence is not subject to discovery and could not be used to support any defense. *See* FRE 1101(c) ("The rules on privilege apply to all stages of a case or proceeding.").

C.      The Requests Lack The Requisite Specificity

The proposed subpoenas also fail to clear the specificity hurdle. A Rule 17(c) subpoena may not be used for "fishing expedition[s]" in the hope that "something useful will turn up." *Cartagena-Albaladejo*, 299 F. Supp. 3d at 386-87 (quoting *United States v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991)).  "*Nixon* mandates that the party requesting the information identify the item sought and what the item contains, among other things." *United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002).  Describing "categor[ies] of materials, without a

description of or reference to actual items known to exist" is not sufficient.  *United States v. Carriles*, 263 F.R.D. 400, 404 (W.D. Tex. 2009).  Accordingly, "[r]equesting entire files instead of specific documents is indicative of a fishing expedition."  *Id.* at 402; *Cartagena-Albaladejo*, 299 F. Supp. 3d at 386 (quoting *Morris*, 287 F.3d at 991)).  The proposed subpoenas contain numerous such requests and fall far short of meeting the specificity requirement.

> 1.    UCLA Subpoena Parts I and IV and UC Regents Subpoena Requests 1, 2 and 3 – Requests Regarding UCLA and UC Regents' Investigations

The requests contained in parts I and IV of the UCLA Subpoena and UC Regents Subpoena Requests 1, 2, and 3 lack any specificity.  For example, they seek "*[a]ll* documents and communications concerning *any* internal investigation, compliance review, inquiry or probe conducted by or on behalf of UCLA" regarding whether Policy 2202 was violated in the admission of "*any* student through the student-athlete admissions process."  (UCLA Subpoena at 2 (emphasis added).)  These requests are improper because they do not identify specific documents but ask for "any" documents that may have been created, at any time, regarding a broad topic.  *See United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019) (denial of subpoena appropriate when defendant broadly asked for "investigative reports and materials about police calls to his home at the time of and for the two days prior to his arrest") (internal quotation marks omitted).

> 2.    UCLA Subpoena Part II – Requests Regarding the 2014 Investigation

Salcedo also improperly requests the entire investigative file underlying the 2014 report.  Requests for entire investigation files are routinely rejected because of their lack of specificity, and should be rejected here, too.  *See Cartagena-Albaladejo*, 299 F. Supp. 3d at 386; *Reed*, 726 F.2d at 577; *Carriles*, 263 F.R.D. at 402.  Salcedo has itemized the parts of the investigation file he seeks, but that does not make his request sufficiently specific.  In *Morris*, for example, the

court upheld the district court's quashing of a subpoena for lack of specificity because it had requested "all records, documents, reports, telephone logs, etc., surrounding the investigation into" the shooting of the defendant.  287 F.3d at 991.  Salcedo's list of the types of documents he expects to find in investigation files similarly does not change the fact that he is impermissibly requesting the entire files.

      3.       **UCLA Subpoena Part III – UCLA's Relationship with Singer**

The requests in Part III of the UCLA subpoena are clear examples of fishing expeditions. They seek, for example, "[a]ll documents and communications concerning Singer's involvement in the possible admission of students at UCLA."  (UCLA Subpoena Request 9.2.)  He does not specify the actual documents he seeks, let alone establish that such documents exist.  He likewise does not explain what he believes these documents to contain.  The possibility that "something useful will turn up" if UCLA searches far and wide for any communications with Singer at any point in time does not justify this request.  *Cartagena-Albaladejo*, 299 F. Supp. 3d at 386-87.

      4.       **UCLA Subpoena Parts V and VI – Admission of Non-Athletes and Children and Relatives**

Salcedo likewise does not request any particular documents in UCLA Requests 11, 12, and 13.  Instead, he again asks for categories of documents, such as "[a]ll documents and communications concerning the admission" of students who meet certain criteria.  (UCLA Subpoena Request 11.)  This is another inappropriate attempt to dig through UCLA's files in the hopes of finding something exculpatory.  Complying with this request would require UCLA to review the admission of every single student-athlete ever admitted to UCLA to confirm the athlete's qualifications, to determine if donations were associated with the athlete, and to collect any documents relating to the student's admission.  This would be extremely laborious, and is

not within the scope of Rule 17(c). *See United States v. Phoenix*, 2015 WL 6094882 (N.D. Cal., Oct. 16, 2015) (quashing a subpoena that requested compilations that did not exist).

Salcedo's non-specific requests are especially inappropriate given that student records are involved. Under the Family Educational Rights and Privacy Act, UCLA would have to notify students before any education records are produced. *See* 20 U.S.C. § 1232g. That would significantly multiply the already undue burden of conducting the far-flung searches demanded in the subpoenas. The lack of specificity in the subpoenas alone merits denial of the motion.

V.    Conclusion

The defense theory the proposed subpoenas are intended to support is legally unsound and factually irrelevant. The Court should reject Salcedo's effort to drum up irrelevant evidence that would serve no purpose other than to distract from the charges at hand. UCLA and the UC Regents respectfully submit that the motion should be denied.

Respectfully Submitted,
UNIVERSITY OF CALIFORNIA, LOS
ANGELES AND THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA,
By its attorneys,

*/s/ Luis Li*
Luis Li (*pro hac vice*)
Gina Elliott (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 15th Floor
Los Angeles, California 90071-3426
(213) 683-9100
luis.li@mto.com
Gina.Elliott@mto.com

Blanca Fromm Young (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
(415) 512-5000
blanca.young@mto.com

*/s/ Diana K. Lloyd*
Diana K. Lloyd (BBO No. 560586)
Lauren Swidler (BBO No. 703994)
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000
dlloyd@choate.com
lswidler@choate.com

Dated:  February 28, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Diana K. Lloyd*
Diana K. Lloyd