UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA                    19-CR-10081-IT-11

v.

JORGE SALCEDO,

            Defendant.

**SENTENCING MEMORANDUM OF DEFENDANT JORGE SALCEDO**
**(Leave to File Excess Pages Granted on March 8, 2018, Docket No. 657)**

**INTRODUCTION**

Jorge Salcedo pled guilty to one count of federal program bribery conspiracy (Count 5) of the Superseding Indictment ("SI") on January 14, 2021.  Under the plea agreement between the parties, the government has agreed to dismiss all remaining counts (Counts 1, 2, 17, and 20) against Mr. Salcedo, and the single count in the original indictment.  Mr. Salcedo agrees with the sentencing calculations submitted by U.S. Probation, including that Mr. Salcedo's Total Offense Level is 21, with a sentencing guidelines range of 37-46 months.

As a result of this prosecution, Mr. Salcedo has endured extensive punishment already.  He lost a job he loved, nearly lost his family, and was humiliated in the soccer community, which was his life's work and focus, and in connection with which he will never coach competitively again.  He has accepted full responsibility for his misconduct, is very remorseful for his bad choices, and wants to do whatever it takes to put his life right.  Since he was arrested on March 12, 2019, he has worked exceedingly hard to turn his life around; recommitted to his family, his wife, and his church; and ultimately obtained meaningful employment in a company that is developing novel technology to effectively address the spread of viruses, including COVID-19, around the world.  Incarceration will inevitably interrupt his progress in re-inventing his life, but he accepts and understands that this Court

1

has multiple considerations in imposing a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## I.       HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.       Mr. Salcedo's Upbringing and Education

Mr. Salcedo is a 48-year old husband and father of four young children (ages 5 to 14).  He earned a bachelor's of science degree in political science from UCLA, where he was a member of the University's acclaimed Men's Soccer Team.  Following a five-year career as a professional soccer player, Mr. Salcedo became a coach of UCLA's Men's Soccer Team, a position he held from 2000 until 2019.  He resigned from his job at UCLA when he was charged with the crimes in this case.  Mr. Salcedo has no prior criminal convictions.

Born in 1978 in Southern California, Mr. Salcedo is the son of Hugo and Socorro Salcedo. His parents immigrated from Mexico to the U.S. in their early teen years, settling in Southern California.  They both came from large families with little money.  Mr. Salcedo has one sibling, a younger brother named Eduardo.  From his childhood through high school, Mr. Salcedo lived in Cerritos, a small city in Los Angeles County.  He graduated from Cerritos High School in 1994.

Mr. Salcedo had an emotionally challenging childhood.  By age 12, his parents had separated, largely due to his father's opposition to his mother's desire to pursue further education.  But even before the separation, Mr. Salcedo had a strained relationship with both parents.  His father, a former Olympic athlete, exerted considerable pressure on Mr. Salcedo to excel in athletics and academics. His mother, who suffered from long-term depression and anger, was physically and verbally abusive towards him.  Both parents used physical punishment as a means to discipline Mr. Salcedo.

### B.       The Dominant Role of Soccer in Mr. Salcedo's Life

Soccer has played a dominant, positive role throughout Mr. Salcedo's life.  By age 3 or 4, Hugo Salcedo introduced Mr. Salcedo to the sport.  The year Mr. Salcedo was born, his father competed in

the 1972 Olympic Games as a member of the U.S. Men's Soccer Team. Hugo Salcedo later went on to coach men's soccer at UCLA, and has spent the past 30 years in various executive positions with professional soccer.

By age 7, Mr. Salcedo began playing organized soccer. Each day before school, he trained with his father from 6 a.m. to 7:15 a.m., learning to perfect soccer techniques and broadening his knowledge of the game. At age 12, when Hugo Salcedo was an Assistant Coach of UCLA's Men's Soccer Team, Mr. Salcedo was the team's ball boy. Being surrounded by accomplished collegiate soccer players fueled Mr. Salcedo's desire to become an elite athlete and the most physically fit player on the field. He engaged in intense, grueling training and workouts to achieve his goal.

Mr. Salcedo's hard work and determination paid off. By age 14, he was selected to be one of 18 members of the U.S. Youth National Team from a pool of over 2 million athletes nationwide. Mr. Salcedo's soccer prowess and skill later resulted in his selection as a member of the U16 National Team, the U20 National Team, and the U23 Senior National Team. While on the various U.S. National Teams, Mr. Salcedo traveled throughout the U.S. to participate in soccer tournaments. As a team captain of elite athletes, Mr. Salcedo developed skills in leadership, sportsmanship, teamwork, communication, and comradery. His experiences on the soccer field and with his teammates were a sharp contrast to those at home.

While attending Cerritos High School, many of the Nation's most prestigious collegiate soccer programs recruited Mr. Salcedo, including Stanford University, UCLA, the University of California, Berkeley, the University of Virginia, and Harvard University. He was offered athletic scholarships to attend several of these schools. Mr. Salcedo chose UCLA.

UCLA boasted one of the top men's soccer programs in the country, and was deemed to be the gold standard by many. When Mr. Salcedo joined the team as a freshman in 1990, the roster was laden with premiere athletes. In this setting, Mr. Salcedo thrived. In 1990, as a freshman, he became

a starter for the varsity, a position he held for all four years in college.  He was an instant contributor to his team's success, as he scored the winning goal in the National Championship game in his freshman year.  Mr. Salcedo's experience at UCLA were instrumental in shaping his life.

In 1994, Mr. Salcedo's senior year at UCLA, he traveled to Japan to try out for a professional soccer team to pursue his lifelong dream.  At that time, there was no professional soccer in the U.S. In 1995, at age 23, Mr. Salcedo became a professional soccer player in Mexico for a team named Morelia.  The following year, Major League Soccer (MLS) was formed in the U.S. as the country's first professional soccer league.  The Los Angeles Galaxy of MLS drafted Mr. Salcedo as its third player. For five years, Mr. Salcedo played professional soccer in the MLS.

### C.    Coach of the UCLA Men's Soccer Team

Following his career as a professional soccer player, in 2000, UCLA offered Mr. Salcedo a position as Assistant Coach of the Men's Soccer Team, a post he held for four years.  In 2004, UCLA's Head Coach of the Men's Soccer Team left to take another position.  UCLA offered the position to Mr. Salcedo over 100 other highly qualified candidates.  Mr. Salcedo served as Head Coach for 15 years.  During his 19-year coaching career at UCLA, the Men's Soccer Team won over 80 percent of its games, competed in two National Championship games, and participated in several Final Four tournaments.  Throughout Mr. Salcedo's tenure as a UCLA soccer coach, the Men's Soccer program was one of the top collegiate programs in the country.   Mr. Salcedo has immense pride in the accomplishments of his teams and great affection for his players to this day. (Ex. 1).[1]

Two former UCLA soccer players coached by Mr. Salcedo provide insight on how he had a positive influence on them and their teammates.  David Estrada, a professional soccer player for over a decade, is a first-generation immigrant raised in a low-income household (Ex. 2).[2]  He is grateful that

---

[1]   Exhibit 1 is a letter submitted by Jorge Salcedo to the Court.

[2]   Exhibit 2 is a letter dated August 5, 2020 submitted by David Estrada to the Court.

Mr. Salcedo gave him the opportunity to play soccer for UCLA, and credits his success in life to Mr. Salcedo's mentorship and leadership (Ex. 2).  In his letter to the Court, Mr. Estrada also provides examples of how Mr. Salcedo played an important role in the lives of two other young men from underserved communities (Ex. 2).  Erik Holt, also a professional soccer player, was the first in his family to graduate from college (Ex. 3).[3]  Mr. Salcedo inspired him and his teammates to fulfill their potential on the field and in life through relentless preparation, professionalism, work ethic, and passion (Ex. 3).

Mr. Salcedo and his wife Rebecca treated the members of the team as their family.  According to Garrett Pendergraft, a friend of the Salcedos, UCLA soccer players often attended church with the Salcedos (Ex. 4).[4]  Mr. Salcedo had a "strong, positive influence on his players" and incorporated them into his family life in many ways (Ex. 4).

### D.       Mr. Salcedo's Family

Jorge and Rebecca Salcedo have been married for almost 17 years and have four young children.  They both attended UCLA, and were married in 2004, after Mr. Salcedo was named as Head Coach.  The oldest child is Matteo (age 14), followed by Malea (age 12), Marco (age 10), and Macsen (age 5).  The family lives together in Dana Point, California.

The Salcedos are a tight-knit, and deeply religious family of Christian faith.  In contrast with the distant and strained relationship Mr. Salcedo had with his parents, he has deep love and affection for his children and plays and active role their lives.  Mr. Salcedo has one-on-one relationships with each of his children.  All of the children play soccer, and Mr. Salcedo has served as a volunteer coach for their teams over the years, even to this day.  Each day, the family prays together in the early

---

[3]  Exhibit 3 is a letter dated October 17, 2020 submitted by Erik Holt to the Court.

[4]  Exhibit 4 is a letter dated October 15, 2020 submitted by Garrett Pendergraft, Ph.D to the Court.

morning, as religion is an integral aspect of the Salcedos' lives. (Ex. 5).[5]

Lead Pastor Ramin Razavi of Calvary Church of Pacific Palisades has known the Salcedo family for several years, and offers a firsthand perspective regarding Mr. Salcedo and his family (Ex. 6).[6]  In Lead Pastor Razavi's view, Mr. Salcedo is a "devoted" man, committed to the care of his family, his team, his friendships, and his greater community" (Ex. 6).  While Mr. Salcedo was coaching at UCLA, the Salcedos decided to homeschool their children so that Mr. Salcedo would be present and involved in the growth of each of child (Ex. 6).  To do so, they converted their garage into a school (Ex. 6).  This ensured the family could stay together through the season as much as possible (Ex. 6).

The Salcedo children, in Lead Pastor Razavi's eyes, are some of the most loving, kind, inspired and passionate kids he has ever known (Ex. 6).  They "love their parents, esteem them and want to be with them," which, during a time when families are drifting apart, "is a soul warming testimony to see" (Ex. 6).  The Salcedo children "know the love and security of their Dad's devotion to them" (Ex. 6).  Mr. Pendergraft made similar observations about Mr. Salcedo and his relationship with his family: "One of my first impressions of Jorge was as a dedicated father:  we were having a conversation at a social gathering while he was looking after his infant son.  The more I got to know Jorge, the more I was impressed with his love for his family and his commitment to being present with them.  This commitment was even more impressive given the significant demands on his time" (Ex. 6).

E.     **Dire Consequences of Mr. Salcedo's Conduct**

For the past two years, Mr. Salcedo has struggled to deal with the anguish and harm he has caused to his family, friends, community, and himself.  That harm began in the early morning of March

---

[5] Exhibit 5 is a letter submitted by Rebecca Salcedo to the Court.

[6] Exhibit 6 is a letter dated January 6, 2020 submitted by Lead Pastor Ramin Razavi of Calvary Church of Pacific Palisades.

12, 2019, when he was arrested at his home.  All of his children and his wife witnessed a traumatic and frightening scene.  At 6 a.m., several federal agents dressed in black uniforms and wearing goggles rushed through his front door shouting and with weapons drawn.  Terrified, the children ran upstairs to their parent's bedroom, screeching: "They have Daddy!  They have Daddy!"  The children sobbed and began shaking. (Ex. 5).  Malea later told her parents she thought the men were taking her father to kill him.  One of Mr. Salcedo's greatest regrets is that his conduct exposed his family to witness this horrible event.  It has created an image in their minds they will never forget.

After the arrest, it was all downhill for Mr. Salcedo.  There was heavy media coverage of the case, including numerous pictures of Mr. Salcedo on TV and in other news media.  Soon, he resigned from the job he so dearly loved.  His family moved out of the house to live with his wife's parents in Sacramento.  Within days, Mr. Salcedo  lost his job, lost his source of income, and nearly lost his marriage and family.  Within months, he was forced to sell the house.  Mr. Salcedo tarnished his sterling reputation in the world of soccer, which he had built over a lifetime of dedication and arduous effort.  He was shamed and humiliated.  Today, Mr. Salcedo knows the NCAA likely will ban him from participating as a collegiate coach, and there is a realistic probability he may never be able to return to coaching soccer.  In sum, his life hit rock bottom.

At this point, Mr. Salcedo had a stark choice:  he could either refuse to acknowledge his mistakes and feel sorry for himself, or do the hard work and undertake a concerted effort to turn his life around and return to being a productive member of society.  He chose the latter.

### F.    Mr. Salcedo's Acceptance of Responsibility and Rehabilitation Efforts

A key step in that turnaround was atoning for his conduct by pleading guilty and accepting full responsibility for his actions.  Since the arrest, Lead Pastor Razavi has met with Mr. Salcedo's many times and seen his deep humility throughout this process (Ex. 6).  In Lead Pastor Razavi words, Mr. Salcedo knows what he did and he wants to take ownership for his role (Ex. 6). He is trying to

start fresh, trying to restore trust, rebuild stability, do the hard work of healing, preserve the deep love in his home and carve a path for a future that will provide for his family (Ex. 6).

### 1.    Life Coaching with Mr. Nava

Mr. Salcedo took a significant step forward in the fall of 2019, when he began life coaching with Donald Nava, a renowned, veteran, executive life coach in California who works with professional athletes, executives, and people worldwide interested in personal development (Ex. 7).[7] Mr. Nava coached Mr. Salcedo on a daily basis for a year (Ex. 7).  According to Mr. Nava, who has mentored thousands of people over 30 years, he has never seen such radical changes as those he witnessed in Mr. Salcedo (Ex. 7).  Mr. Nava reports that Mr. Salcedo has made a turnaround in his choices, life management, character, and values (Ex. 7).  As a primary example of this transformation, Mr. Nava describes the work Mr. Salcedo currently is performing for a company that is making a major contribution to the world with technological advancements to address the COVID-19 pandemic (Ex. 7).  A full discussion of that work follows.

### 2.    Employment with MedeSol, Inc.

With the encouragement and support of Mr. Nava and others, Mr. Salcedo searched for gainful employment to support his family.  During his job search, Mr. Salcedo met Simon Johnston, the Chief Executive Officer and co-founder of MedeSol, Inc.  MedeSol is a privately-held medical technology firm in Bellevue, Washington.  After working with Mr. Salcedo over a period of time, Mr. Johnston has asked him to serve as the Company's President and Head of Business Development.

One aspect of MedeSol's business is its commercialization of *N*-halamine technology developed by professors at Auburn University.[8]  This antimicrobial technology is applied to textile

---

[7]  <u>Exhibit 7</u> is a letter (undated) submitted by Donald Nava to the Court.

[8]  See *Auburn-developed disinfectant technology finds new potential during COVID-19 pandemic*, January 28, 2021, found at www.ocm.auburn.edu (Ex. 8).

products, such as personal bioprotective equipment worn by healthcare and emergency workers to prevent infections of pathogens like COVID-19, SARS, and other biological agents. The bioprotective clothing materials and polymers have biocidal functions (*i.e.*, sterilization, disinfection, and sanitation) against all major pathogens.

MedeSol also distributes a patented disinfectant that can kill viruses for a period of up to 28 days on various materials including hard, non-porous surfaces to soft, porous materials used in respirators.[9] It has developed three solutions for persistent disinfection to prevent the transfer of infectious viruses and bacteria from surfaces to human subjects and by interrupting airborne particles that are not adequately defended against with conventional materials. These products can be used by healthcare facilities, educational institutions, manufacturing plants, the military, and individual communities.

A recent study conducted in 2020 by Dr. Ivan Enciso and other members of the Faculty of Medicine, of the University of Colima, affiliated medical research institutions and hospital in Colima, and the University of Nuevo Leon suggests there are positive health effects of one of MedeSol's products, MedeSol HOCl (hypochlorous acid), which is a neutral electrolyzed saline (Ex. 7).[10] The study involved use of MedeSol HOCl in the treatment of ninety-four patients infected with SARS-CoV-2 virus (Ex. 7). Thirty-nine patients received normal medical treatment measures offered to ambulatory (non-hospitalized) patients upon diagnosis (the control group) (Ex. 7). Forty-five patients received the same normal medical treatment plus doses of MedeSol HOCl, either by inhalation with using a nebulizer, intravenous injection, or both (the experimental group) (Ex. 7). The study's

---

[9] MedeSol's website is www.medesolglobal.com.

[10] The attached study is titled "Patient-Reported Health Outcomes After Treatment of COVID-19 with Nebulized and/or Intravenous Neutral Electrolyzed Saline Combined with Usual Medical Care Versus Usual Medical care alone: A Randomized, Open-Label, Controlled Trial" (Ex. 9).

conclusion was the addition of HOCl treatments reduced COVID-19 symptoms, reduced the rate of progression to serious disease requiring hospitalization, and reduced fatalities in the treated group to zero (Ex. 9).[11]

MedeSol's central objective is to introduce its technologies to world markets to improve the quality of lives.  Mr. Salcedo's main responsibility is to introduce and market MedeSol's products throughout the world, including Mexico, Africa, and the Middle East.  To date, Mr. Salcedo already has played an integral role in creating the platform to enter these international markets.  In a short period of time, through his relationships and contacts around the world, MedeSol has accomplished several impressive feats.  The Company  has established manufacturing capabilities in Mexico, which will allow MedeSol to produce products for markets that have previously been underserved.  The array of products will improve the quality of life for potentially millions of impoverished communities in Mexico, Latin and South America.  Mexico, however, is the tip of the spear for Latin America and was strategically chosen by Mr. Salcedo to create a platform to better serve people in need.

Also, through Mr. Salcedo, MedeSol is in the process of forming MedeSol East.  In Duqm, Oman, MedeSol is finalizing an agreement to establish manufacturing in an economic zone in the Middle East.  MedeSol East will service the Middle East, Africa, and parts of Asia.  Again, Mr. Salcedo successfully leveraged his relationships to achieve a complicated and challenging task.

---

[11] More specifically, the study findings were as follows: (1) the rate at which COVID-19 patients developed illness that required hospitalization was reduced by 92% in those patients who received HOCl treatments; (2) the number of patients who reached an acceptable level of symptom control by day five of treatment was 43 times higher in those who received HOCl than in those who received only conventional medical offerings; and (3) there were no important adverse effects reported by patients dosed either by inhalation of HOCl or by intravenous injection or both (Ex. 9).  Those patients receiving HOCl by both routes showed better recovery than those who received HOCl by inhalation only (Ex. 9).  The death rate in patients who received only the normal medical offerings was 12.8%, and 0% in the patient group that received HOCl treatments (Ex. 9).

Mr. Salcedo's future role with MedeSol is perhaps best described by Jeff Williams, Ph.D, B.V.Sc., M.R.C.V.S., a Technical Advisor to MedeSol (Ex. 10).[12]  Dr. Williams met Mr. Salcedo in early in 2020, and now has a business relationship with Mr. Salcedo in the enterprise (Ex. 10). According to Dr. Williams, Medesol's mission is to take several novel chemical approaches that can beneficially impact infectious disease control, and ensure they become commercially viable and valuable products to the world's population (Ex. 10).  Mr. Salcedo, now a partner in the enterprise, has become intensely committed to an effort and opportunity to bring about a great deal of good for many people, and to impact pain and suffering caused by infectious diseases everywhere (Ex. 10).  In Dr. Williams' words, "[Mr. Salcedo] clearly dedicated himself to using his most valuable traits—his ability to inspire, to appreciate and instill enthusiasm for a noble cause, to cultivate exceptionally valuable new relationships, to identify and  bring out the best in others, and quickly forge deep friendships and respect from them—to make this venture come about, affect many people's lives in the process, and to work tirelessly to that end (Ex. 10).

When Dr. Williams first met Mr. Salcedo, he openly acknowledged his pending case and all the consequences for his marriage, family, friends and their wellbeing (Ex. 10).  Since then, Dr. Williams has been impressed by the support he has witnessed of so many individuals from Mr. Salcedo's previous life who have stepped up without hesitation, showing Mr. Salcedo that he can count on them to advance this cause and his future (Ex. 10).  Dr. Williams is looking forward to working with Mr. Salcedo in the few years left of his professional life, and is confident that he will perform in

---

[12] Dr. Williams, an Emeritus Professor of Microbiology and Molecular Genetics at Michigan State University, is a retired professor of microbiology who spent almost 30 years in academia teaching medical students and performing federally and internationally funded research on infectious diseases (Ex. 10).  Most of his work involved diseases of populations in the developing world, where he lived and travelled, throughout Africa and Latin America, studying the natural history of the most devastating of tropical diseases, and helping develop solutions (Ex. 10).  Dr. Williams was elected a Fellow of the American Association for the Advancement of Science, and served for four years on an advisory council to Dr. Tony Fauci at NIH (Ex. 10).  Upon retirement, Dr. Williams has been involved in private enterprise ventures, including as a Technical Advisor to Medesol (Ex. 10).

exemplary ways (Ex. 10).  He believes Mr. Salcedo will be an effective force for good in the world, and would be disappointed if the mistakes Mr. Salcedo has made impede this meaningful and worthy outlet now for his exceptional talents (Ex. 10).

### 3.    Helping Others

This case has loomed heavy over Mr. Salcedo's head, posing questions about his character and his commitment to assisting others.  Mr. Salcedo is determined to move forward and use his ability and skills to assist others when possible, as shown by his role with Medesol.  One other simple, yet telling, example involves Mr. Salcedo's efforts to help one of his son's soccer teammates, who lacked confidence in his ability to play the game (Ex. 11).[13]  Mr. Salcedo, a parent on the sidelines, took an interest in the boy (Ex. 11).  He provided individual training to enhance the boy's soccer skills, and sent instructional video clips to him (Ex. 11).  And he taught the boy one of life's most important lessons:  we all make mistakes, but it's what one does after making mistakes that makes a difference (Ex. 11).  The boy's parents observed that Mr. Salcedo "reignited our son's passion for soccer, built up his confidence and helped our son realize that if he works hard he can accomplish anything" (Ex. 11).  In their letter to the Court, the boy's parents make this poignant statement about Mr. Salcedo: "We all make mistakes, but it's what we do after that counts.  Jorge is a good man and he has made a huge impact on our son.  Even when his life had been turned upside down, he was still looking out for others.  We are so appreciative for everything that Jorge did for our son because he truly made a difference in his life" (Ex. 11).[14]

---

[13]  Exhibit 11 is a letter dated September 30, 2020 submitted by Eric and Nancy Rochelle to the Court.

[14]  In the summer of 2020, Mr. Salcedo  volunteered to assist at the Placer Food Bank in Folsom, California, and worked there for approximately two months.  Unfortunately, volunteers at the food bank, including Mr. Salcedo, were asked to end their engagement due to COVID-19 concerns.

## II.   **NEED FOR THE SENTENCE IMPOSED**.

Mr. Salcedo recognizes his crime is serious, and this Court has opined in previous sentencings that incarceration is required to promote respect for the law and to provide just punishment for the offense, as set forth in 18 U.S.C. § 3553(a)(2)(A).  Given Mr. Salcedo's lack of any criminal history, the Bureau of Prisons will likely assign him to serve any period of incarceration at a minimum security prison, as it has done with others in this case.  However, even those who have been so assigned are required to quarantine, sometimes for two weeks in solitary confinement, before entering the prison population.  That time can be extended if a prisoner is inadvertently exposed to another incoming inmate or person who may have been exposed.   Additionally, because of COVID-19, the circumstances of imprisonment are more severe than incarceration in the past, with less ability for prisoners to engage in teaching, classes, recreation, or other more communal pursuits.  As a result, a period of incarceration is harsher than in the past, and those difficult conditions should inform what type of sentence is necessary to provide just punishment and provide respect for the law.

As to general deterrence under Section 3553(a)(2)(B), in prior sentencings in this case, valid points have been made that that the fact of imprisonment—as opposed to the length of time in prison—deters others.  Virtually every aspect of the Varsity Blues prosecution has received intense media coverage.  A bright spotlight has been shined on all participants, including parents, coaches, test-takers, intermediaries, and educational institutions nationwide.  A loud and unequivocal message has been sent to the public:  it is against the law to bribe a college official to assist in the admission of an applicant as a student-athlete, and it is against the law for college employees to accept such a bribe.

With regard to the need to protect the public from further crimes of Mr. Salcedo, Section 3553(a)(2)(C), there is no need for any prison sentence at all.  Mr. Salcedo is no longer employed as a coach at UCLA.  It is improbable that he will ever coach again at a university, and will never be able to help another applicant gain admission as a student-athlete.  Importantly, the traumatic events

experienced by Mr. Salcedo and his family over the past two years assure that he will not commit another criminal act for money.  Mr. Salcedo has dedicated the past two years to change his life, renew his commitment to his family and God, and re-invent his work life through sheer determination, optimism, and countless hours of hard work.  He views these changes as vital to the survival of his marriage, the upbringing of his children, and the quality of his life.

Finally, under Section 3553(a)(2)(D), Mr. Salcedo is unaware of any necessary educational or vocational training, medical care, or correctional treatment that could be effectively provided in an institutional setting; U.S. Probation also has identified none.  In any event, in the current COVID-19 setting, it is unlikely that Mr. Salcedo could obtain any training, teaching, or educational opportunities offered inmates during safer times.

## III.   UNWARRANTED SENTENCING DISPARITIES

### A.   Background

The government has controlled how and when misconduct in this case was charged, and to which crimes defendants were allowed to plead.  On October 22, 2019, the grand jury returned a Superseding Indictment charging Mr. Salcedo (and others) with racketeering conspiracy (Count 1); a mail, wire, and mail and wire honest services fraud conspiracy (Count 2); a federal programs bribery conspiracy (Count 5), and certain substantive counts of mail, wire and honest services fraud (Counts 17 and 20) (Docket No. 272).  For federal programs bribery, Mr. Salcedo's Total Offense Level is 21 (37-46 months), compared to a Total Offense Level 17 (24-30 months) for racketeering,[15] and compared to a likely Total Offense Level 6 or 7 for a mail, wire, and honest services fraud conspiracy (0-6 months).[16]  Simply put, by dictating both the charges and the pleas

---

[15] The parties calculated the RICO conspiracy guidelines at TOL 17 (24-30 months); U.S. Probation calculated the Total Offense Level at 18 (27-33 months) for the proposed racketeering plea.

[16] On September 13, 2019, this Court disagreed with the government's U.S.S.G. calculations for mail/wire/honest services fraud in a related case involving parents, 19-cr-10079-IT, finding no specific

that it will accept, the government completely controls sentencing calculations for defendants alleged to have committed misconduct that forms the identical factual basis for all three crimes.

Since March 2020, Mr. Salcedo has attempted to resolve the charges and move forward with his life. At that time, the government insisted he enter into a plea agreement for one count of racketeering conspiracy. A plea hearing was held in July 2020, and the Court deferred accepting the plea because various defendants had filed persuasive motions to dismiss challenging the viability of the RICO charge, and the matter was still under consideration by the Court. (Docket 492 at 38).

In November 2020, this Court reached a decision on the law to be applied in connection with the racketeering conspiracy, rejecting the government's view that where a coach simply "carried on" or "aided and abetted" the activities of the enterprise, it was sufficient to bring him within the umbrella of the conspiracy. Docket 582 at 38-39. Instead, this Court held that the government would need to show a defendant endeavored to operate or manage Key Enterprise (Docket 582 at 38), something Mr. Salcedo did not do. Mr. Salcedo was unaware of the existence of Key Enterprise except for the payment from Singer that arrived from a KWF account. Accordingly, Mr. Salcedo could not proceed with the racketeering plea, and it was withdrawn on January 14, 2021. Mr. Salcedo was left with the charge of federal program bribery conspiracy

characteristics under the U.S.S.G. to increase the base offense level of 7 (0 to 6 months, assuming Criminal History Category I) because money passing between co-conspirators did not stand-in as an alternate measure for any loss incurred by universities or testing companies. _United States v. Gregory Abbott, et al._, 19-cr-10117-IT (Docket No. 443, at 5-6). While all the parents who pled guilty have been allowed to plead to a count involving mail/wire/honest service mail or wire fraud conspiracy, the government has pressed coaches and other participants to plead to a RICO conspiracy charge. After this Court's issued its decision on November 23, 2020 (Docket 564), ruling on the elements the government would need to show in response to defendants' motions to dismiss the RICO conspiracy charge in the instant case, the government pressed Mr. Salcedo for a guilty plea on the federal programs bribery conspiracy count. For every defendant allowed to plead to the charge of mail/wire/honest services fraud conspiracy, the government is aware the resulting U.S.S.G. calculation will result in a 0-6 months range, even though the conduct underlying all charges is identical.

15

with its attendant significantly higher U.S.S.G. calculations to be able to plead and move on with his life.[17]

Mr. Salcedo provides the information below regarding sentences of others for purposes of highlighting his relative culpability.  By doing so, he in no way means to undercut his acceptance of his responsibility.   He knows his failings, has accepted responsibility for his crimes, and his guilt and remorse are his own.   He completely admits his criminal conduct and accepts his personal responsibility.

However, because unwarranted disparity among sentences is one of the Section 3553(a) factors, viewing his conduct as compared to others is important to avoiding such unwarranted disparities, especially where the government is in control of what crimes are charged and the crime to which a defendant is allowed to plead.  Viewed through a lens of relative culpability, Mr. Salcedo's misconduct is not "worse" than many others involved in these cases.

### 2.    Relative Culpability

The most culpable person in this scheme is its mastermind:  Rick Singer.  *United States. v. William Rick Singer*, 19-cr-10078-RWZ.  Mr. Singer pled guilty to a four-count information charging a RICO conspiracy, money laundering conspiracy, conspiracy to defraud the United States, and obstruction of justice.  He is cooperating with the government and has not been sentenced.  According to the Superseding Indictment in this case, Mr. Singer allegedly received approximately $25 million from parents to bribe coaches and administrators to designate applicants as student athletes (Super. Ind. ¶ 49).  Mr. Singer was also the mastermind behind the testing fraud scandal and the creation of

---

[17] In the operative plea agreement, the government did agree to abide by its earlier recommendation of no more than 24 months incarceration, as opposed to going up to the low-end of the federal programs bribery sentencing guidelines range, which Mr. Salcedo both recognizes and appreciates.  That discretion, however, only underscores the point Mr. Salcedo makes.  His misconduct has not changed.  Rather, it is the government's charging and plea decisions that have an outsized impact on the outcome if the focus is on the U.S.S.G. as opposed to the nature of his conduct relative to others.

fictitious athletic profiles for students (Super. Ind. ¶¶39-48). In addition, UCLA bears culpability because had the school not white-washed earlier parental complaints about Singer's misconduct in obtaining side-door admissions and not concealed its compliance review regarding same, Singer's scheme at UCLA would have failed.[18]

> ### a. Other Participants in the Federal Programs Bribery Conspiracy Regarding the Two Applicants Assisted by Mr. Salcedo.

The participants in the federal programs bribery conspiracy involving Applicant 1 were Mr. Singer, Ali Khosroshahian, Laura Janke, and Applicant 1's parents, Bruce and Davina Isackson, and other persons not charged. The participants in the federal programs bribery conspiracy involving Applicant 2 were the same except that Applicant 2's parent was Xiaoning Sui. All of these charged participants have pled guilty, but none have been sentenced except for Ms. Sui. This section also discusses the sentencing of Peter Dameris, the father of an applicant in connection with which Mr. Salcedo received no bribe, but about which information is included in his Presentence Report.

Mr. Khosaharhian and Ms. Janke are charged in this case. Both pled guilty to the RICO conspiracy. Both are cooperating, and neither one has been sentenced. According to Mr. Khosaharhian's plea agreement, the parties calculated his U.S.S.G. at Total Offense Level 23 (46-57 months), with defendant reserving the right to argue a 2-level money laundering enhancement should not apply. Per Ms. Janke's plea agreement, the parties calculated her U.S.S.G. at Total Offense Level

---

[18] For the reasons set forth in Defendant's Memorandum in support of his Motion to Issue Fed. R. Crim. P. 17(c) Subpoenas (Docket 323)(Ex. 12) and in his reply brief (Ex. 13), UCLA is no victim here. For many years, UCLA knew that sports team roster spots were provided in exchange for financial donations to sports teams and the school. In 2012, UCLA investigated allegations about Singer's misconduct, the same misconduct at issue here, and concealed both the compliance report (Docket 323-9) and the financial misconduct from the public and from the upper administration of the University of California public university system. (Ex. 12). At that time, instead of owning their own failure to comply with the California Board of Regents Policy 2202 barring development considerations from influencing admissions decisions (Docket 336, Exhibit A), UCLA scapegoated former Track and Field Director Michael Maynard. (Docket 323-10)(Ex. 14), and continued UCLA's relationship with Singer. As late as July 2018, UCLA continued to provide guidance to coaches regarding prospective student athletes where, in addition to athletic and academic checks, initial and final giving history checks were required for non-scholarship athletes. (Ex. 15).

18 (27-33 months).  According to the Superseding Indictment, Mr. Singer paid $350,000 to a private soccer club controlled by Mr. Khosroshahian and Ms. Janke (Super. Ind. ¶ 53).  They are alleged to have been involved in *both* the testing and recruitment schemes, creating fake athletic profiles for multiple students, and recruiting coaches for the scheme, as well as making money for their services.

The Isacksons were charged in a three-count information.  *United States v. Bruce and Davina Isackson*, 19-cr-10115-PBS.  The government alleged the Isacksons engaged in mail fraud, honest services mail fraud, and conspiracy to defraud the United States, all to use bribery to facilitate the admission of their older daughter (Applicant 1) as a student athlete to UCLA.  It further alleged that when a clerical error prevented a successful effort to get their second daughter admitted to USC through the so-called side door, they then helped her cheat on the ACT and be get admitted to USC as a student-athlete (Plea Tr. at 21-27).  According to the affidavit submitted in support of a complaint against the Isacksons and others, the government alleged the Isacksons further discussed a cheating effort for their third child (Affidavit, ¶ 264).  In total, the government alleged the Isacksons paid $600,000 for Mr. Singer's services (Information, ¶ 38).  The Isacksons paid three times more than the $200,000 that Mr. Salcedo received, committed the illegal conduct at least twice,  participated in both the testing and the recruitment schemes, and committed other conduct charged by the government.  Presumably, they could also have been charged with participating in the federal programs bribery conspiracy given they were recorded during the investigation in a conversation with Mr. Singer stating that a payment had been made to Mr. Salcedo (Affidavit, ¶ 266).  However,  they were not so charged.

Mr. Isackson pled guilty to three counts in the Information:  conspiracy to commit mail and honest services mail fraud; conspiracy to commit money laundering; and conspiracy to defraud the United States).  The parties calculated Mr. Isackson's U.S.S.G. at Total Offense Level 21 (37-46 months) (Plea Tr., at 16).  Davina Isackson pled guilty to one count:  conspiracy to commit mail and honest services mail fraud.  The parties calculated Ms. Isackson's U.S.S.G. at Total Offense Level 18

(27-33 months) (Plea Tr., at 17).  If Judge Saris follows this Court's September 2019 decision instead of the parties' calculations, the U.S.S.G. calculations might be significantly less.  Both Mr. and Mrs. Isackson are cooperating with the government.  Neither has been sentenced.

Ms. Sui pled guilty pursuant to a Fed. R. Crim P. 11(c) plea agreement to a Superseding Information charging a single substantive count of federal programs bribery.  *United States v. Xioaning Sui*, 19-10082-DPW.  She was originally charged in a sealed indictment with one count of mail/wire/honest services fraud.  In her plea agreement to the substantive count of federal programs bribery, the government calculated her Total Offense Level as 21 (37-46 months).  Ms. Sui paid Mr. Singer $400,000, knowing some portion of it would be used to pay Mr. Salcedo to facilitate her son's admission (Applicant 2). (Sentencing Tr. at 15).  She was sentenced to time-served, which was 157 days (approximately 5 months in prison), no supervised release, and a $250,000 fine.

Finally, Peter Damaeris is the father of an applicant whom Mr. Salcedo was unable to assist in connection with possible admission of his son to UCLA and for whom Mr. Salcedo received no payment.  *U.S. v. Peter Damaeris*, 20-cr-10099-RGS.  The information is included in Mr. Salcedo's Presentence Report.  PSR ¶¶ 69-75.  Mr. Damaeris was permitted to plead guilty to a single count of conspiracy to commit mail and honest services mail fraud.  He was sentenced to time served (1 day), 3 years of supervised release, and a $95,000 fine.  The incarceration period was agreed by the government, largely due to the health of family members (Plea agreement, ¶ 4.a).  Mr. Dameris paid Mr. Singer $300,000 for the purpose of obtaining admission of his son as a tennis player at Georgetown (Information, ¶ 14).  According to the government, Mr. Damaeris believed the money would go to the tennis team, not to the coach (Sentencing Tr. at 6).[19]

---

[19] At some sentencing hearings, including those of Ms. Sui and Mr. Dameris, the government has justified its recommendation of a less than guideline sentence based on the date an individual accepted responsibility and pled guilty.  Under the U.S.S.G., there is no distinction between accepting responsibility on the day after an Indictment or several weeks before trial.  While the government undoubtedly prefers that defendants not test the government's legal theories or explore the quality of the evidence underlying the factual allegations,

b.        **Other Defendants in This Case.**

To date, only two defendants in the current Superseding Indictment have been sentenced: Martin Fox and Niki Williams.

According to the government at Martin Fox's sentencing hearing, Mr. Fox was involved in the admission of two students as fake athletic recruits, and took steps toward admitted a third through connections with college coaches.  He enabled Mr. Singer to control the Houston testing center through his connection to Niki Williams, facilitating the cheating on college entrance exams for four students (Sent. Tr. at 15).  Mr. Fox pled guilty to the racketeering conspiracy charge, and agreed he had been involved in directing the enterprise's activities, such as figuring out the testing site and how to connect the enterprise to a coach at University of Texas (Sent. Tr. at 16-17).  The government contended Mr. Fox was more culpable than other defendants engaged in the events with which he was involved because he was implicated in both the testing and recruitment schemes, recruited others to the scheme (including a coach and testing administrator), and he did it for personal profit (Sent. Tr. at 19).  By contrast, Mr. Salcedo was not involved in the testing scheme, did not know that fictitious profiles had been created for the students he assisted, and did not bring other persons into Mr. Singer's scheme for money.[20] Mr. Fox was sentenced to 3 months imprisonment; 15 months supervised release (with the first 3 months home confinement); a $95,000 fine; $245,000 forfeiture; and 250 hours community service

defendants have a right to do so before deciding to plead.  A defendant should not be penalized for that decision, which is effectively what the government's argument on timing of acceptance of responsibility asks the Court to do.  Indeed, as this case makes abundantly clear, the opportunity for a defendant to file serious legal motions can highlight very real and impactful differences in legal burdens (the November 23, 2020 opinion), and guideline calculations (the September 19, 2019 opinion).

[20] Unlike Mr. Fox, Mr. Salcedo does not have health problems such as the ones that were separately taken into account in Mr. Fox's sentencing (Fox Sent. Tr. at 23-29).

Niki Williams was among the least culpable of all of the defendants, earning only $12,500 for her role in cheating on the tests. She had a lifetime of service within her school system, and is in a unique position among the defendants in this case. She was sentenced to 12 months probation and forfeiture of $12,500.

### c. Other Coaches.

Two coaches have been sentenced: John Vandomoer, a sailing coach at Stanford University, and Michael Center, a tennis coach at the University of Texas. Four coaches or athletic department officials were charged in this indictment and have not pled (Gordon Ernst, Donna Heinel, William Ferguson, and Johan Vavic). Mr. Khosroshahian, a former women's soccer coach at USC, has pled and has not been sentenced, as discussed above. One additional coach, Rudolph Meredith, was charged in a separate case, and has not been sentenced. All are discussed below:

Mr. Vandemoer pled guilty to a RICO conspiracy. *United States v. John Vandemoer*, 19-cr-10079-RWZ. Mr. Vandomoer did not personally accept money. Rather, he assisted two applicants with admission through the side door in exchange for a total payment of $610,000 to benefit Stanford's sailing program (Information, ¶¶ 11-12). Although it is unclear precisely what amount the sailing program actually received, the important point is that a significantly higher dollar amount was involved at Stanford than at UCLA. The Court accepted U.S. Probation's calculation of Total Offense Level 18 (27-33 months) (Sent. Tr. at 33). It also determined there was no calculable loss to the University (Sent. Tr. at 32). Mr. Vandemoer was sentenced to time served (one day), two years of supervised release with the first six months in home detention, and a $10,000 fine.

Mr. Center, the University of Texas coach, pled to a single count of conspiracy to commit mail and honest services mail fraud. He is cooperating. *United States v. Michael Center*, 19-cr-10116-RGS. Mr. Center accepted $100,000 from Mr. Singer as a bribe to assist an applicant through the side door as a student athlete, and thereafter agreed to help a second applicant (Criminal Complaint Affidavit,

¶¶ 11, 26).  He also used a book scholarship to help ensure the admission (Id., ¶ 16).  Mr. Center was sentenced by Judge Stearns under a Fed. R. Crim. P. 11(c)(1)(C) plea agreement, which required 6 months incarceration, 12 months supervised release, and a $60,000 forfeiture.  The Court accepted the plea agreement.  At sentencing, the government acknowledged that Mr. Center could not be charged with the RICO conspiracy because he did not have insight regarding the larger conspiracy (Fox Sent. Tr. at 21, distinguishing other defendants), something that equally applied to Mr. Salcedo, though he was charged with RICO in any event.  Ultimately, following this Court's November 2020 opinion, the government recognized Mr. Salcedo could not plead to the RICO conspiracy because he did not direct or manage any part of the Key enterprise, a company he did not even know existed except for the transfer of money by Mr. Singer from a Key account in July 2016.  Yet, Mr. Salcedo was not permitted to plead to the mail/wire/honest services fraud conspiracy which would have resulted in a much lower U.S.S.G. range under this Court's September 2019 decision.

The other coaches in the Superseding Indictment (Mr. Ernst, Ms. Heinel, Mr. Ferguson, and Mr. Vavic) have not pled guilty.  All were charged with each of the three conspiracies (RICO, mail/wire/honest services fraud, and federal programs bribery) with which Mr. Salcedo was charged, as well as additional counts.  In each case except Mr. Ferguson's, the amount of money alleged as bribes taken by each defendant exceeds the $200,000 paid to Mr. Salcedo.  Some alleged bribes were alleged to have been paid to particular coaches personally; others were supposedly paid to university athletic or team accounts which a coach controlled.  Mr. Ernst was alleged to have accepted more than $2.7 million in bribes to help at least 12 student applicants (SI ¶¶ 86-87); Dr. Heinel was alleged to have taken more than $1.3 million in bribes to help more than two dozen student applicants (SI ¶¶ 59-63); Mr. Vavic was alleged to have taken $250,000 in bribes to assist two applicants (SI ¶¶ 55-57); and Mr. Ferguson was alleged to have accepted $100,000 in bribes to assist one applicant. (SI, ¶¶ 116-117).

Rudolph Meredith pled guilty to conspiracy to commit wire and honest services wire fraud, and honest services wire fraud. *U.S. v. Rudolph Meredith,* 19-cr-20075-MLW.  He was a coach at Yale, and according to the government, was paid approximately $860,000 in bribes from Singer in connection with admissions, and agreed upon another bribe of $450,000 he intended to collect directly from a parent, for a total of $1.31 million (Plea Tr. at 17-19).  He was provided an opportunity to cooperate, and did cooperate with the government, which is how the government uncovered Singer's operation (Plea Tr. at 15).  He was not charged with RICO because the government did not know about Singer's scheme prior to Meredith's cooperation (Plea Tr. at 13).  The government characterized Meredith's acceptance of money in exchange for admission of students as bribes (Plea Tr. at 9), and presumably, had he not been an early cooperator, he could have been included in the federal programs bribery conspiracy as well.  Mr. Meredith is cooperating and has not been sentenced.

### d.    Parents Involved in the Scheme.

To date, this Court has sentenced 11 parents who pled guilty in cases related to this larger investigation. *United States v. Gregory Abbott, et al.*, 19-cr-10117-IT.  As the Court is aware from its extensive familiarity with this matter, these parents paid large amounts to Singer, which financed his entire scheme.   This conduct shows a privileged class of people, with substantial assets and advantages, cheating to get even more of a step up for their children.  While the coaches to whom Singer funneled a share of these "bribes" were also necessary for the scheme to work, at least for Mr. Salcedo, he was not privileged or advantaged by the standards of these parents.  In Mr. Salcedo's case, he was trying to support a family in Los Angeles on his coach's salary, supplemented by summer soccer camps, but he was not living flush by any means.  He was trying to keep up with expenses of his family.

| Defendant | Scheme | Alleged Conduct | Government's Recommendation | Sentence |
|---|---|---|---|---|
| Abbott, Gregory | Testing | Paid $125,000; Active and repeat participant; Threatened legal action against College Board when test score delayed | 8 months incarceration; $40,000 fine | 1 month imprisonment; $45,000 fine |
| Abbott, Marcia | Testing | Paid $125,000; Active and repeat participant; Threatened legal action against College Board when test score delayed | 8 months incarceration; $40,000 fine | 1 month imprisonment; $45,000 fine |
| Buckingham, Jane | Testing | Paid $50,000; Active participant; Arranged for Singer's associate to take test. | 6 months incarceration; $40,000 fine | 3 weeks imprisonment; $40,000 fine |
| Caplan, Gordon | Testing | Paid $75,000; Active participant; Hired counsel to force ACT to release fraudulent test score. | 8 months incarceration; $40,000 fine | 1 month imprisonment; 250 hours of community service, $50,000 fine |
| Flaxman, Robert | Testing | Paid $75,000; Enlisted child's involvement; Took tax deduction | 8 months incarceration; $40,000 fine | 1 month imprisonment; $50,000 fine |
| Huffman, Felicity | Testing | Paid $15,000; Active participant | 1 month incarceration; $9,500 fine | 14 days imprisonment; 250 hours community service, $30,000 fine |
| Huneeus, Agustin | Recruitment and testing | Agreed to pay $300,000; Active participant; Enlisted child's direct involvement | 15 months incarceration; $95,000 fine | 5 months; $100,000 fine |
| Klapper, Marjorie | Testing | Paid $15,000; Active participant; Falsified college applications | 4 months incarceration; $20,000 fine | 3 weeks imprisonment; $9,500 fine |
| Sartorio, Peter Jan | Testing | Paid $15,000; Structured cash withdrawals to conceal payment | 1 month incarceration; $9,500 fine | Probation; $9,500 fine |
| Semprevivo, Stephen | Recruitment | Paid $400,000; Active participant; Enlisted child's direct involvement; Lack of remorse (sued university to block expulsion of child) | 18 months incarceration; $95,000 fine | 4 months imprisonment; 500 hours community service; $100,000 fine |
| Sloane, Devin | Recruitment | Paid $250,000; Active participant; Enlisted child's involvement | 12 months and 1 day incarceration; $75,000 fine | 4 months imprisonment; 500 hours community service, $95,000 fine |

As discussed above, the government charged most of these parents with a one count information charging conspiracy to commit some variation of mail/wire/honest services fraud, with

the limited U.S.S.G. incarceration range of 0-6 months under the Court's September 2019 decision. Some of the parents knew that money was being funneled to coaches and/or university sports teams, and presumably they could also have been charged with federal programs bribery, with its attendant higher U.S.S.G. calculation. Without the parents' collective willingness to cheat the admission system to obtain even further advantages for their already advantaged children, Mr. Singer's scheme would not have worked, and Mr. Salcedo would never have been tempted to take bribes of money he needed to meet his own family's expenses.

Mr. Salcedo admits his role and deeply regrets his bad choices. By comparing him to the parents, this argument is not intended to minimize his conduct – only to say it is not relatively "worse" than what the parents did. Some parents enlisted their children in the scheme. Most or all had fake athletic profiles created for their children, and some also bought fake and inflated test scores to advance their offspring's cause. Some obtained fake identifications, and some committed other crimes in addition to the one to which they pled. These parents were sentenced to between 14 days and five months imprisonment, including the three that paid more than $200,000 to Mr. Singer. (i.e., Mr. Huneeus, Mr. Sempreivo, and Mr. Sloan).

Another 19 parents who were the subject of the multiple superseding indictments in *United States v. David Sidoo, et al.*, 19-cr-10080-NMG, and can be similarly compared. In the fourth superseding indictment, the 15 then remaining defendants were charged with wire/honest services/honest services wire fraud conspiracy, federal program bribery conspiracy, money laundering conspiracy, and other substantive counts. In Count 2, the government charged 11 of the remaining 15 defendants with federal programs bribery and alleged that those parents knew some portion of the amounts paid to Singer were to be used as bribes to facilitate the admission of their children to USC. Yet, the government has allowed all five of the eleven defendants named in Count 2 that have pled to plead to wire/honest services/honest services wire fraud conspiracy (Diane Blake, Todd Blake, Mossimo

Giannuli, Lori Loughlin, and William McGlashan, Jr.).

One defendant in the *Sidoo* case who was also charged with federal programs bribery, Robert Zangrillo, received a Presidential Pardon. According to the Second and Fourth Superseding Indictments, Mr. Zangrillo paid $200,000 to Mr. Singer for acceptance of his daughter as a student-athlete at USC, knowingly submitted falsified athletic credentials for her, knew some portion of his money was used for bribes, and engaged his daughter in the cover-up of the side-door admission. (Docket No. 314, ¶¶ 262-268; Docket No. 732, ¶¶ 349, 372). The pleading defendants who have been sentenced in the *Sidoo* case are as follows:

| Defendant | Scheme | Alleged Conduct | Government's Recommendation | Sentence |
|---|---|---|---|---|
| Sidoo, David | Testing | Paid $200,000; Active and repeat participant; | 12 months and a day; $250,000 fine; 12 months SR | 90 days incarceration, 12 months SR; $250,000 fine. |
| Blake, Diane | Recruiting | Paid $250,000. | 6 weeks incarcerations; 24 months SR; $125,000 fine, 100 hours community service | 6 weeks incarceration; 24 months SR; $125,000 fine; 100 hours CS |
| Blake, Todd | Recruiting | Paid $250,000 | 4 months incarceration; 24 months SR, $125,000 fine, 100 hours community service | 4 months incarceration, 24 months SR, $125,000 fine; 100 hours CS |
| Gianulli, Mossimo | Recruiting | Paid $500,000 | 5 months incarceration; 24 months SR, $250,000 fine, 250 hours CS | 5 months incarceration, 24 months SR, $250,000 fine; 250 hours CS |
| Henriquez, Elizabeth | Testing and Recruiting | Paid $450,000 | 26 months incarceration; 36 months SR; $250,000 fine; 300 hours CS | 7 months incarceration, 24 months SR, $200,000 fine, 300 hours CS |
| Henriquez, Manuel | Testing and Recruiting | Paid $450,000 | 5 months incarceration, 24 months SR, $150,000 fine, 250 hours CS | 6 months incarceration, 24 months SR, $200,000 fine, 200 hours CS |
| Hodge, Douglas | Recruiting | Paid $850,000 | 24 months incarceration; 36 months SR; $200,000 fine; 300 hours CS | 9 months incarceration, 24 months SR, $750,000 fine; 500 hours CS |
| Janavs, Michelle | Testing and recruiting | Paid $300,000 | 21 months incarceration, 36 months SR, $175,000 fine, 250 hours CS | 5 months incarceration, 24 months SR $250,000 fined |
| Loughlin, Lori | Recruiting | Paid $500,000 | 2 months incarceration, 24 months SR, $150,000 fine, 100 hours CS | 2 months incarceration, 24 months SR, $150,000 fine, 100 hours CS |
| McGlashan, William | Testing and Recruiting | Paid $300,000 | Not available yet. | Sentencing pending |
| Sidoo, David | Testing | Paid $200,000 | 90 days incarceration, 12 months SR, $250,000 fine. | 90 days incarceration,  12 months SR, and a $250,000 fine. |

As set forth in the chart above, the amount of money paid by these parents was between $200,000 and $850,000. Five of them paid $450,000 and above (Elizabeth and Manuel Enriquez, Douglas Hodge, and Lori Laughlin and Mossimo Giannulli). Several parents participated on behalf of more than one child and one parent for as many as three (Douglas Hodge); at least four of these parents were involved in both the testing and the recruiting schemes. Some used fake identification cards, fake athletic profiles, and disguised their payments as charitable contributions. Some enlisted their children in the scheme to cheat. Their sentences have ranged between 90 days and 9 months.

## CONCLUSION

Mr. Salcedo respectfully requests that he be sentenced to not more than three months incarceration, 12 months supervised release, $200,000 in forfeiture, which is currently being held in escrow by the government, a $100 special assessment, and no fine. He requests the Court to find that no fine is warranted because he will be unable to support his family while he is incarcerated, and his wife's income will be insufficient to pay his family's living expenses without his contribution. He believes that such a sentence would be sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in Section 3553(a).

Respectfully submitted,

**JORGE SALCEDO**

By his attorneys,

*/s/ Susan G. Winkler*
Susan G. Winkler  (BBO No. 530682)
WINKLER LAW LLC
120 Holmes St., Suite 313
Quincy, MA 02171
617-642-6671
Winkler.susan@gmail.com

*/s/ Thomas C. Frongillo*
Thomas C. Frongillo (BBO No. 180690)
CAMPBELL CONROY & O'NEIL, P.C.
1 Constitution Wharf, Suite 310
Boston, MA  02129
(617) 241-3000
TFrongillo@campbell-trial-lawyers.com

DATE:  March 12, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Susan G. Winkler*
Susan G. Winkler