1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,          )
                                        )
5            Plaintiff,                 )
                                        )
6        v.                             )   Criminal Action No.
                                        )   1:19-cr-10081-IT-11
7    JORGE SALCEDO,                     )
                                        )
8            Defendant.                 )
                                        )
9    _____

10

11      BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

12

            SENTENCING HEARING BY VIDEOCONFERENCE
13

14

                    Friday, March 19, 2021
15                      2:36 p.m.

16

17

18

19

20

    John J. Moakley United States Courthouse
21   Courtroom No. 9
    One Courthouse Way
22   Boston, Massachusetts

23

    Robert W. Paschal, RMR, CRR
24   Official Court Reporter
    rwp.reporter@gmail.com

25

1                     **A P P E A R A N C E S**

2

    On behalf of the Government:

3

        UNITED STATES ATTORNEY'S OFFICE
4       BY:  KRISTEN A. KEARNEY
        One Courthouse Way
5       Suite 9200
        Boston, MA  02210
6       (617) 748-3204
        kristen.kearney@usdoj.gov
7


8

    On behalf of the Defendant:

9

        WINKLER LAW LLC
10      BY:  SUSAN G. WINKLER
        120 Holmes Street
11      Unit 313
        Quincy, MA  02171
12      (617) 642-6671
        winkler.susan@gmail.com
13


14      PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
        BY:  THOMAS C. FRONGILLO
15      One Liberty Square
        13th Floor
16      Boston, MA  02109
        (617) 401-7289
17      tom.frongillo@verizon.net

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2               (In open court at 2:36 p.m.)

3               THE DEPUTY CLERK:  United States District Court is

4     now in session, the Honorable Judge Indira Talwani presiding.

5               This is Case Number 19-cr-10081, United States

6     versus Jorge Salcedo.  Will counsel please identify

7     themselves for the record.

8               MS. KEARNEY:  Good afternoon, Your Honor.  Kristen

9     Kearney for the United States.

10              THE COURT:  Good afternoon.

11              MS. WINKLER:  And Susan Winkler for the defendant,

12    Jorge Salcedo, who is also present here on the screen.

13              THE COURT:  Good afternoon.

14              MR. FRONGILLO:  Good afternoon, Your Honor.  Thomas

15    Frongillo for Mr. Salcedo.

16              THE COURT:  Good afternoon.

17              So we're here for sentencing.  And since this is

18    proceeding by videoconference, I'm going to begin by

19    describing the arrangements.

20              So you're appearing here by videoconference with a

21    video link to the courtroom.  On your screen, you should be

22    able to see me, my courtroom deputy, the lawyers, the

23    probation officer, and the court reporter.  The courtroom is

24    closed -- sorry.  The courtroom is not closed, but I'm the

25    only one here.

1          If you have any trouble with the video or phone
2     connection, or you cannot hear or see what is happening, let
3     me know, speak up, wave your hand, and I will stop the
4     proceedings and see what we can do.  If you need anything
5     repeated, let me know.  The court reporter will be preparing
6     a transcript of this proceeding, but no recording of the
7     video itself will be preserved.

8          And for anyone else on the line, as well as the
9     parties here, under Local Rule 83.3(a), any photography,
10    recording, rebroadcasting, et cetera, of this proceeding is
11    prohibited by local rule.

12         Mr. Salcedo, you have the right to be physically
13    present in open court for this proceeding, but you can waive
14    that right.  Before I ask whether you intend to waive your
15    right, you should know the following:  Today is March 19,
16    2021.  We are experiencing a worldwide epidemic caused by the
17    coronavirus.

18         The president of the United States and the governor
19    of Massachusetts have each declared a state of emergency,
20    although neither the federal government nor the state
21    government has yet made judges or court employees or defense
22    counsel or prosecutors yet eligible for vaccination.

23         Nonetheless, we are trying to proceed with matters,
24    and congress has passed an emergency statute that permits
25    defendants in criminal cases to appear in court by video or

telephone for certain types of proceedings.  Our normal
procedure before the emergency was to have all defendants
physically present in the courtroom for sentencing hearings.

We're attempting as best as we can to protect the
health and safety of our court employees, the lawyers, the
defendants, the security personnel, and everyone else who is
involved with the court system.  At the same time, we are
attempting to permit the basic functions of the court to go
forward without unnecessary delays.

The physical appearance of defendants and counsel
in the courthouse and their transportation to and from the
courthouse are likely to increase health risks for all
persons involved as well as the general public.  To try to
minimize those risks, we are giving defendants who prefer to
appear in court by video the option to do so.  It is
voluntary.  You do not have to appear by video.  But if you
choose to appear by video, I will ask you to waive your right
to be physically present.

You should also know that you have a right to have
this proceeding conducted in open court in public view.  Our
normal procedure was to have such proceedings in open court.
As I said before, the courtroom is open, but in light of the
emergency, access to the courtroom is somewhat limited; and
as announced on our website, we are permitting members of the
public to have access to this videoconference.

```
1                    Ms. Marchione, are there members of the public on
2       this line?
3                    THE DEPUTY CLERK:  Yes, Your Honor, there are.
4                    THE COURT:  Thank you.
5                    So with that, do you understand that you have the
6       right to be physically present in open court for your
7       sentencing hearing?
8                    THE DEFENDANT:  Yes, I do, Your Honor.
9                    THE COURT:  Do you understand you have the right to
10      consult with your lawyer during this hearing?
11                   THE DEFENDANT:  Yes, I do, Your Honor.
12                   THE COURT:  Do you understand that if you wish to
13      speak with your lawyer during the proceeding, you should let
14      me know, and I will make arrangements for the two of you to
15      have a private conversation?
16                   THE DEFENDANT:  Yes, I do, Your Honor.
17                   THE COURT:  Do you understand you have the right to
18      see and hear everything that happens in court during your
19      sentencing, but because there's only a single camera here,
20      you will see only part of the courtroom?
21                   THE DEFENDANT:  I understand, Your Honor.
22                   THE COURT:  Do you understand that your family
23      members and other supporters have the right to attend this
24      proceeding, but they will need to do so through the telephone
25      line?
```

1          THE DEFENDANT:  I understand, Your Honor.

2          THE COURT:  Have you consulted with your lawyer

3     concerning waiving your right to appear in person?

4          THE DEFENDANT:  Yes, I have, Your Honor.

5          THE COURT:  Do you agree to waive your right to

6     appear in person for your sentencing and instead to appear by

7     video?

8          THE DEFENDANT:  Yes, I do, Your Honor.

9          THE COURT:  Do you also agree that to the extent

10    that your right to public access to this proceeding is in any

11    way impaired, you waive that right?

12         THE DEFENDANT:  I understand, Your Honor.

13         THE COURT:  And to the lawyers, is there any reason

14    I should not accept the waiver?

15         MS. WINKLER:  No, Your Honor.

16         MS. KEARNEY:  No, Your Honor.

17         THE COURT:  I find the defendant has knowingly and

18    voluntarily waived his right to appear physically and has

19    knowingly and voluntarily agreed to proceed by

20    videoconference.  I also find that Mr. Salcedo's sentencing

21    cannot be further delayed without serious harm to the

22    interest of justice since delaying this proceeding until it

23    is reasonably safe for Mr. Salcedo to travel to Massachusetts

24    would frustrate his right to a speedy disposition of the

25    charges brought against him.

1          I further find that the measures taken to provide

2    public access to the proceeding are reasonable under the

3    circumstances and that to the extent that the defendant's

4    right to public access to this proceeding is in any way

5    impaired, he has knowingly and voluntarily waived that right.

6    I accept the waiver, and I will proceed now to sentencing.

7          So, as always, I start with the documents that I

8    have received and reviewed in preparation for the sentencing.

9    I have the presentence report that was prepared

10   December 18th, revised February 12, 2021, and March 11, 2021.

11   I have the Government's sentencing memorandum filed March 12,

12   2021; the defendant's sentencing memorandum filed March 12,

13   2021, and accompanying exhibits and also the defendant's

14   response and accompanying documents filed March 18th.

15         I have reviewed the first superseding indictment,

16   the original plea agreement, the amended plea agreement.  I

17   have the Government's motion for forfeiture.  I've also

18   reviewed the statement of reasons in the criminal case

19   against Mr. Center and against Mr. Vandemoer.

20         So with that, is there any other material that's

21   been submitted to the Court that I missed?

22              MS. KEARNEY:  Not from the Government, Your Honor.

23              MS. WINKLER:  Not from the defendant, Your Honor.

24              THE COURT:  Okay.

25              MS. VICTORIA:  Your Honor, there was a letter from

1    UCLA that was --

2              THE COURT:  Yes.  Thank you.  I have that as a --

3    well, I have it.  I guess --

4              MS. KEARNEY:  I believe it was attached to the

5    presentence report.

6              THE COURT:  I think it was attached to the --

7    either the presentence report or the Government's memorandum;

8    but I do have it, and I have reviewed it -- thank you -- the

9    presentence report.  And that is not something that UCLA

10   wanted put on the docket, I take it?  That was just sent to

11   you?

12             MS. KEARNEY:  Correct, Your Honor.

13             THE COURT:  Anything else?

14             MS. WINKLER:  No, Your Honor.

15             MS. KEARNEY:  No, Your Honor.

16             THE COURT:  And for probation, was any information

17   withheld from the presentence report pursuant to

18   Rule 32(d)(3)?

19             MS. VICTORIA:  No, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             And we don't have any witnesses or victims present

22   planning to make a statement, correct?

23             MS. KEARNEY:  Correct.

24             THE COURT:  Okay.  So, Ms. Winkler, have you had an

25   opportunity to review all the materials submitted in

1    connection with the sentencing?

2          MS. WINKLER:  Yes, Your Honor.

3          THE COURT:  Actually, I didn't know which one of

4    you is proceeding here.

5          MS. WINKLER:  It's me.  And, yes, Your Honor, we've

6    had an opportunity to review all of it.

7          THE COURT:  And have you had a chance to go over it

8    with the defendant?

9          MS. WINKLER:  We have.

10          THE COURT:  Mr. Salcedo, have you reviewed all the

11    material that was submitted in connection with the

12    sentencing?

13          THE DEFENDANT:  Yes, I have, Your Honor.

14          THE COURT:  And had a chance to discuss that

15    material with your counsel?

16          THE DEFENDANT:  Yes, I have, Your Honor.

17          THE COURT:  Okay.  So let's start with the

18    presentence report, and I have some objections from the

19    Government and also from the defendant.  Maybe I'll start

20    first with the defendant's objections, and I wasn't clear

21    whether any of them needed to actually -- you were

22    challenging the statements in the presentence report that you

23    felt needed to be changed or you were just trying to bring

24    material to my attention?

25          MS. WINKLER:  It's the latter, Your Honor.  We just

1    wanted to bring material to your attention.

2         THE COURT:  Okay.  So with that, is there anything

3    further that -- I have read all of your objections and the

4    probation office's responses.  Is there anything further on

5    the objections that you would like to discuss at this point?

6         MS. WINKLER:  No.  Your Honor, I don't believe any

7    of them impact the sentencing guideline calculation, and some

8    of them were referenced in the sealed pleading yesterday, but

9    I don't think there's anything additional that we need to

10   say.

11        THE COURT:  Okay.  And then turning to the

12   Government's objection, the objections -- first there were

13   objections regarding the determination by -- or the finding

14   by the probation office that, under the guidelines, UCLA is

15   not a victim.  Did you want to address that further or just

16   rest on your objection there, Ms. Kearney?

17        MS. KEARNEY:  We'll rest on our written submission,

18   Your Honor.

19        THE COURT:  Okay.  And for the reasons that are set

20   forth by the probation office and that were previously set

21   forth in various sentencing proceedings here, it is my

22   understanding of the guidelines, and I believe of every other

23   judge now who has considered this, that the universities are

24   not victims under the -- under the sentencing guidelines for

25   determination of a guideline sentence.  So I am overruling

1     the Government's objection there.

2               With regard to the maximum fine, the Government

3     objected that the maximum fine should be twice -- twice the

4     gain or loss.  Probation responded that that wasn't

5     sufficiently set forth in the indictment.  And do you have

6     any disagreement with that, Ms. Kearney?

7               MS. KEARNEY:  I will note that paragraph 160(h) of

8     the superseding indictment indicates that the Government

9     intended to forfeit property that constituted proceeds of the

10    fraud, and it listed a $200,000 money judgment.  So

11    Mr. Salcedo was on notice that the gain here was $200,000;

12    but otherwise, we'll rest on our objection.

13              THE COURT:  Okay.  I am stating the maximum fine as

14    set forth by the probation office.  I do think the forfeiture

15    portion is clear, but I don't think I need to calculate that

16    for purposes of the fine.

17              So I think that takes care of -- oh, no.  Yeah,

18    that takes care of all the objections, correct?

19              MS. KEARNEY:  Yes, Your Honor.

20              MS. WINKLER:  Yes, Your Honor.

21              THE COURT:  Okay.  So for the guidelines, it

22    appears there's no dispute here.  The base offense level is

23    considered a level 12; specific offense characteristics, a

24    two-level increase because there were two bribes involved, a

25    ten-level increase based on the value of the payments, for an

1    adjusted offense level of 24, a three-level decrease for

2    acceptance of responsibility, for a total offense level of

3    21.  Any disagreement?

4               MS. KEARNEY:  No, Your Honor.

5               MS. WINKLER:  No, Your Honor.

6               THE COURT:  And Mr. Salcedo has no criminal history

7    that is countable here, and that gets us to zero criminal

8    history points, criminal history category I.  Any

9    disagreement?

10              MS. KEARNEY:  No, Your Honor.

11              MS. WINKLER:  No, Your Honor.

12              THE COURT:  So with that, the imprisonment under

13   the statute is not more than five years; a guideline range,

14   37 to 46 months; the statutory range for supervised release,

15   not more than three years; a guideline range, one to three

16   years; probation, statutory range, one to five years;

17   guideline range, ineligible; a fine, statutory range, not

18   more than 250,000 based on my overruling the Government's

19   objection on that; and a guideline range of 15,000 to

20   150,000.

21              Any disagreement with any of that?

22              MS. WINKLER:  No, Your Honor.

23              MS. KEARNEY:  No, Your Honor.

24              THE COURT:  Okay.  And restitution to be

25   determined, but there has been no request for restitution

1    here, correct?

2           MS. KEARNEY:  Correct.  There's no restitution

3    request, Your Honor.

4           THE COURT:  Okay.  And I have the Government's

5    motion for forfeiture in the amount of $200,000, which tracks

6    the plea agreement, correct?

7           MS. KEARNEY:  Yes, Your Honor.

8           MS. WINKLER:  Yes.

9           THE COURT:  And a special assessment, a mandatory

10   $100?

11          MS. KEARNEY:  Correct.

12          THE COURT:  So with that, I will hear from the

13   Government.

14          MS. KEARNEY:  Thank you, Your Honor.

15          Jorge Salcedo was an eager participant in Rick

16   Singer's scheme.  He did not need a lot of convincing and did

17   not need to be dragged across the line between right and

18   wrong.  He had no intention of stopping, and even asked

19   Singer for an advance on the next deal.

20          Mr. Salcedo was a repeat player in the scheme.  He

21   facilitated two side door deals at UCLA, attempted a third,

22   and even organized a side door at the University of Southern

23   California.  He took an active role in directing this scheme.

24   He enlisted others, including the women's soccer coaches and

25   his own assistant coach.  He actively lied to UCLA compliance

1    staff and instructed others, including a parent, to do the

2    same.

3         And he also determined to use the athletic

4    scholarship process to bypass the scrutiny that UCLA

5    compliance applied to walk-on applicants.  And Mr. Salcedo

6    pocketed all $200,000 in bribe payments.  He wasn't doing

7    this to increase financial support for UCLA or its soccer

8    teams.  He was acting out of his own self-interest.

9         These factors place Mr. Salcedo among the most

10   culpable of the coaches and set him apart from the coaches

11   who have been sentenced thus far.  John Vandemoer, the

12   Stanford sailing coach, directed all the bribes to the

13   sailing program.  Michael Center, the Texas coach, directed

14   some of the bribe he received to the tennis program and took

15   only $60,000 for himself.  Unlike Mr. Salcedo, Michael Center

16   participated in Singer's scheme only once and refused to do

17   it a second time when presented with the opportunity.

18        Yet given the seriousness of his offense, the

19   importance of deterring others, and the need to punish what

20   he called outright avarice, Judge Stearns sentenced Center to

21   six months in prison despite that Center's conduct was an

22   aberration on his otherwise unblemished record, whereas

23   Mr. Salcedo engaged in repeated deals, accepted significantly

24   higher bribes, and engaged in separate frauds against USC and

25   the IRS.  A significantly longer sentence than six months is

1    merited.

2          The other comparable the Government noted in our

3    sentencing memorandum was for Xiaoning Sui, the parent of the

4    2018 applicant for whom Mr. Salcedo did a side door.  Ms. Sui

5    received a sentence of time served, which was approximately

6    five years in a Spanish prison where she did not speak the

7    language and was away from family and friends.

8          Unlike Mr. Salcedo, Sui was a passive participant.

9    She followed Singer and Mr. Salcedo's lead.  As a coach,

10   Mr. Salcedo stands in a different position than the parents.

11   Unlike the parents, coaches like Mr. Salcedo have a duty to

12   their team and to their university, a duty to recruit

13   athletes who will contribute to the team, a duty to

14   distribute limited athletic scholarships among the team

15   members, and a duty to use athletic recruitment to benefit

16   the schools and not their pockets.

17         Yet lining his pocket is exactly what Mr. Salcedo

18   did.  While his sentencing memorandum suggests that he agreed

19   to accept bribes as a way to support his family in

20   Los Angeles on a coach's salary supplemented by soccer camps,

21   it is important to note that Mr. Salcedo's coach's salary was

22   six figures and he was living in a $2½ million home.  He was

23   not stealing bread to feed his family.

24         And I want to talk next about a disturbing theme in

25   Mr. Salcedo's sentencing memorandums.  While Mr. Salcedo

indicates that he takes responsibility for his conduct in his
letter to the Court, the sentencing briefs submitted on his
behalf explicitly blame UCLA for not stopping him.  But the
facts show that UCLA compliance staff questioned the
recruitments here but were further misled by Mr. Salcedo and
others at his direction.

Compliance staff questioned why the 2016 applicant
was listed as a track athlete with the NCAA and why nothing
about soccer came up when they searched for her online.
Mr. Salcedo respond with a fake backstory about how she came
to his attention.  Then when compliance staff continued to
question her admission given her medical history, Mr. Salcedo
directed the women's coaches and student's mother to lie
about the extent of her issue and to insist that she intended
to play for the team.

Compliance staff also questioned Mr. Salcedo as to
why he was attempting to recruit the 2017 applicant so late
in the process, why an Internet search did not show any
results about him playing soccer, and why he was being
recruited after being denied regular admission.  Ultimately,
the student enrolled in a different school.

It was to avoid this scrutiny that Mr. Salcedo
opted to designate the 2018 applicant as a scholarship
recruit and planned to do the same for future Singer clients.
In other words, UCLA attempted to address the concerns about

1    illicit recruitments, but Mr. Salcedo found new ways to get

2    around that.  This shows that Mr. Salcedo was not going to be

3    deterred no matter what hurdles UCLA put up.

4            In making their argument that UCLA bears

5    culpability for Mr. Salcedo's actions, his lawyers point to a

6    UCLA form that asks about recruited walk-ons' past and future

7    financial donations as somehow showing that UCLA encouraged

8    coaches to recruit based on development potential.  But this

9    argument misses the point.  UCLA can't verify whether

10   financial contributions are influencing admissions decisions

11   without confirming whether there are any financial

12   contributions in the first place.  And perhaps more telling,

13   Mr. Salcedo hid the bribes he received and the families'

14   ability to contribute from UCLA.

15           It has also been suggested, not by Mr. Salcedo, but

16   by some of the people submitting letters in support of him

17   that he is a people pleaser whose trust in others led him to

18   the offense here.  Let me be clear:  Mr. Salcedo did it for

19   the money and knew from the beginning that there was fraud

20   involved.

21           Starting with the 2016 applicant, Mr. Salcedo

22   understood she was not a recruitable player.  Ali

23   Khosroshahin texted Mr. Salcedo, "Does the women's coach know

24   she is not going to play?"

25           In connection with the attempted recruitment of the

1    2017 applicant, Mr. Rick Singer warned Mr. Salcedo that if

2    UCLA Googled the applicant, nothing would come up about

3    soccer and offered to tone down the fake profile for the

4    student.

5          Mr. Salcedo's sentencing memo also makes an

6    argument all too familiar in white-collar cases, that he's

7    already been punished enough by losing his job and tarnishing

8    his reputation.  But that arguments ascribes an inverse

9    relationship between one's position in society and punishment

10   where the higher your position, the less punishment you

11   deserve.  Privileged people who are embarrassed get off,

12   while poor people whose crimes garner little more than a

13   press release go to jail.

14         In summary, Your Honor, Mr. Salcedo has

15   demonstrated that he is a perpetual cheat.  He cheated UCLA

16   by recruiting students in exchange for bribes.  He cheated

17   his team by causing limited scholarship money to be directed

18   to a fake recruit.  He cheated USC by engaging in a separate

19   conspiracy to bribe Donna Heinel to facilitate the admission

20   of an applicant as a member of USC's baseball team, and he

21   cheated the IRS by inflating his business losses to avoid

22   paying taxes.

23         A meaningful term of imprisonment is necessary

24   to -- excuse me -- to deter Mr. Salcedo and others from

25   engaging in this conduct, to promote respect for the law, and

1    to provide just punishment.  And for these reasons the

2    Government recommends a sentence of 18 months imprisonment, a

3    fine of $95,000, one year of supervised release, forfeiture

4    of $200,000, and a $100 special assessment.

5              Thank you.

6              THE COURT:  I do have some questions for you.  If

7    I'm trying to think about relative culpability here, where do

8    you place -- I had the filing from the Government before I

9    sentenced the parents in this scheme.  I had a brief from the

10   Government sort of where everyone was placed, in a sense,

11   relative to each other in terms of culpability.

12             So here, I understand your statement concerning the

13   differences between Mr. Salcedo's situation and Mr. Center

14   and Mr. Vandemoer, as well as Ms. Sui.  But compared to the

15   other people in this indictment, how do you -- the other

16   coaches -- where do you place him in terms of culpability?

17             MS. KEARNEY:  Towards the top, Your Honor.

18   Mr. Salcedo had one of the highest numbers of repeat deals

19   and towards the higher end of the bribe amounts received and

20   also the interest in repeating the process, coupled with his

21   other frauds on USC and the IRS.

22             So compared to the other defendants in this

23   indictment, Gordon Ernst and Donna Heinel, for the number of

24   times that they did it and the amounts that they received,

25   are going to be at the very top.  I would put Martin Fox

1  toward the top as we've discussed previously because he had

2  insights into both aspects of the scheme.

3         But then next would be probably Ali Khosroshahin

4  and Mr. Salcedo for the number of times that they did it, the

5  amount of money that they got from the scheme.

6         THE COURT:  So above -- you would find his

7  involvement greater than that of Mr. Vavic or Ferguson?

8         MS. KEARNEY:  Yes, Your Honor.  Mr. Ferguson only

9  did one side door deal and he also did attempt to recruit

10 other coaches to the scheme.  He also had some of the money

11 go to the school in addition to his pocket.  Mr. Vavic was

12 only involved with two students and was willing to do more,

13 and he recruited or helped facilitate Ali Khosroshahin's

14 involvement in this scheme.

15        But Mr. Salcedo did more students and he was also

16 engaging in, as I mentioned, the separate schemes to defraud,

17 not involving Mr. Singer.

18        THE COURT:  And not in this indictment, but

19 separately, where do you place him compared to Mr. Meredith?

20        MS. KEARNEY:  So Mr. Meredith only did two

21 students.  He had much higher bribes, but that is somewhat in

22 relation to the school for the same reason that Mr. Vandemoer

23 at Stanford had higher bribe amounts as well, because

24 Mr. Singer would charge parents more and expected to have to

25 pay more to get into a higher ranked school.

1          THE COURT:  Okay.  The other question I had for

2    you, at some point, I am trying to, obviously, wrestle with

3    comparability here, and usually we can use the guidelines as

4    some kind of a proxy for similarly situated defendants.

5          It seems to me, though -- and help me here if you

6    see this differently.  It seems to me that when you are

7    talking about the crimes committed by the coaches, they all

8    engaged in the same crime, the same -- the same offense,

9    essentially, whether there was a little bit more money or a

10   little bit less money, more people, fewer people, et cetera.

11   It was basically the same crime.

12         But the way the guidelines work, the way I'm

13   expected to determine the crime or determine the appropriate

14   guideline depends on the statute that's being used, right?

15   That the way we -- the procedure we go through to calculate

16   the guidelines is we take the statute that the Government has

17   charged the defendant with and the defendant has pled guilty

18   to or been convicted of.  We go to the back of the

19   guidelines.  We look up which section of the guidelines is

20   the section that we're going to use for that crime, and we

21   then look at what the guideline says about it.

22         But regardless which of the labels that the

23   Government is using here, whether you're charging people with

24   a violation of racketeering, honest services mail fraud,

25   federal programs bribery, wire fraud, all of these different

1    shapes that this -- these crimes have been charged and the

2    different versions of the indictment, at heart, we're dealing

3    with the same crime, and yet the guidelines are entirely

4    different.

5              MS. KEARNEY:  Well -- I'm sorry, Your Honor.

6              THE COURT:  Well, I mean, that's -- that's really

7    the question, is this sort of, how can I -- how is this

8    anything different than sort of the question of what statute

9    the Government chose to prosecute the person under rather

10   than what the misconduct was?

11             MS. KEARNEY:  Well, Your Honor, I think one issue

12   is that the Government calculated -- calculates the

13   guidelines different than the Court has.  So with the honest

14   services fraud charge, the Government would consider that,

15   you know -- has considered the $200,000 amount as going

16   towards the guidelines calculation, whereas I know the Court

17   has opted not to do that.  And so when you look at it that

18   way, the differences are not actually that much.

19             THE COURT:  But, you know -- and maybe I'm -- maybe

20   I'm naive in how I understand the different roles of the

21   prosecutor and the judge, but I understand a crime is

22   committed, and maybe I'm being overly simplistic here, but a

23   crime is committed.  The Government charges the defendant

24   with the crime.  The defendant at some point is sentenced for

25   that crime, and the judge is the one who imposes the

1    sentence.

2         And I think what you're saying here is the

3    Government has a view of what the sentence should be.  And so

4    rather than saying, "This is the crime we're charging and

5    this is -- now, Judge, what do you think is the appropriate

6    sentence?"  What it sort of feels like has happened in this

7    case is that the Government says, "We're the ones who are

8    getting to decide what the appropriate sentencing range is.

9    And if you won't agree with our calculation of it, we're not

10   going to appeal you to the First Circuit," which you

11   certainly had every right to do every step of the way.

12   Instead, what you're saying is, "We'll just keep charging it

13   differently."

14        What's -- what am I missing in that analysis?

15        MS. KEARNEY:  No, Your Honor.  I would disagree

16   with that, because we -- you're correct that the conduct is

17   the same and it results in different charges, but we're

18   asking you to sentence based on the defendant's relative

19   culpability regardless of the crime that -- or the statute

20   that they have pled guilty to.

21        We have tried to adjust our sentencing

22   recommendations appropriately based on the prior sentences

23   given so that there is not going to be major discrepancies

24   between the sentences, which is why even in the plea

25   agreement here, even though the sentencing guideline range

1    was 37 months, we agreed not to seek more than 24 months,

2    which was the guideline for the RICO conspiracy, and then

3    we've also adjusted further and are now recommending

4    18 months based on our analysis of the relative culpability.

5            So we are trying to consider this defendant's

6    conduct beyond what the guidelines calculations might be.

7            THE COURT:  Okay.  And with regard to supervised

8    release, you're only asking for one year.  You don't have any

9    concern to need an additional time beyond that?  And the fine

10   of 95,000 is assessed -- is -- you've reached that number

11   how?

12           MS. KEARNEY:  So the fine of 95,000 we reached

13   based on the guidelines calculation, the amount of the fine

14   that Mr. Fox was required to pay, as well as looking at the

15   assets reported in the presentence report.  And that's how we

16   reached that number.

17           THE COURT:  Okay.  Okay.  Thank you.

18           Ms. Winkler?

19           MS. WINKLER:  Thank you, Your Honor.

20           Let me start by describing for a moment Jorge

21   Salcedo and what -- where his life was before this indictment

22   happened.

23           I think it's important to note that soccer was his

24   life.  It was his passion, his joy.  It was the source of his

25   lifetime of accomplishments and his income.  It is what he

did as a young man on the U.S. youth national team.  It's
what he did at UCLA when he led his team to a national
companionship and later as their coach.

It's where he met his wife, ultimately.  It's where
he devoted endless hours and mentored young men and
demonstrated the commitment and the hard work it took to
accomplish difficult goals.  His commitment to both soccer
and to UCLA was very deep and longstanding.  He loved that
life.

And I think it's important to ask the question,
what went wrong?  What went wrong for Jorge was, in the
spring of 2016, early that spring, he made a bad financial
decision.  He bought a house he couldn't afford.  It was not
an extravagant house.  It was 2,900 square feet.  It was
built in the 1940s.  It was a decent house in a very
expensive housing market.  At that time, I think he paid 1.6
or 1.8.  It was not worth the 2½ million that it later became
worth.

He was trying to provide a better standard of
living for his wife and four children.  His wife did not
work.  She stayed home and took care of the kids and
homeschooled them.  And for years before they bought that
home, they had been living in rental properties.

He at the time believed there would be legitimate
business opportunities that would provide him the additional

1    income he would need to pay the mortgage based on some

2    business opportunities he thought he would have with a

3    colleague with whom he had worked previously, but that did

4    not materialize.

5            So almost immediately, he was underwater.  He had

6    only his income, and the Government is correct.  He was

7    making over $100,000 on a coach's salary, but it was not

8    enough for him to pay the mortgage and to pay his family's

9    living expenses.

10           So when Mr. Khosroshahin approached him in May of

11   2016, it was -- he did not need a lot of convincing.  It was

12   money that suddenly appeared in front of him that would help

13   him get out of the problem.  And he knew it was wrong.  He

14   did it to help his family.  He did it for his four children

15   and his wife.

16           The Government says he did it for self-interest.

17   He did it to enrich himself.  I don't think that's fair.  He

18   was not living high on the hog.  He didn't use this money to

19   buy a vacation property on Cape Cod.  He wasn't making lavish

20   expenditures.  What he was doing was putting a roof over his

21   kids' heads and taking care of the expenses of family life.

22   There was nothing extravagant about this family.

23           And I think it's worth noting -- I mean, the

24   prosecution points out you can't blame UCLA for this.  Well,

25   in fact, for years, as was briefed earlier by Mr. Frongillo

1    and myself in connection with the 17(c) subpoenas, for years,

2    the coaches had been expected to raise money at UCLA.  And

3    that was something that was -- in particular, the prospective

4    student athletes that were at the bottom of the roster were

5    sometimes used to do as well as to increase the athletic

6    performance of the team, something that the NCAA required for

7    the team, to meet certain academic standards.  And to do

8    that, sometimes those bottom-of-the-roster spots were used

9    both for academics and for financial purposes.

10              THE COURT:  So --

11              MS. WINKLER:  What he did -- yes, Your Honor?

12   Sorry.

13              THE COURT:  But that was -- I think there's

14   something that gets blurred here when we talk about the

15   universities' roles in these cases.  And I think I don't -- I

16   don't think that it's helpful to think about the universities

17   as being in all cases caught unaware of the notion that

18   programming at their places was -- that admissions might have

19   been linked to how to fund those programs.  I would find that

20   surprising and that study that you -- or that report that you

21   showed sort of raised those questions.

22              And I think that's a legitimate criticism, and

23   maybe it's a criticism that as an overall society, as we talk

24   about what's -- what does it mean when we say that

25   universities are purely places of merit and that anyone who

1    gets in must be this -- the top and this, this, and this,

2    when, in fact, people get in lots of different ways.

3              And, you know, someone might get a particular edge

4    because they live in a strange, remote part of the country,

5    and somebody get a particular edge because of their

6    background, and someone might get a particular edge because

7    they're able to fund a building.  And we don't talk about the

8    being able to fund a building; but it may be true that a

9    university might choose to use that because you need to do

10   that sometimes.

11             Or maybe the person is going to fund four more

12   scholarship positions.  Who knows?  Whatever it is, there may

13   be lots of different reasons, and we should probably have a

14   frank conversation as a society that this isn't pure merit

15   and the fact that somebody goes to an elite school doesn't

16   mean that they are very necessarily smarter and brighter and

17   better than the person who didn't get to go to that very

18   elite university.  All legitimate conversation.

19             But that's a different conversation than what we

20   have here, because regardless of whether UCLA might have

21   either looked the other way or accepted that sometimes

22   fundraising and admissions may have some connection, maybe

23   they do that, that has nothing to do with here where the

24   money was going to Mr. Salcedo's pocket.

25             MS. WINKLER:  Correct, Your Honor.  That is

1   correct.  That's where he went wrong.  He diverted the money

2   into his pocket.

3           The reason I bring up the point is not to say what

4   he did was okay.  It was not.  But the distance between what

5   he did and what he had known at the school is not so far

6   as -- when I think of fraud cases, at least fraud cases that

7   I was familiar with, you would have people who came up with

8   these -- well, you know, you could have a plan to rob a bunch

9   of banks.  That's not what Mr. Salcedo did.

10          He saw an avenue, and it doesn't make it any

11  better, but it was not such a huge deviation from what he had

12  seen the school do to do for himself, that it's just not as

13  far as a move.

14          THE COURT:  Well, I mean, I guess what I would say

15  is, if he was right about the school using positions to help

16  fund their sports department, if that is true, the problem is

17  lack of candor about it.  But it's their positions.  So the

18  problem is that they might be saying one thing and doing

19  something else, and you say, "Well, okay.  So why aren't they

20  being straightforward about what's happening, if that were

21  the case?"

22          But this is different.  This is saying, "I see how

23  easily it can be used, and I'm going to do it to my benefit

24  instead of the benefit of the program or to the benefit of

25  some other things that are being funded in this manner."

1           MS. WINKLER:  Yes, Your Honor.  That's true, and

2     that's where Mr. Salcedo got off track with what he did when

3     he accepted the money after Mr. Khosroshahin offered him this

4     easy way to get the money that he at that point desperately

5     needed to cover his expenses.

6           To continue, once the indictment came down and the

7     arrest happened, Mr. Salcedo's life changed utterly.  I think

8     it's fair to say life as he knew it was gone.  He was --

9     could no longer be a head soccer coach or any competitive

10    soccer coach.  He was humiliated in that world and, you know,

11    appropriately so given what he had done.  But it's no

12    exaggeration to say soccer had been his life, and that was

13    gone.

14          And it also, for him at least and his family,

15    soccer meant UCLA.  And both he and his wife had gone to

16    UCLA.  They both were heavily involved in the soccer

17    community and in the UCLA community.  So they were losing

18    their community, their friends.  Essentially, their support

19    structure was gone as well.  And when it was exposed, it --

20    you know, Jorge has lost a significant amount.  His deep

21    connection to UCLA is broken.  His ability to work in the

22    soccer world is gone.

23          So that caused a significant degree of

24    self-reflection, and I think it's important to notice the

25    changes that Jorge made following that March 2019 series of

1    events.  The first one was he sold that house.  He got rid of
2    the financial albatross around his neck, and that was not an
3    easy choice.  It sounds like it might be, but it wasn't.
4              It's where his kids and his wife lived and they had
5    to go to northern California and rent.  And they were in a
6    situation where they moved away from their friends, their
7    teams, their church.  And as a result of that, he faced
8    significant sadness and anger and disappointment from his
9    family based on choices he alone had made.
10             And, you know, he had to come clean about those
11   choices, and they had to sell the house.  That's what allowed
12   him to put the 200,000 in escrow for the Government and to
13   start paying back taxes and some of the other things he
14   needed to do.
15             He -- when they got to northern California, which
16   is where they moved to after events of the arrest and the
17   indictment, he engaged regularly with a life coach, Don Nava,
18   and also a pastor, Ramin Razavi, and took a hard look at his
19   life and his choices and his decisions and how he was making
20   them.
21             And both of -- both of those men wrote on his
22   behalf, and you can see from that how he changed his focus to
23   focus on his family, his marriage, what he could do that was
24   productive and positive.  And both of those people who work
25   closely with him thought he was making real changes in terms

1   of his willingness both to accept responsibility for what he
2   did and also to make good choices going forward.
3          Together, he and his family made the hard choice to
4   live within their means, which is something that's very
5   important.  But as a family, they had to make sacrifices.
6   They went back to renting a more modest home.  They cut their
7   expenses.  His wife Rebecca got a teaching position, and the
8   teaching position she got was back in southern California, so
9   they moved back to southern California for her to be able to
10  work as a teacher.
11         And by doing that, as a family, they got to the
12  point where their expenses were within their means.  They
13  could -- they can now live within their means, and that was
14  something that affected the whole family, but the whole
15  family along with Mr. Salcedo made the decision to do.
16         A year ago, he decided to accept responsibility for
17  his crimes here and tried to get on with his life to focus it
18  in a positive direction.  And as part of all that, he had to
19  reinvent himself, figure out what he could do for a job or a
20  career because all he had ever known, the soccer life, was
21  gone.  And he did that.  He took a hard look at the skills he
22  had.
23         He ultimately found a position with MedeSol, which
24  we described in the sentencing memorandum, the start-up
25  company that is hoping to market a very promising product

1    that will assist with protection from viruses including

2    COVID-19 and potentially worldwide.

3            The work could make a positive difference in the

4    world, and it attracted Jorge because it could.  It's

5    something he's proud of.  It's something his family supports

6    and is proud of him for doing, and he keeps them involved in

7    the fact that he is doing the work so that it's -- it has

8    become a -- very much a family thing for his family.

9            And I'm sure you saw the letter from Jeff Williams,

10   which -- the person who made the product, who was

11   particularly taken with Jorge and his transparency about both

12   his wrongdoing and his willingness and what he could

13   contribute to the team going forward.

14           So I think, in terms of a sentence that is

15   sufficient but not greater than necessary to accomplish the

16   goals of sentencing, you know, he certainly has been punished

17   a lot already.  I think it's fair to say that incarcerative

18   sentences today are harsher than they've ever been because of

19   the quarantining and the, essentially, solitary confinement

20   required to do that in order to be in prison and the lack of

21   other opportunities while people are in prison.

22           For general deterrence, while I know it's been said

23   that it's important that people are incarcerated at least for

24   some amount of time as a deterrent factor, I'm not sure the

25   amount of time ultimately is going to have significant effect

1    on that.  And there's been significant press on this case.

2    If there's any coach in any university system that missed it,

3    I would be surprised.

4         Jorge has done the work to reinvent himself in

5    trying to move on in his life, in his marriage, and with his

6    family.  So in terms of specific deterrence, I -- he isn't

7    going to ever do this again and hopefully nothing like it

8    ever.  He has made that commitment.

9         And so I do think that the important -- where this

10   comes down to, I think relative culpability is a very -- is

11   the hard issue in this case.  And in terms of the people in

12   this indictment, I think Ms. Kearney has it -- I don't think

13   I would disagree with the order she puts people in.  I would

14   note that at least according to the indictment, I think it's

15   Mr. Vavic that took more, 250,000, but some of it may have

16   been directed to the university.  At any rate, somewhere in

17   the center of that group would be where he falls.

18        In connection with the -- and, certainly,

19   Coach Meredith -- I don't think it's fair to say costs more

20   to get into the schools whether it's Yale or Stanford as

21   opposed to UCLA or USC.  It's what the market would bear.

22   It's what Coach Meredith could get for his services.  Maybe

23   it is.  Maybe the buildings cost more there too, although I

24   wouldn't think so.

25        THE COURT:  I think the point she was making is

1    that parents were willing to pay more for certain schools

2    than others.  But I would take your point that the price that

3    a parent would be willing to pay for a different school is

4    not the measure we would use here.  So whether the person is

5    willing to pay 80,000 or a 100,000 because of which school it

6    is, I don't think that's our determining factor.  But I do

7    think we're talking about large sums of money and multiple

8    locations, and I think that might be the better focus.

9              MS. WINKLER:  And, certainly, you know, we're not

10    disputing the facts on the three applicants.  They are what

11    they are, including Applicant 2, which failed.  He didn't get

12    paid.  That person went to another school.

13              With regard to -- what I would -- I think the

14    important points that I would like to make, I think the

15    parents are relative comparators.  I know the Government

16    slides away from them and for good reason.

17              THE COURT:  Well, let's assume I'm using the

18    parents who were involved in Mr. Salcedo's crime.  We've got

19    five months for Ms. Sui --

20              MS. WINKLER:  Yes.

21              THE COURT:  -- the Isacksons are the other.  They

22    haven't been sentenced yet.

23              MS. WINKLER:  Correct.  And Mr. Dameris, the

24    attempt that didn't happen, was time served of one day.

25              THE COURT:  Okay.  So let's assume that Mr. Dameris

1    doesn't add in, but let's assume that there's a good chance

2    that the Isacksons would get a similar or a greater sentence

3    than Ms. Sui, where I think there was more money involved --

4    I'm not positive -- but even if it's the same, why wouldn't

5    the measure be, well, those were one each, and Mr. Salcedo

6    did both of them?

7            MS. WINKLER:  Um --

8            THE COURT:  I mean, certainly --

9            MS. WINKLER:  Your Honor, with Ms. Sui, I think we

10   ought to talk about her specifically just for a moment.

11           THE COURT:  Okay.

12           MS. WINKLER:  She was in the Spanish prison for

13   five months, but five months was not what the judge looked at

14   and decided she needed.  It was -- in the -- I mean, it this

15   way --

16           THE COURT:  It was a (C) plea.  I'm not sure how

17   much he looked at it.

18           MS. WINKLER:  Yes, but it was a (C) plea because

19   she was sitting in jail in Spain.  It took that long.  It

20   took the five months to work through extradition and the

21   immigration issues, so that it was not -- it's not the same

22   kind of thoughtful consideration to her culpability relative

23   to the other parents.  I mean, she got five months, where

24   parents who spent -- well, I think she was at $400,000 that

25   she paid.

1          THE COURT:  It was -- it was right in the same

2    range.  I mean, ironically, I know that there's a lot of

3    suggestions that there was different sentencing by different

4    judges.  But I think, actually, everyone has been sentencing

5    fairly consistently here.  And she got five months, which is

6    similar to some of the parents that I sentenced.

7          So why -- why would I go less than that?  And maybe

8    I should be going higher than that.  Why would I go less than

9    that?  Why would I go less than Mr. Center's?

10          MS. WINKLER:  Your Honor, those -- those

11    comparisons -- and Mr. Center is a close comparison in the

12    sense that he did the same crime and he did not do it as many

13    times.

14          The reason I keep going back to the parents is that

15    some of these parents did it multiple times for much, much

16    more money.  And, for example, and these are the ones --

17    Judge Gorton's sentences have been a bit higher than yours,

18    not -- not hugely higher, but a little bit.  And, for

19    example, Douglas Hodge did it for two of his children, tried

20    to do it for a third.  And he was looking at nine months

21    incarceration, or he was sentenced to nine months

22    incarceration.

23          There was -- just generally speaking, there -- and

24    I think -- I'm sorry.  I want to go back to the important

25    point on this.  These parents could have been charged with

1    federal programs bribery just like the coaches were.

2           THE COURT:  I agree with you on that, and I agree

3    with you that the -- that there's been an element of -- that

4    just makes no sense here in trying to look at this whole

5    scheme to have, you know -- we're on a fourth superseding

6    indictment that somebody doesn't plead guilty and then all of

7    a sudden, the next go-round of more indictments or I issue a

8    ruling that doesn't look so good in the way -- the reasoning,

9    thinking, and we get more indictments.

10          I don't have any disagreement with you that it's

11   hard to figure out who is who and what the relative

12   culpability is from looking at the name of the offense.  So

13   I'm all with you about pushing that aside.

14          But that wasn't what the prosecutor was arguing

15   here.  The prosecutor was not saying this was federal bribery

16   or this was wire fraud.  We're just looking at what happened

17   here because this is -- at the end of the day, the things

18   that happened here, you can -- you can define without having

19   to talk about the statute, right?  We can talk about it.

20   There are bribes.  There's buying your way into things.

21   There's -- you know, there's culpability in different ways,

22   and that's maybe more useful to talk about.

23          MS. WINKLER:  In my mind, he is in this case most

24   like Mr. Fox, who although he personally profited by 245,000,

25   according to the Government, there were multiple recruitments

1    involved.  He was involved in both the testing and the

2    recruitment side and involved in multiple tests.  And he

3    recruited Coach Center.  Now, I know he had certain health

4    issues, and he was sentenced to three months.

5              THE COURT:  And three months' home confinement, I

6    believe.

7              MS. WINKLER:  And three months' home confinement.

8    That's right, yes.  And I believe he was also -- in

9    fairness -- a cooperator, or the Government characterized him

10   as a cooperator.  So there are some differences there.

11             And Coach Center -- Coach Center -- you know,

12   his -- the facts are -- it is not a good comparator for

13   Mr. Salcedo, just to be direct about it.  I mean, he did take

14   only $60,000 in his pocket.

15             But it was also in a -- you know, that sentence,

16   frankly, is an outlier to the other sentences for people who

17   did more, at least in my mind.  The six months is longer when

18   you look at the kinds of sentences the parents got.  Any

19   parent who was down at the -- at that level of $60,000, most

20   all of those parents pled in your session, and most of them

21   got between one month, some of them less than one month.  But

22   they were -- of the ones who paid in -- paid that amount --

23   and I guess I'm not seeing any difference between somebody

24   who pays a bribe and somebody when accepts a bribe.

25             THE COURT:  I will -- I'll give you one difference,

1   and it's something that I think distinguishes the coaches

2   from Mr. Fox, which is the position of trust, right?  That

3   there was -- I mean, that's -- at -- you know, at heart, when

4   we're talking about what is it that everyone would find

5   offense, what's offensive about what the parents did is they

6   were trying to buy a place for their children.  That's

7   offensive.  What's offensive about what Mr. Fox did is he was

8   facilitating that.

9          What's offensive about what the coaches did is that

10  they had a position of trust to get the best people for their

11  team onto the team.  And maybe -- maybe the best person for

12  the team that -- was going to be somebody who was going to

13  help fund the team.  Perhaps one could make that argument,

14  but it certainly was to use that position for personal gain.

15  That's a difference.

16         Now, you can say that when you weigh those things,

17  they're different things, and buying a spot is as bad as

18  violating trust.  But it is a different -- there is something

19  different than simply saying the one's buying versus, you

20  know, receiving or giving the money.  They're different

21  things.

22         MS. WINKLER:  Your Honor, if I could say two things

23  briefly to that.  I think that brings us back to a perception

24  of what were the coaches being asked to do; and to the extent

25  it was to bring on some academics or some funding, that

1    was -- that's part of why this big picture matters as to what

2    the schools were asking the coaches to do.  It doesn't excuse

3    putting the money in your own pocket.  And I'm not suggesting

4    it does.  But it does -- that's one piece of it.

5         The other part of it -- and while the position of

6    trust with the university is something that I know has

7    motivated some of the animus behind this, it's hard to say

8    that that is in any way worse.  I don't think it's worse, at

9    least, than a parent buying their kids a higher score so that

10   they can then beat out a child who has worked hard on their

11   own to get into whichever university at whichever level.

12        THE COURT:  What's the difference between -- I

13   mean, somebody is not getting that spot at UCLA if this

14   student is getting that spot.

15        MS. WINKLER:  Well, it's because of what the spot

16   is.  There is a difference between the bottom of the roster

17   on a sports team, which is used for different purposes,

18   multiple purposes, and a student -- in other words, you don't

19   get your top hundred kids in the university in the bottom of

20   a sports team.  That's not what those spots were used for.

21   Whereas if you go outside of that and a child is -- gets

22   higher on the ladder than another child --

23        THE COURT:  You know what?  You're buying into this

24   notion that these admissions spots, that they go down at the

25   universities and they count, look, we've got 1,600 spots.

1    Let's give them to the top.  Let's put everybody in order,

2    and we're going to give them to the top 1,600.  I don't think

3    you'll find an admissions officer who will tell you that

4    admissions work that way.

5            I think you might find it slightly differently, to

6    say that, you know, some percentage of these applications

7    that we got -- maybe it's a third, maybe a quarter, who

8    knows -- but there's a very sizable percentage of people who

9    could do fine at our school.  We're going to take that one,

10   and now we're going to decide how out of that group we're

11   going to let people in.  And it's not in order of who is the

12   best this or who is the best that.  There's all kinds of

13   different factors that go in.  And some of it is random and

14   some of it's in line.

15           But the point is that there's different factors

16   that go in, and Mr. Salcedo used one of the factors that goes

17   in, which is a recommendation from the athletic department,

18   to get one particular person in rather than an another.

19           Now, maybe that person would have gotten in anyway.

20   You know, maybe someone -- we've had -- at least one of the

21   parents who was convicted here, their child has since gone in

22   to the same school where -- or equally good school or better

23   school.  I mean, it isn't necessarily -- Mr. Singer was

24   selling to these parents that their children were no good

25   after a year of tutoring, right?  He came and told them that

1    even though they thought they could get in, now they can't

2    get in anywhere.  That was part of his sales pitch.

3           So I don't know as I sit here that these students

4    couldn't get in or they could get in.  What I do know is that

5    the spots were being bought and sold or the extra finger on

6    the thing, which maybe got you a spot and maybe didn't.  But

7    I can't say with any of these, well, but the person would

8    have gotten in anyway or the person wouldn't have gotten in

9    anyway.  That's not really the question in front of me.

10           MS. WINKLER:  And I didn't mean to suggest that it

11   is, Your Honor.  I was just -- the comparison between the

12   testing and the recruitment, yes, in the recruitment

13   situation, there is a finger on the scale if the coach

14   recommends that student over another student.  Certainly, it

15   does.

16           But I think it's also true -- and even though every

17   university may have 20 factors they look at in deciding

18   whether to take an applicant, one of them is test scores.

19   And it's why the parents were paying the big money to get

20   their kids higher scores.  It's why they were willing to

21   cheat to do it.

22           They were trying to advantage their children to

23   help their children get into better schools.  That doesn't

24   seem like a stretch to me.  It's more of a question of, all

25   right, if you're going to try to push your kid up that way

1   versus push your kid in this way.  There's -- both of them
2   are designed to do the same thing, to get kids into a school
3   that -- well, would they have gotten in otherwise?  I don't
4   know.  But that was the goal, was for the -- and maybe just
5   for the peace of mind of the parent to know the kid would get
6   in or did get in.
7          That's -- I don't really have any further
8   distinction I can draw on that point, Your Honor.  I do think
9   the parents and the sentences they got are -- should be taken
10  into account because much of the conduct in which they
11  engaged was equally -- you know, they did it because they
12  loved their kids, the Government says.  I'm sure that's true.
13  And Mr. Salcedo did what he did because he loved his kids.
14         That doesn't make it okay for any of them, but
15  that's still an important motivating factor.  And the fact
16  that he comes at it without money and needs money in order to
17  do that, while another parent has extra money and can pay
18  their kid's way in, it shouldn't be -- it shouldn't put him
19  in a worse position than the parents who are on the other the
20  side of the arrangement.  I think that's all I'm trying to
21  say.
22         THE COURT:  Ms. Kearney, would you -- although I
23  know you may not agree with the sentences that have been
24  given to the parents, would you agree with Ms. Winkler's
25  suggestion that in terms of culpability, the coaches

 1 shouldn't be held to a higher standard than the parents and

 2 that, you know, if I -- if I look at the guidelines, the plea

 3 ranges, et cetera, that the Government has negotiated and the

 4 guidelines for the parents, and in the Government's view,

 5 would you agree with Ms. Winkler that they are comparable?

 6    MS. KEARNEY:  No, Your Honor.  And back to -- I'll

 7 reference what I said earlier, which is that the coaches have

 8 a duty to their schools, a duty to the team, a duty not to

 9 line their pockets.  They fill out conflict of interests

10 forms.  They have contracts that require them to disclose

11 money that they've received.  They have compliance officers.

12 Here, Mr. Salcedo was lying to the compliance officers.  So

13 there -- those extra duties make the coaches more culpable

14 than the parents.

15    THE COURT:  Okay.  If I don't have anything else

16 from counsel, I'll give Mr. Salcedo an opportunity to speak

17 if he'd like.

18    MS. WINKLER:  Jorge, you're on mute.

19    THE DEFENDANT:  Yes, Your Honor.  I would like to

20 share some words.

21    Your Honor, I made foolish decisions from a place

22 of desperation.  I take complete responsibility for my

23 regrettable actions.  There's no one to blame besides me.

24 The desperation was born from my decision to take on an

25 obligation to purchase a home that was financially way above

1   our means.

2          We had -- we had rented for seven years, and we

3   were excited to purchase our first home, but we soon found

4   ourselves way over our heads.  The financial pressure led to

5   a series of misguided and poor choices.  I was presented with

6   a situation from a colleague I trusted, and I made the

7   decision that will stay with me for the rest of my life.  My

8   desperation blinded my judgment, and I made decisions that

9   were completely wrong.

10         On March 12, 2019, a life that I built from the age

11  of 14, a life that my wife and I built for 19 years, all came

12  to an abrupt end.  Thirty-six days after my arrest, we sold

13  our home and moved from a community that we all dearly loved.

14  The loss and the damage I exposed my family to was almost

15  unbearable.  I nearly lost all the important parts of my life

16  because of my actions.

17         We spent one year in northern California preparing

18  a better way forward as a family, and most importantly, a

19  realistic way.  We made a second move 14 months later and

20  moved back to southern California, where we now live and have

21  begun to take steps we needed to move on with our lives.

22         The road to get to today has been a long process.

23  It has been over one year since I attempted to enter a guilty

24  plea.  My family and I want to close this chapter of our

25  lives.  And part of this process is accepting my

1    responsibility and acknowledging those who I've hurt and/or

2    caused disruption for.

3            I'd like to take this time to apologize to the

4    Government and to the Court for the time and resources

5    they've extended in this case.

6            To UCLA, although my actions may signal otherwise,

7    it is a place that my wife and I truly loved.  UCLA provided

8    some of the most impactful and meaningful experiences of my

9    life.  I received an amazing education there, became a

10   student athlete on the UCLA soccer team, an assistant coach

11   and a head coach for 15 years at UCLA.

12           Working there wasn't a job.  It was an extension of

13   my family.  I cared deeply about everyone that was involved

14   in our program.  Not one day goes by that I don't miss and

15   regret what I did to destroy my life at UCLA, to destroy my

16   family's life at UCLA.  I miss so badly being on the soccer

17   field and spending time with my players.  It was an honor and

18   a joy to coach these elite young men that represented our

19   program.

20           To my parents and my brother who have not wavered

21   in their love and support, I'm sorry that I dragged my family

22   into this.  To all my extended family, they were vital in the

23   first year to our family's healing and recovering.  I thank

24   them for their unyielding love and -- their unyielding and

25   unconditional love.  To all of them, especially my nephew

1   Trey, I'm truly sorry for what I put you through.

2           To my wife, if it wasn't for her strong -- for her

3   being a strong woman of faith, she may not be sitting right

4   here in the room next to me.  I'm very grateful for the grace

5   and mercy she has displayed.  She didn't deserve any of this.

6   I deeply hurt her, and I'm very sorry.

7           To my four children, who are sitting upstairs

8   awaiting the outcome of today, I'm so sorry.  My children

9   know how much I love them, and we've experienced a lot of

10  healing throughout this process.  I did things the wrong way,

11  and they have learned that there are consequences for bad

12  choices.  I am so sorry how this has impacted their lives.

13  And for them, especially, I will live the rest of my life in

14  honesty and in truth.

15          I'd like to thank Tom and Susan for their

16  professionalism, their hard work, their dedication to

17  represent me, to guide me.  It's been a two-year relationship

18  that I consider them friends, and I greatly appreciate all

19  that Tom and Susan have done.

20          In conclusion, Your Honor, I made the worst

21  mistakes of my life.  There's not one day that goes by that I

22  don't feel remorse for my actions.  I've been forgiven by my

23  family, my loved ones; and I hope in time my UCLA colleagues

24  will find it in their hearts to forgive as well.

25          In the two years since my arrest, I've tried to

1    turn my life around through very trying circumstances.  I

2    have a job that will make a significant impact around the

3    world and improve the quality of life for many people.  I'm a

4    different man, Your Honor, than I was two years ago.  And I

5    will never make decisions like this again.

6             I thank you, Your Honor, for this opportunity to

7    address the Court.

8             THE COURT:  Thank you.

9             Ms. Marchione, I saw a message flash up that I

10   think you wanted my attention on, but I wasn't able to get

11   it.  So --

12            THE DEPUTY CLERK:  You still have time to read it,

13   Judge, if you'd like me to send it again or --

14            THE COURT:  I'll just take one second here and do

15   that.

16            THE DEPUTY CLERK:  Thank you, Your Honor.

17            THE COURT:  My courtroom deputy was reminding me,

18   Ms. Kearney, that once I sentence the defendant, that the

19   Government has agreed to dismiss Counts 1, 2, 17, and 20.

20   And I think we need that at some point on the record, but we

21   can wait till I've concluded with the sentencing.

22            In sentencing, I'm required to consider the factors

23   at 18 U.S.C. Section 3553(a) to determine what a reasonable

24   sentence is, and I have done so here.

25            The way I think about the factors and my job on

sentencing is that there are various things about the nature
and circumstances of the events, of the offense, and the
defendant's personal and criminal history that I'm required
to consider.  And then I have to think about those looking at
the policies and purposes of sentencing.  And so that's what
I've tried to do here.

Starting with the nature and circumstance of the
offense, the salient -- the salient parts of this in trying
to determine what the right sentence is here was that this
did involve bribery.  It involved a personal gain.  I
understand and I am sympathetic that Mr. Salcedo was feeling
the threat of mortgage payments that he was having difficulty
meeting.  You know, again, that's a conversation for another
day about how we have mortgages that people are told you can
do on your salary, and it turns out that that's just not at
all realistic.

So I don't minimize at all the stress he was
feeling about the financial situation, but the choices
ultimately were simply to take the easy path, what appeared
to be the easy path, to resolve that financial issue and to
keep on going it.  I think the problem about talking about
the mortgage as a reason for the problem is it sort of
invites the logic that if this hadn't been stopped, it would
have continued.  I think maybe Mr. Salcedo would agree that
while this was the most devastating thing in his life, in

1   some ways, it was probably better that the plug was pulled
2   now rather than further down the line.

3           But at any rate, it was an offense of bribery and
4   for financial gain.  It was not an offense that was directed
5   with some mixed intentions regarding the -- helping the
6   program itself.

7           At the same time, I don't minimize Mr. Salcedo's
8   real commitment to his team and to the school and to the
9   students he worked with, and I take at face value -- I -- it
10  seems compelling to me that defendant -- that Mr. Salcedo
11  didn't see it as injuring anybody and was not trying to harm
12  people.  He just didn't realize that he may well have been
13  doing that.

14          And I take very seriously what you have lost.
15  Ms. Winkler didn't mention it here but mentioned it in the
16  brief that your connections with UCLA go all the way back to
17  when, as a child, you were a ball boy on the team.  So I
18  understand that you've lost something very, very significant
19  and that this is -- that prior to this opportunity presenting
20  itself to you, you were a person driven to excellence in your
21  sport and for your players and for your team.

22          But taking all of those things into account -- and
23  I have to consider about the -- what the purposes of
24  sentencing needs to do.  And I do need to reflect the
25  seriousness, promote respect for the law, provide a just

1    punishment, afford adequate deterrence to criminal conduct.
2    I would agree with Ms. Winkler that I don't anticipate that
3    you're going to need further deterrence, but I think there is
4    still a message of general deterrence of what is the impact
5    of this -- of this offense.
6          And then, finally, I do have to try and -- in this
7    morass of cases -- try and look at how the kinds of sentences
8    and -- that have been imposed on other defendants and to
9    avoid unwarranted sentencing disparities among similarly
10    situated defendants.
11          So taking all of those things into account, I
12    have -- I have considered that I don't -- I don't see how I
13    can find Mr. Salcedo less culpable than Mr. Center, and I
14    also understand that at least one of the parents has a
15    five-month sentence as well.  And so I'm sort of looking at
16    those as bottom measures, but viewing that this is worse than
17    those.  And with regard to the parent, that was one parent.
18    We're dealing with more than two or an attempted third
19    transaction.
20          So all of that gets me to the point where I believe
21    the appropriate sentence here would be somewhat longer than
22    Ms. Sui and Mr. Center's, and I'm imposing -- anticipating
23    imposing an eight-month term of incarceration.  I'm prepared
24    to delay your reporting date in light of COVID-19 to avoid
25    the -- at least until you've had an opportunity to be

1    vaccinated if you haven't already and it feels appropriate to
2    go there.  I don't give you an open check on that, but I will
3    entertain a reasonable request in that regard.
4          I'm actually a little bit -- I am anticipating
5    imposing a year of supervised release because the -- that's
6    sort of the bottom of the guidelines, and no one has asked
7    otherwise.  I do recognize that it has been a year since you
8    have attempted to plead guilty.  And I guess I would leave it
9    this way, which is that I will impose a year of supervised
10   release, but I will entertain a post judgment -- a post
11   sentence motion to end supervised release early.
12         I'm not imposing the fine requested by the
13   Government, and the reason I'm not imposing that fine is I do
14   think that the go-rounds on the charging decision have made
15   this litigation and prosecution difficult.  I think that it
16   was easy to understand -- I think it was easy for everyone to
17   understand that what you were charged with was wrong.  It was
18   hard for me to put those facts into a racketeering
19   conspiracy.  That seemed to be a crime that didn't cover the
20   activities, in my view, that you were -- the specific facts
21   that you were engaged in doing.
22         And that ended up in a lot of delay, and we ended
23   up a year later with a conviction that you then have.  And I
24   understand that that also meant and is -- translates into
25   legal fees and time.  And so in light of those charging

1    choices, I am not imposing a fine.  I am imposing the

2    $200,000 restitution that's part of your plea agreement and

3    the $100 special assessment.

4              So before I impose that, any objections?

5              MS. KEARNEY:  Your Honor, just to clarify, I think

6    you said $200,000 in restitution, and it should be $200,000

7    in forfeiture.

8              THE COURT:  Thank you.  $200,000 forfeiture and no

9    restitution.  There's been no request for restitution at this

10   point.

11             Any objection before I formally impose sentencing?

12             MS. KEARNEY:  No, Your Honor.

13             MS. WINKLER:  No, Your Honor.

14             THE COURT:  Mr. Salcedo, pursuant to the Sentencing

15   Reform Act of 1984 and having considered the sentencing

16   factors enumerated at 18 U.S.C. Section 3553(a), it is the

17   judgment of the Court that the defendant, Jorge Salcedo, is

18   hereby committed to the custody of the Bureau of Prisons to

19   be imprisoned for a term of eight months.

20             Upon release from imprisonment, defendant shall be

21   placed on supervised release for a term of one year.  Within

22   72 hours of release from custody, the defendant shall report

23   in person to the district to which he is released.

24             I am not imposing a fine for the reasons previously

25   stated.  It is -- I am signing the order of forfeiture for

1    $200,000.  And I'm imposing a special assessment of $100.

2              While under the probation office's supervision, you

3    must comply with the mandatory conditions.  You must not

4    commit another federal, state, or local crime.  You must not

5    unlawfully possess a controlled substance.  You must refrain

6    from any unlawful use of a controlled substance.  You must

7    submit to one drug test within 15 days of release from

8    imprisonment and at least two periodic drug tests thereafter,

9    not to exceed 104 tests per year.

10             You must cooperate in the collection of DNA as

11   required by the probation officer.  You shall not possess a

12   firearm, ammunition, destructive device, or any other

13   dangerous weapon.  You shall comply with the standard

14   conditions that have been adopted by the court, which are

15   described at sentencing guidelines Section 5D1.3(c) and which

16   will be set forth in detail on the judgment.  And that's it.

17             The sentence is imposed for all the reasons

18   previously stated and because the Court believes the sentence

19   in all of its components is reasonable and sufficient but not

20   greater than necessary to accomplish the goals of sentencing

21   consistent with 18 U.S.C. Section 3553 and the Supreme

22   Court's guidance.

23             Mr. Salcedo, the plea agreement you've entered into

24   with the Government limits your rights of appeal, but you may

25   still appeal, as all defendants may, on the grounds of

1    ineffective assistance of counsel or prosecutorial

2    misconduct.  If you are unable to appeal costs -- to pay

3    appeal costs, you may ask for permission to appeal in forma

4    pauperis.  Sentence is imposed as stated.

5              Now, Ms. Kearney, your motion.

6              MS. KEARNEY:  Yes, Your Honor.  At this time, the

7    Government moves to dismiss Counts 1, 2, 17, and 20 of the

8    superseding indictment.

9              THE COURT:  And those counts are now dismissed.

10             MS. WINKLER:  Your Honor?

11             THE COURT:  Yes.

12             MS. WINKLER:  Since the original indictment still

13   remains on the docket, could we also ask that it be

14   dismissed?  It's the same count, the RICO count, in

15   connection with Mr. Salcedo.

16             THE COURT:  Thank you.

17             MS. KEARNEY:  Yes, Your Honor.  To the extent

18   Count 1 of the original indictment is not moot, the

19   Government moves to dismiss it.

20             THE COURT:  Yes.

21             MS. WINKLER:  And --

22             THE COURT:  The case law is a little odd in that

23   respect, but we'll do it separately.  Count 1 is also

24   dismissed of the original indictment.

25             MS. WINKLER:  And if we could ask Your Honor for a

```
 1    recommendation to the Bureau of Prisons that Mr. Salcedo be
 2    incarcerated near his home in Los Angeles and in particular,
 3    FCI Lompoc.  And I can do it in the form of a motion if
 4    that's better.
 5              THE COURT:  No, I put it on the judgment.  But I
 6    can tell you that the Bureau of Prisons would prefer my
 7    making a recommendation without a specific reference to a
 8    facility.  The reason -- they want to start in with
 9    determining the appropriate security level and then determine
10    it.  So I will make a recommendation for a facility at his
11    appropriate security level close to his home.  His home is
12    Dana Point, however, not Los Angeles.  Correct?
13              MS. WINKLER:  That's right.
14              Isn't it, Mr. Salcedo?
15              THE DEFENDANT:  Yeah, that's correct, Your Honor.
16              THE COURT:  It's a distance that New Englanders
17    don't take into account.
18              THE DEFENDANT:  Understood.
19              THE COURT:  With regard to your report date, it
20    would normally be about six weeks.  I can set a report date
21    now, or you can -- and if you would like to request
22    additional time, you can do that separately, or you can let
23    me know right now what you would like to do.
24              MS. WINKLER:  Your Honor, if you're willing to
25    consider later, if he can't get the vaccine within that six
```

1    weeks, a motion to delay a report date to allow him to do it

2    if he's then eligible, that would be -- we could set it now.

3            THE COURT:  Let's go ahead and set it, and I will

4    entertain any reasonable motion.

5            I'm also willing to -- I know that Mr. Salcedo's

6    wife will be responsible for their children and is -- has an

7    academic year schedule, perhaps.  So if there's something in

8    the timing of that that would be more or less helpful, you

9    may want to start before the school year -- before the summer

10   starts so that -- minimize the time that she has to parent

11   during the academic year -- I'm open to entertaining those

12   options.  You're welcome to make that in a motion.  But for

13   right now, let's get a six-week date.

14           THE DEPUTY CLERK:  Your Honor, this is

15   Ms. Marchione.  I have a six-week date roughly of Monday,

16   May 3rd.

17           THE COURT:  Monday, May 3rd.  And you will be

18   alerted to the facility.  I will put the request in for a

19   recommen- -- for a facility at your security level as close

20   as possible to Dana Point, which I believe will be FCI

21   Lompoc, assuming they have room there.  And I would encourage

22   you to get the vaccination before you -- your report date at

23   this point.  Although, vaccination of the Bureau of Prisons

24   staff has been prioritized, we aren't at very good numbers

25   yet.  So I would encourage that to happen first.

1          Anything that we need to do today?

2          MS. WINKLER:  Your Honor, I don't know whether you

3    prefer to have this by motion, but there is a $25,000 bond

4    that the Salcedos paid back in July that we would like to

5    move to have returned to them.  And I can do it by motion if

6    that's easier.

7          THE COURT:  It would be easier because that bond is

8    paperwork that goes through the clerks office ultimately, so

9    having this on paper makes it a lot easier.

10          MS. WINKLER:  All right.  Will do.  Thank you.

11          THE COURT:  Thank you.

12          Mr. Salcedo, I wish you success moving forward.  I

13    acknowledge the efforts that you have put in so far, and I

14    trust that this is -- you are going to be able to move

15    forward once you get past this time.

16          THE DEFENDANT:  Your Honor, I'm sure this isn't

17    commonplace, but I just wanted you to know that I appreciate

18    the way you critically think through things and it's much

19    appreciated.

20          THE COURT:  Even if it caused you a one-year delay,

21    but . . .

22          Okay.  Thank you.  We are in recess.

23          (Court in recess at 4:13 p.m.)

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 2nd day of April, 2021.

/s/ Robert W. Paschal

_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter